**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**

| | | |
|---|---|---|
| **JOSH JAMES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.: 5:09-cv-00177-TBR** |
| **v.** | ) | |
| | ) | **JURY DEMAND** |
| **JAMES MARINE, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF JOSH JAMES'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Plaintiff, Josh James, through his undersigned counsel, and files this Memorandum In Support of His Motion For Summary Judgment. The Court should grant Mr. James summary judgment because Defendant violated the Americans with Disabilities Act by moving Mr. James to an inferior position based on its belief that an individual who had suffered a seizure should not work around water. Defendant demoted Mr. James even though his treating physician had released him to work, specifically including work around water.

The Court should also grant summary judgment on Mr. James's Family and Medical Leave Act claim. Defendant placed Mr. James on FMLA leave only because he sought treatment for back pain. Defendant, however, refused to restore Mr. James to his job after he produced releases from the doctors who treated his back condition. Defendant did so because its company doctor, who never treated Mr. James, disagreed with the unrelated earlier decision of the doctor who treated him for his seizure to release him to work. Defendant's failure to restore Mr. James to work based on a previous seizure unrelated to his FMLA leave violated the FMLA. As such, the Court should grant summary judgment for Mr. James.

## STATEMENT OF FACTS

**MR. JAMES WORKED FOR DEFENDANT UNTIL IT REFUSED TO LET HIM RETURN FROM MEDICAL LEAVE IT FORCED HIM TO TAKE FOR BACK PAIN**

**A. Mr. James Worked As a Welder And Crane Operator Until Defendants Rejected a Post-Illness Medical Release**

Defendant hired Mr. James as a welder trainee on August 4, 2004. *See* (James Dep. at 10:25 – 11:3, 23:20-23).[1] As he advanced during his employment, Mr. James performed a variety of duties, including welding, fitting, operating a cherry picker, operating a crane, using a welding torch, operating a Bobcat, and docking and tieing off flats and barges. *See* (Dft's Resp. to Pltf's 1st Ints. at 6 ¶ 12).[2] Most of these duties required working on or around water. *See* (James Decl. at ¶¶ 2-4). These varied duties changed, however, after Mr. James suffered a medical condition.

Mr. James suffered a seizure as he finished a work shift at Defendant's Walker Boat Yard facility on January 31, 2008. *See* (Dft's Resp. to Pltf's 1st Ints. at 8 ¶ 17; Compl. ¶ 7; Answer ¶ 7; James Dep. at 38:21 – 39:5). When his supervisors requested medical releases before his return, Mr. James saw Dr. Paul Moots in Nashville. *See* (James Dep. at 41:22 – 42:10). Dr. Moots was a neuro-oncologist who was the treating physician for Mr. James's seizure. *See* (James Dep. at 44:13-22, 104:3-5; Barlow Dep. at 25:12-17).[3]

Dr. Moots took Mr. James off work from February 1 through March 12, 2008, when he released Mr. James to return to work without restrictions. He specifically authorized Mr. James to work around water in March 2008. *See* (Compl. ¶ 8; Answer ¶ 8; James Dep. at 42:10-16, 42:23-5, 46:16-21, & Ex. 6 thereto). Dr. Moots knew when he released Mr. James to return to

---

[1] Excerpts of Mr. James's deposition cited herein are attached as Cumulative Ex. A.

[2] Attached as Ex. B.

[3] Excerpts of the deposition of Dr. Ron Barlow cited herein are attached as Cumulative Ex. C.

work that Mr. James's job involved welding, operating a cutting torch, climbing ladders, working around water, and operating cranes. *See* (James Dep. at 49:24 – 50:8).

Defendant's safety director and human resources director were advised that Mr. James's treating physician had released him. *See* (Walker Dep. at 19:21-24, 20:8-11, 21:3-6).[4] Mr. James returned to work on March 13, 2008 following his seizure. *See* (Dft's Resp. to Pltf's 1st Ints. at 9 ¶ 19; James Dep. at 114:13-15).

Yet, although he had been released to return to his regular duties and to work around water, Defendant would not let him do so. Roy Mannon, the superintendent over the entire facility, moved Mr. James to work in the Fab Shop when he returned to work. Mr. Mannon said he was placing Mr. James in the land-based Fab Shop "because you've had a seizure, [and] I don't feel safe with you working on the water." *See* (James Dep. at 54:16 – 55:2, 59:4-6, 62:9-13, 62:18-23, 63:3-7, 175:19 – 176:4, 178:11-21).

Although Mr. James was happy to have a paying job again, the Fab Shop position limited his work opportunities. In the Fab Shop, Mr. James only welded new metal, used a cutting torch, and used a metal press to bend metal. *See* (James Dep. at 54:18 – 55:2). He was not allowed to weld older metal on barges, which was more challenging, or to install newly-fabricated metal onto barges because Defendant would not let him work around water. Also, by restricting him to the Fab Shop, Defendant ended Mr. James's work as a fitter and a crane operator, which had required special training beyond his welder training. *See* (James Decl. at ¶¶ 4-6; James Dep. at 15:3 – 17:12). Still, despite his limited role, Mr. James continued to perform his job well. *See* (Walker Dep. at 61:24-25).

[4] Excerpts of the deposition of Chad Walker cited herein are attached as Cumulative Ex. D.

**B. <u>When Mr. James Suffered a Flare-Up Of a Back Injury, Defendant Refused To Let Him Return To Work Despite Medical Releases</u>**

Mr. James's back began hurting badly while he worked in Defendant's Fab Shop on Thursday, May 15, 2008. *See* (James Dep. at 64:5 – 65:2, 114:16-20; Compl. ¶ 10; Answer ¶ 10). He completed his shift that evening then went to Prime Care on May 16, where he was treated with medication. *See* (James Dep. at 66:1-14, 117:7-17). When his back still hurt on Saturday, May 17, Mr. James went to the emergency room at Western Baptist Hospital. There, he received a steroid injection and a pain shot. *See* (James Dep. at 66:15-18). Finally, because he still had some stiffness in his lower back on Monday, May 19, Mr. James went to Dr. Troy Nelson, who gave him trigger point steroid injections in his back. *See* (James Dep. at 66:19 – 67:3).

The back injury that flared up in May 2008 was not a symptom of any prior condition that required him to need time off work. *See* (Harper Dep. at 51:25 – 53:14 & Ex. 10 thereto).[5] Accordingly, Mr. James did not request any medical leave. *See* (Harper Dep. at 50:18 – 51:8, 51:22-24, & Ex. 9 thereto). Nevertheless, Defendant unilaterally placed Mr. James on FMLA leave as of May 16, 2008.[6] *See* (Compl. ¶ 22; Answer ¶ 22; Harper Dep. Ex. 12); *see also infra* at 12 n.12.

After being absent on Friday and Monday, Mr. James returned to work on Tuesday, May 20, and provided return-to-work notes from both Prime Care and Dr. Nelson. *See* (James Dep. at 67:5-10; Harper Dep. at 62:8-15, 62:24 – 63:4, 63:11-17, 64:8 – 65:8, & Exs. 13-14 thereto).

---

[5] Excerpts of the deposition of Jill Harper cited herein are attached as Cumulative Ex. E.

[6] Defendant did not complete the FMLA designation notice until December 24, 2008, which provides a different date for the beginning of Mr. James's leave than Defendant's termination letter. *Compare* (Harper Dep. Exs. 11 & 12). Defendant never responded to the portion of an interrogatory requesting it to identify each date on which it placed Mr. James on FMLA leave in 2008. *See* (Dft's Resp. to Pltf's 1st Ints. at 9 ¶ 19). May 16, 2008 was the first day Mr. James missed work and obtained treatment for his back pain so he will assume that to be the date on which Defendant considered his leave to have begun.

Still, then-human resources director Chad Walker and safety director Tom Freeman "decided that it would be unwise if he had a back problem and had just been recently treated for a back problem to let him return to work." *See* (Walker Dep. at 22:14-22). Defendant was aware that Mr. James had been released to return to work but it simply "didn't agree with putting him back to work after receiving the medications he received for the type of pain he was having." *See* (Walker Dep. at 23:13 – 24:2, 24:11 – 26:12).

Because he had received treatment and, in their opinion, had "[t]he potential for him hurting himself badly at work," *see* (Walker Dep. at 22:23 – 23:2), Defendant required Mr. James to undergo a physical examination at Occunet before he could return to work. While Defendant regularly employed Occunet to perform medical evaluations on its applicants and employees, *see* (Compl. ¶ 10; Answer ¶ 10), it had never previously required such a return-to-work exam of any other employee.[7] *See* (Dft's Resp. to Pltf's 1st Ints. at 7-8 ¶ 15; Compl. ¶ 10; Answer ¶ 10).

### 1. <u>Defendant Required Mr. James To Undergo a Pre-Employment Examination That Involved His Prior Medical History</u>

Mr. James immediately reported to Occunet, where he was required to undergo a pre-employment physical instead of a return-to-work examination. *See* (James Dep. at 68:8-10, 72:9-20). Defendant sent Mr. James to Occunet for "a return-to-work fit test" but specifically directed the test would be "the same thing" as a pre-employment physical. *See* (Walker Dep. at 62:24 – 63:7; Barlow Dep. at 19:10 – 20:4 & Ex. 3 thereto). This required Mr. James to provide an extensive medical history including his past surgeries and other medical conditions. *See*

[7] Defendant's contention that Mr. James told Defendant he had received treatment for non-work-related back pain is wrong on both counts. Mr. James did not inform Defendant about his minor back treatment because he had been released to work. Defendant, though, knew of his injections before he arrived at work. Mr. James simply confirmed his treatment. Moreover, when confronted about the treatment by Tom Freeman, Mr. James repeatedly corrected Mr. Freeman by indicating that the back pain was a flare up of a previous on-the-job back injury. *See* (James Dep. at 65:3-14, 67:20 – 68:7, 71:6-15, 114:21 – 115:6; James Decl. at ¶¶ 7-8).

(James Dep. at 74:13-20; Walker Dep. at 63:24 – 64:4). Instead of only examining his back to ensure he could work, Defendant wanted an examination of the capabilities of all of Mr. James's bodily systems. *See* (Barlow Dep. at 20:13 – 21:13).

Mr. James had not sought any treatment for seizures on May 16, 17, and 19, 2008. *See* (Harper Dep. at 67:3-10 & Exs. 13-14 thereto). Yet, Occunet discovered from its medical history form that Mr. James had undergone brain surgery[8] and suffered a seizure. *See* (Walker Dep. at 28:16-23 & Ex. 1 thereto; James Dep. at 74:21-23; Barlow Dep. at 21:14-19 & Ex. 2 thereto). Mr. James had not had any seizure issues and had not presented any safety problem after he returned to work in March 2008. *See* (James Dep. at 177:15 – 178:10). None of his work absences after he returned to work in March 2008, including his absences on May 16 and 19, 2008, had anything to do with seizures or related conditions. *See* (James Dep. at 179:1-25). Yet, after reviewing Mr. James's medical history, Occunet refused to approve his return to work and demanded that Mr. James provide his medical records from his treating physicians. *See* (Dft's Resp. to Pltf's 1st Ints. at 6-7 ¶ 13; James Dep. at 74:24 – 75:23; Walker Dep. at 29:12-20 & Ex. 1 thereto; Barlow Dep. at 21:20 – 22:8 & Ex. 2 thereto).

Mr. James complied but still was not allowed to return to work. *See* (James Dep. at 76:14-20). Instead, Occunet refused to release Mr. James to return to work until he could be certified as seizure free for six months. *See* (James Dep. at 76:21 – 77:5; Harper Dep. at 66:15 – 67:2 & Ex. 15 thereto; Barlow Dep. at 22:10 – 23:10 & Exs. 4-5 thereto).

---

[8] In November 2006, Mr. James had been diagnosed with a malignant brain tumor. *See* (James Dep. at 29:10 – 30:5). Mr. James's family doctor immediately removed Mr. James from work and referred him to a specialist who surgically removed the tumor. *See* (James Dep. at 29:6-9, 30:6-15, 103:10-13). After conferring with Defendant's human resources staff, Mr. James took FMLA leave from November 20, 2006 through February 27, 2007. *See* (James Dep. at 31:16-20; Harper Dep. at 50:16 – 51:11 & Ex. 9 thereto). At the end of his leave, Mr. James returned to his normal duties at work and suffered no impact on his ability to work. *See* (James Dep. at 31:25 – 32:5, 33:18-22, 103:18-25; Walker Dep. at 18:6-16).

Occunet's restriction was not based on any new seizure. *See* (Barlow Dep. at 32:5-8). After an initial examination by a nurse practitioner consisting only of a hernia check and touching his back in a few places, Mr. James never saw any physician. Dr. Barlow never examined Mr. James and refused even to speak with him. *See* (James Dep. at 73:25 – 74:8, 77:10-23; Barlow Dep. at 24:2-6). Instead, its refusal to let Mr. James return to work was based solely on the records of his January 2008 seizure. *See* (Barlow Dep. at 23:21 – 24:1, 35:10-18).

Occunet required Mr. James to provide documentation from Dr. Moots, the treating physician for his seizure, stating he had been seizure free for six months and could work around water without any restrictions. *See* (Walker Dep. at 43:8 – 44:7; Barlow Dep. at 24:7-19 & Ex. 5 thereto). Mr. James tried to comply with Occunet's requirement by having Dr. Moots write a letter. *See* (James Dep. at 77:24 – 78:4).

Dr. Moots wrote an August 4, 2008 letter in which he described Mr. James's recent medical history. *See* (James Dep. Ex. 7). Dr. Moots identified a couple of events during the six-month period that he thought might have been partial seizures, resulting in a precautionary increase in Mr. James's medication, though Mr. James believed they were only panic or anxiety attacks unrelated to any seizure disorder. *See* (James Dep. at 78:21 – 79:19, 80:10-22, 83:16-20, 189:11 – 190:4, & Ex. 7 thereto). Still, Dr. Moots stated Mr. James was safe to work. *See* (James Dep. Ex. 7). Dr. Moots said the letter would suffice to show Mr. James had been seizure free for six months. *See* (James Dep. at 80:1-7). Defendant requested and received a copy of the letter, which it acknowledges released Mr. James to return to work full time. *See* (Walker Dep. at 52:24 – 53:7 & Ex. 10 thereto).

Then, on August 30, 2008, Dr. Moots sent another letter regarding Mr. James's condition. *See* (James Dep. Ex. 8). The second letter specified that Mr. James had not suffered any

"generalized seizures and only had two brief events that are suspected to have been minor partial seizures without generalization." *See* (James Dep. at 88:9-14 & Ex. 8 thereto). Mr. James did not ask Dr. Moots to clarify or revise this statement, however, because the doctor went on to make clear that Mr. James was safe to work by writing: "We follow him closely, and as long as he is compliant with his medications and follow-up, I think he is safe to work." Mr. James has always been compliant with his seizure medications. *See* (James Dep. at 180:15 – 181:16 & Ex. 8 thereto). Defendant also saw Dr. Moots' second letter and acknowledges that Dr. Moots again stated Mr. James was safe to work. *See* (Walker Dep. at 57:2-8, 57:19-22, & Ex. 13 thereto).

Soon thereafter, even though Mr. James never suffered any seizure except on January 31, 2008, *see* (James Dep. at 175:14-18), Occunet rejected Dr. Moots' letters as certification that Mr. James had been seizure free for six months. *See* (James Dep. at 92:18 – 93:17). On September 18, 2008, Occunet notified Defendant that Dr. Barlow would not approve Mr. James to return to work. Dr. Barlow believed the possible partial seizures Dr. Moots mentioned in his letters made Mr. James a risk at work. *See* (Walker Dep. at 58:15 – 59:9 & Ex. 14 thereto). Dr. Barlow had requested documentation from Dr. Moots, a neurologist with expertise in evaluating seizures that Dr. Barlow lacked. *See* (Barlow Dep. at 15:14 – 16:8, 24:20-23). Yet, Dr. Barlow refused to certify Mr. James as able to work because he disagreed with Dr. Moots' conclusion that Mr. James could work safely.[9] *See* (Barlow Dep. at 31:25 – 32:4, 40:1-8).

All of Mr. James's doctors had released him to return to work. *See* (James Dep. at 95:24 – 96:3). The only medical restriction that conceivably applied to Mr. James prohibited him from

[9] Although Dr. Barlow testified that he disagreed with Dr. Moots' decision to let Mr. James return to work without proving conclusively that he had been seizure free for six months, Dr. Barlow admitted his six-month limitation was "arbitrary" and lacked any scientific or regulatory support. *See* (Barlow Dep. at 15:14-19, 31:25 – 32:4, 36:2-13, 36:22 – 37:11).

driving for four months after his March 12, 2008 release.[10] *See* (James Dep. at 50:19 – 51:6, 185:6-10, & Ex. 6 thereto). When he worked in the Fab Shop, he did not drive on public roads. *See* (James Dep. at 182:21-24). The only driving he might have done involved driving a truck the length of a dock to retrieve tools. *See* (James Dep. at 182:5-20). This was not unsafe because the path did not have traffic or other individuals who could be injured if Mr. James had had a seizure. *See* (James Dep. at 183:11-24). Additionally, Defendant could have accommodated Mr. James by placing him in the tool room, where he had worked on some prior occasions, *see* (James Dep. at 11:13-22), or by having other employees perform operations that involved driving since Defendant's employees were interchangeable in their functions. *See* (James Dep. at 21:11 – 23:19).

Moreover, on or about July 28, 2008, while he was off work pursuant to Dr. Barlow's prohibition, Mr. James underwent the return-to-work portion of his physical examination at Rehab Associates Physical Therapy. Defendant acknowledges that Rehab Associates determined "that he was capable of performing his job functions." *See* (Dft's Resp. to Pltf's 1st Ints. at 6-7 ¶ 13; Harper Dep. at 99:18 – 100:22; Walker Dep. at 36:22 – 37:9 & Ex. 3 thereto). Nevertheless, Defendant removed Mr. James from his welding duties because "Dr. Ron Barlow of Occunet refused to certify that he was qualified to return to work due to safety concerns for Plaintiff and his co-workers until it could be demonstrated that Plaintiff was seizure free for a period of six months." *See* (Dft's Resp. to Pltf's 1st Ints. at 4 ¶ 7; Barlow Dep. at 22:10 – 23:20, 34:10-18, & Exs. 4-5 thereto).

---

[10] While the driving restriction did not apply to his operation of heavy equipment, *see* (James Dep. at 188:6-12), the driving restriction would have expired in July and Mr. James could have performed any necessary driving if he had been allowed to return to work. In the meantime, he could have worked in the tool room or performed other non-driving jobs as an accommodation but for Defendant's medically unnecessary restriction against allowing him to work around water.

#### a. Defendant Refused To Let Mr. James Return To Work Because Of His Seizure History

Defendant knew by at least June 2, 2008 that Occunet was looking at Mr. James's seizure as part of its decision regarding whether it would certify him as qualified to return to work. *See* (Walker Dep. at 35:15-20 & Ex. 2 thereto). By June 17, 2008, Defendant knew Mr. James had passed a physical examination indicating he could work so far as his back was concerned but that Occunet would not approve him to perform any work for Defendant until he could prove he had been seizure free for six months. *See* (Walker Dep. at 39:4-21, 40:13-21, & Ex. 4 thereto).

Defendant then refused to let Mr. James return to work on the basis of Occunet's restriction. *See* (Harper Dep. at 67:25 – 68:4). Defendant acknowledges it has nothing to indicate Mr. James had a seizure on May 15 or 16, 2008 or at any time other than January 31, 2008. *See* (Harper Dep. at 69:9 – 70:7). It further acknowledges that Dr. Nelson and Prime Care, which treated Mr. James's back injuries, released him to return to work "without any restrictions," while Dr. Moots had released him to return to work with no restrictions except against driving for four months. *See* (Harper Dep. at 70:8 – 71:13 & Exs. 16-17 thereto).

Yet, that did not get Mr. James back to work because, as human resources co-director Jill Harper testified: "He had gone in [to Occunet] for his back, and they had obviously had access to all of his medical information and found out about the seizure disorder that he had been experiencing, and they had been our occupational provider for about ten years and knew of the industry and knew of the dangers and the hazards associated with his work. And they were not comfortable releasing him." *See* (Harper Dep. at 68:4-12).

Thus, Defendant refused to restore Mr. James to work after his back treatments in May 2008 even though he had been fully released to work without restrictions. *See* (James Dep. at 67:5-10; Harper Dep. at 62:8-15, 62:24 – 63:4, 63:11-17, 64:8 – 65:8, & Exs. 13-14 thereto).

Then, Defendant refused to let Mr. James return to work even after he passed a physical examination at Occunet and a return-to-work examination at Rehab Associates for his back. *See* (Dft's Resp. to Pltf's 1st Ints. at 6-7 ¶ 13; Harper Dep. at 99:18 – 100:22; Walker Dep. at 36:22 – 37:9, 39:4-13, & Exs. 3-4 thereto).

Although Mr. James had already been released to return to work and actually had returned to work following his seizure, *see* (Dft's Resp. to Pltf's 1st Ints. at 9 ¶ 19), Defendant refused to let him return to work in May 2008 solely because of his previous seizure. *See* (Walker Dep. at 41:5-12, 47:9-11, 49:25 – 50:12, & Ex. 9 thereto). Defendant refused to restore Mr. James to his job because Dr. Barlow believed Mr. James's seizure history made him unsafe to work and based "upon its own judgment" regarding Mr. James's ability to work. *See* (Dft's Resp. to Pltf's 1st Ints. at 4 ¶ 7, 7 ¶ 13, & 9 ¶ 19; Dft's Resp. to Pltf's Req. for Adms. at 1 ¶ 1).[11]

Ms. Harper testified that she has received training on the FMLA's requirement that employers restore an employee to work upon a simple return-to-work certification from the employee's physician. *See* (Harper Dep. at 78:5-11). She also admitted that, even though all of Mr. James's doctors had released him to work, Defendant required him to go to Occunet and prohibited him from working based on Dr. Barlow's belief that he was not medically qualified to work. *See* (Harper Dep. at 79:16 – 80:16). Defendant recognized – as Occunet pointed out to then-human resources director Chad Walker – that the final decision on returning Mr. James to work rested with it. Defendant, however, chose to listen to Dr. Barlow despite releases from all of Mr. James's treating physicians. *See* (Walker Dep. at 59:14 – 60:17 & Ex. 14 thereto).

### C. <u>Defendant Terminated Mr. James Because Of His Seizure History</u>

Mr. James understood he was simply "[i]n limbo" after May 19, 2008 while he waited to get his medical situation resolved because he received no communications from Defendant's

[11] Attached as Ex. F.

management regarding his situation. *See* (James Dep. at 90:20 – 92:2). Mr. James received no information until he called Defendant on Christmas Eve 2008. During that phone call, Chad Walker told Mr. James he had been terminated. *See* (James Dep. at 96:4-11, 97:13-18).

Mr. Walker told Mr. James that he had been terminated earlier in the year even though Defendant did not decide to terminate Mr. James until "late December 2008 or early January 2009." *See* (Dft's Resp. to Pltf's 1st Ints. at 5 ¶ 9; James Dep. at 97:13-18, 100:24 – 101:7). Defendant then formally notified Mr. James of his termination in a letter dated January 14, 2009. Defendant's letter stated Mr. James's leave had expired on August 7, 2008 and his termination was effective on that date.[12] *See* (Compl. ¶ 22; Answer ¶ 22; Harper Dep. at 54:22 – 55:6, 61:6-11, & Ex. 11 thereto; Walker Dep. at 61:21 – 62:2).

Ms. Harper ultimately wrote that Defendant terminated Mr. James because he was "unable to return to work and the exhaustion of [his] FMLA." Mr. James exhausted his FMLA solely because Dr. Barlow would not allow him to return to work.[13] *See* (Harper Dep. at 80:17 – 81:4 & Ex. 11 thereto). Once it had required Mr. James to undergo an evaluation by Dr. Barlow, Defendant would not restore him to work until he could demonstrate to Dr. Barlow's satisfaction that he had been seizure free for six months. *See* (Harper Dep. at 81:1-12). As such, Defendant terminated Mr. James on the basis of both Dr. Barlow's opinions and its own judgment as to the

---

[12] Defendant, however, did not initiate the FMLA process until December 24, 2008. *See* (Harper Dep. at 58:10-23 & Ex. 12 thereto). Further, although the termination letter states it was a follow up to communications with Mr. James at the "outset of his request for medical leave," Defendant had no such communications with him. It had no communications with Mr. James from the time of his conversation with Tom Freeman on May 20 through his phone call with Chad Walker on December 24, 2008. *See* (Harper Dep. at 55:7-12 & Ex. 11 thereto; James Dep. at 90:20 – 92:2, 97:23 – 98:3). In fact, the termination letter was the first and only notice Mr. James received that he was on FMLA leave. *See* (Harper Dep. at 61:12-17; James Decl. at ¶ 9). Additionally, the FMLA designation form that Defendant completed on December 24, 2008 states Mr. James notified it that he needed leave on May 15, 2008, *See* (Harper Dep. at 58:24 – 59:5 & Ex. 12 thereto), which was before Mr. James even visited a doctor about his back pain.

[13] As noted *infra* at 25-26, pursuant to FMLA regulations, Mr. James did not exhaust his leave, which did not begin until December 24, 2008.

hazards and dangers of his job. *See* (Harper Dep. at 81:13 – 82:1, 83:17 – 84:5, & 85:2-22, 90:6 – 91:5; Dft's Resp. to Pltf's Req. for Adms. at 1 ¶ 1).

## STANDARD OF REVIEW

Summary judgment is proper when no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is only "material" if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). Viewing the evidence and drawing all reasonable inferences in favor of the non-moving party, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 547, 587, 106 S.Ct. 1348 (1986), the Court should grant the summary judgment motion if no reasonable jury could return a verdict in favor of the non-moving party. *See Anderson*, 477 U.S. at 248.

## ARGUMENT

### I. DEFENDANT ILLEGALLY REMOVED MR. JAMES FROM HIS REGULAR DUTIES BECAUSE IT REGARDED HIM AS DISABLED

Defendant violated the Americans with Disabilities Act when it placed Mr. James in the Fab Shop because it did not believe he should work around water after suffering a seizure. The Americans with Disabilities Act prohibits employers from discriminating "against a qualified individual with a disability."[14] 42 U.S.C. § 12112(a).[15] Mr. James initially must demonstrate: (1) that he is an individual with a disability, (2) who was qualified to perform his job with or without accommodation, and (3) who was discriminated against because of his disability. *Spees v. James Marine, Inc.*, 617 F.3d 380, 395 (6th Cir. 2010).

[14] Mr. James also alleged disability discrimination pursuant to the Kentucky Civil Rights Act. *See* (Compl. Count III, ¶¶ 38-40). The Sixth Circuit interprets the Kentucky Civil Rights Act consistently with the ADA. *See Henderson v. Ardco, Inc.*, 247 F.3d 645, 649 (6th Cir. 2001).

[15] The ADA Amendments Act of 2008, which expanded the ADA's definition of "disabled," took effect on January 1, 2009 and does not apply retroactively to conduct, such as that at issue here, occurring before that date. *See Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 566 (6th Cir. 2009).

Congress intended the ADA to prohibit employers from limiting individuals based on stereotypes of their abilities. Mr. James was not actually disabled when Defendant placed him in the Fab Shop. "Disability" for ADA purposes, however, includes "being regarded as having such an impairment." 42 U.S.C. § 12102(2)(C).

**A. <u>The Regarded-As-Disabled Theory Is Intended To Redress Employment Actions Based On Unfounded Stereotypes</u>**

The principle underlying the ADA is that people should be judged on their actual abilities in light of relevant medical evidence. *Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000). Accordingly, the Sixth Circuit has recognized that individuals "should not be judged nor discriminated against based on unfounded fear, prejudice, ignorance, or mythologies. . . ." *Id. quoting Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998) (internal quotation marks and citation omitted). "The ADA thus serves to 'prohibit employers from making adverse employment decisions based on stereotypes and generalizations associated with the individual's disability rather than on the individual's actual characteristics.'" *Holiday*, 206 F.3d at 643 *quoting EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1097 (6th Cir. 1998).

The regarded-as prong of the ADA is particularly attuned to rooting out limitations based on unfounded stereotypes. The EEOC implementing regulations note the ADA's role in eliminating such stereotypes:

> The rationale for the "regarded as" part of the definition of disability was articulated by the Supreme Court in the context of the Rehabilitation Act of 1973 in *School Board of Nassau County v. Arline*, 480 U.S. 273 (1987). The Court noted that, although an individual may have an impairment that does not in fact substantially limit a major life activity, the reaction of others may prove just as disabling. "Such an impairment might not diminish a person's physical or mental capabilities, but could nevertheless substantially limit that person's ability to work as a result of the negative reactions of others to the impairment." 480 U.S. at 283. The Court concluded that by including "regarded as" in the Rehabilitation Act's definition, "Congress acknowledged that society's accumulated myths and fears

> about disability and diseases are as handicapping as are the physical limitations that flow from actual impairment." 480 U.S. at 284.

29 C.F.R. § 1630, Appx.

The regarded-as-disabled theory lets individuals be judged on their actual capacities, rather than "myths, fears, and stereotypes" of a perceived impairment. *Mahon v. Crowell*, 295 F.3d 585, 592 (6th Cir. 2002) *quoting Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489-90, 119 S.Ct. 2139 (1999). As such, the "regarded as" part of the definition of disability is satisfied if an individual shows an employer made an employment decision because of a perception of disability based on "myth, fear or stereotype." *Cook v. Rhode Island Dep't of Mental Health, Retardation & Hosps.*, 10 F.3d 17, 23 (1st Cir. 1993).

### 1. <u>Defendant Believed Mr. James Had a Disability That Substantially Impaired Him</u>

Defendant believed Mr. James was unable to perform any job around water based on its stereotypical view about individuals who had suffered a seizure. A plaintiff may prevail on a regarded-as-disabled claim by showing his employer "mistakenly believes that an actual, nonlimiting impairment substantially limits one or more of an employee's major life activities." *Spees*, 617 F.3d at 396 (citation omitted).

Mr. James has met this standard. Seizures, particularly where coupled with migraine headaches as Mr. James also suffers, are qualifying impairments. *See, e.g., Rosteutcher v. MidMichigan Physicians Group*, 332 F.Supp.2d 1049, 1060 (E.D. Mich. 2004). As such, Mr. James has established an ADA violation if he can show Defendant viewed his impairment as substantially limiting a major life activity. *Spees*, 617 F.3d at 397.

Defendant viewed Mr. James as unable to perform a wide range of jobs. It placed him in the Fab Shop located on the hill above its dock. Defendant saw Mr. James as unable to perform

any job that involved being around water in any way, including even stepping on a dock. *See* (James Decl. at ¶ 5). This meant Mr. James could not weld on any vessel on the water, could not operate a crane, and could not even assist with installing the metal he fabricated in the Fab Shop onto a vessel. *See* (James Decl. at ¶ 6). Indeed, according to Dr. Barlow, the doctor to whose opinion Defendant afforded total deference, Mr. James could not perform any work for a barge company because he could not "be by water, climb ladders, or be off the ground over 2 feet." *See* (Walker Dep. Ex. 4).

An employer engages in illegal discrimination when it limits an employee's job functions based on erroneous stereotypes about physical impairments that are not substantially limiting in fact. *See Wilson v. Buckeye Steel Castings*, No. C.-2-99-1300, 2000 WL 1911432, at * 4 (S.D. Ohio Dec. 18, 2000) *quoting Kocsis v. Multi-Care Mgmt., Inc.* 97 F.3d 876, 884 (6th Cir. 1996). The ADA requires an individualized inquiry into an employee's ability to perform the job in question. *Holiday*, 206 F.3d at 643 (citing cases).

Thus, in order to survive summary judgment, Defendant would have to demonstrate, at minimum, that it based its removal of Mr. James from his regular welding and crane operating job on an individualized medical assessment. Defendant, however, fails because the only individualized medical assessment of Mr. James's ability to perform his job after he suffered a seizure came from Dr. Moots who, while aware of his job duties, released Mr. James to return to his job and to work around water. *See* (Compl. ¶ 8; Answer ¶ 8; James Dep. at 42:9-16, 42:23 – 43:2, 49:24 – 50:8, & Ex. 6 thereto).

Instead of relying on Dr. Moots' individualized assessment, though, Defendant reassigned Mr. James because Mr. Mannon, the yard superintendent, stated he did not "feel safe with [Mr. James] working on the water" because he had suffered a seizure. *See* (James Dep. at

54:16 – 55:2, 59:4-6, 62:9-13, 62:18-23, 63:3-7, 175:19 – 176:4, & 178:11-21). Acting in the face of a medical determination based on the "feel[ing]" of a manager is precisely the sort of stereotype the ADA seeks to avoid. As such, Defendant's reassignment of Mr. James violated the ADA.

### 2. **The Reassignment Was An Adverse Employment Action**

Defendant reassigned Mr. James to an inferior position simply because its yard superintendent did not believe an individual who had suffered a seizure should work around water. Since Mr. James was qualified to perform his job by virtue of Dr. Moots' release, Mr. James need only show the discrimination he suffered because of his disability resulted in an adverse employment action. *Spees*, 617 F.3d at 395.

Defendant's transfer of Mr. James to the Fab Shop was an adverse employment action because he had a far smaller range of activities and used few of his skills in that position. Reassignments may qualify as adverse employment actions, even when the reassignment is not accompanied by changes in work hours or salary, when the new position involves "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. *Id.* at 391 *quoting White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 798 (6th Cir. 2004).

In the Fab Shop, Mr. James's duties were limited to welding new metal, using a cutting torch, and using a metal press to bend metal. *See* (James Dep. at 54:18 – 55:2). He was not allowed to weld on older metal on barges, which was more challenging, or to install newly-fabricated metal onto barges because Defendant did not want him to work around water. Also, by restricting him to the Fab Shop, Defendant ended Mr. James's work as a fitter and a crane

operator, which had required special training beyond his welder training, and limited his chance of advancing with the company. *See* (James Decl. at ¶¶ 5-6; James Dep. at 15:3 – 17:12).

This new position involved fewer skills and was less challenging to Mr. James. *See* (James Decl. at ¶¶ 5-6). As such, the transfer was an adverse employment action. *Spees*, 617 F.3d at 392.

Mr. James never indicated he could not perform his regular welder and crane operator jobs. *Cf Whitson v. Union Boiler Co.*, 47 Fed. Appx. 757, 761 (6th Cir. 2002) (ADA challenge to reassignment failed where employee said he could not do regular job due to seizure disorder). Accordingly, the Court should grant Mr. James summary judgment because Defendant violated the ADA by demoting Mr. James based on its perception of him as disabled.

## II. DEFENDANT INTERFERED WITH MR. JAMES'S FMLA RIGHTS BY REFUSING TO RESTORE HIM TO HIS JOB

Defendant also violated Mr. James's FMLA rights by refusing to restore him to work when he produced releases for his May 2008 back pain, the only condition for which Defendant placed him on FMLA leave.[16] The FMLA provides eligible employees with up to twelve weeks of unpaid leave during a twelve-month period to address serious health conditions that make them unable to perform the essential functions of their jobs. 29 U.S.C. § 2612(a)(1)(D). The Act "also creates the concomitant right for an employee who has taken leave 'to be restored by the employer to the position of employment held by the employee when the leave commenced.'"

[16] Defendant is estopped from claiming that Mr. James was not on FMLA leave and, therefore, was not entitled to job restoration after May 16, 2008. An employer is estopped from invoking the expiration of an employee's FMLA-protected leave where the employer made an affirmative representation on which the employee reasonably relied and detrimentally believed was a grant of FMLA leave. *See Murphy v. FedEx Nat'l LTL*, 618 F.3d 893, 899-900 (8th Cir. 2010) *discussing Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 493-94 (8th Cir. 2002). Here, Defendant affirmatively acted by forcing Mr. James to take medical leave after he received medical treatment on May 16, 17, and 19, 2008. Mr. James relied on Defendant's medical review process. *See* (James Dep. at 68:8-10, 72:9-20, 76:14-20, 77:24 – 78:4). Of course, before estoppel is implicated, the employee must put the statute in play by notifying the employer that he may need FMLA leave. *Murphy*, 618 F.3d at 900. While Mr. James did not request FMLA leave in May 2008 because he did not need it, Defendant's decision to force Mr. James to take such leave should preclude it from denying notice of Mr. James taking FMLA leave.

*Hoge v. Honda of America Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004) *citing* 29 U.S.C. § 2614(a)(1)(A); *Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d 405, 407 (6th Cir. 2003).

In order to prevail on his claim that Defendant interfered with his FMLA rights, Mr. James must prove that Defendant interfered with his right to reinstatement to his employment following his FMLA leave. *Hoge*, 384 F.3d at 244. He is not required to show that he was treated worse than other employees. He must only show that he was denied an entitlement under the Act. In this regard, Defendant may be held to violate the Act regardless of the intent behind its conduct. *Id.*

**A. <u>Defendant Unlawfully Refused To Restore Mr. James To Work</u>**

It is undisputed that Defendant did not restore Mr. James to work and ultimately terminated him after it placed him on FMLA leave effective on or about May 16, 2008. *See* (Compl. ¶ 22; Answer ¶ 22; Harper Dep. Ex. 11). This violated the FMLA because Mr. James provided proper medical releases for the back pain that led to the leave. Employers must restore an employee to work unless the employee is ineligible for restoration because of a statutory exception. *See Hoge*, 384 F.3d at 245.

**1. <u>Mr. James Was Entitled To Restoration Because His Doctors Released Him To Work After His Back Treatment</u>**

Defendant was required to restore Mr. James to his job on May 20, 2008 because the doctors who treated him for his back pain released him to work. The FMLA allows employers to condition job restoration on receipt of medical certification if the employer has a "uniformly applied practice or policy" requiring such certification. Such a policy may only require certification "from the *health care provider of the employee* that the employee is able to resume work." 29 U.S.C. § 2614(a)(4) (emphasis added); *see also Hoge*, 384 F.3d at 246. Moreover, the employer may require fitness-for-duty certification "only with regard to the particular health

condition that caused the employee's need for FMLA leave." *Hoge*, 384 F.3d at 246 *quoting* 29 C.F.R. § 825.310(c).

Defendant has identified no uniform policy requiring medical certification upon return to work after an injury. Even if it had such a policy and had properly invoked the policy, however, it required even more from Mr. James than medical certification.[17] Beginning with Mr. James on May 20, 2008, Defendant required a physical examination by its company doctor in addition to his medical releases. Defendant never had imposed such a requirement before Mr. James attempted to return to work after his back treatment. *See* (Dft's Resp. to Pltf's 1st Ints. at 7-8 ¶ 15).

Mr. James produced releases from both Prime Care and Dr. Nelson when he returned to work on May 20. *See* (James Dep. at 67:5-10; Harper Dep. at 62:8-15, 62:24 – 63:4, 63:11-17, 64:8 – 65:8, & Exs. 13-14 thereto). Thus, Mr. James produced releases from his health care providers regarding his back pain, the only condition for which he needed time off work that precipitated the FMLA leave Defendant required him to take. The plain language of the FMLA requires an employer to return an employee to his job or an equivalent position as soon as the employee provides the medical certification permitted by 29 U.S.C. § 2614(a). *Hoge*, 384 F.3d at 246-47. Employers cannot delay restoration of an employee because even "a 'reasonable' delay in restoration after reasonable notice [of the employee's release to return to work] is given would force the employee to take more FMLA leave than is required and would interfere with an employee's exercise of FMLA rights." *Hoge*, 384 F.3d at 249 *citing* 29 U.S.C. § 2615(a)(1); 29 C.F.R. § 825.312(e).

[17] Defendant was not entitled to a fitness-for-duty certification for Mr. James because it failed to complete the FMLA designation notice indicating that such a certification would be required until December 24, 2008, after it contends it had terminated Mr. James. *See* 29 C.F.R. 825.312(d) & (e). Thus, Mr. James would have been entitled to job restoration even if he had not produced any medical releases. Still, for the sake of completeness, Mr. James will analyze this issue as if Defendant had been entitled to fitness-for-duty certification.

Moreover, employers cannot impose special conditions on fitness-for-duty certifications. A medical certification that authorizes an employee to return to work is sufficient to trigger the employer's duty to reinstate the employee even if it does not address whether the employee can work without restrictions. *Clark v. Gospel Light Pubs.*, No. 1:06-CV-327, 2007 WL 2462654, at * 7 n.3 (S.D. Ohio Aug. 27, 2007) *citing* 29 C.F.R. § 825.310(c) & *Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996, 1003-04 (6th Cir. 2005).

Mr. James was entitled to job restoration on May 20, 2008 when he produced releases from the physicians who treated him for the back pain that caused him to miss work on the preceding two work days and led Defendant to place him on FMLA leave. Defendant's disagreement with restoring Mr. James to work based on the medical releases he provided, *see* (Walker Dep. at 26:8-12), was insufficient to deny him restoration. Defendant, if it had legitimate questions about Mr. James's ability to perform his duties, was required to restore him to work then seek clarification from his treating providers regarding any restrictions his back treatment might have required.[18] *Clark*, 2997 WL 2462654, at * 7 at n.3; 29 C.F.R. § 825.312(b). Instead, Defendant simply refused to let Mr. James return to work in violation of the FMLA.[19]

[18] An employer can require that the certification specifically address the employee's ability to perform the essential functions of the employee's job by providing the employee with a list of the essential functions no later than with the designation notice required by 29 C.F.R. § 825.300(d) and indicating in the designation notice that the certification must address the employee's ability to perform those essential functions. 29 C.F.R. § 825.312(b). Defendant, however, did not provide Mr. James with any listing of the essential functions of his job at any time and, at any rate, did not fill out the designation notice until December 24, 2008, after it contends it had already terminated him.

[19] Defendant also violated the ADA by requiring Mr. James to undergo a pre-employment examination before he could return to work. *See* 42 U.S.C. § 12112(d)(3)-(4) (allowing pre-employment medical examinations only after an offer of employment); 29 C.F.R. § 1630.13(1) (unlawful for employer to conduct examination regarding nature or severity of individual's disability).

### 2. Defendant Also Violated The FMLA By Refusing Restoration Based On His Previous Seizure

Defendant's further refusal to restore Mr. James because of his January 31, 2008 seizure violated the FMLA both because Mr. James was not placed on FMLA leave for that condition and because Mr. James had been released to work by the physician who treated him for that condition. Defendant was entitled to fitness-for-duty certification "only with regard to the particular health condition that caused [his] need for FMLA leave." *Hoge*, 384 F.3d at 246 *quoting* 29 C.F.R. § 825.310(c).

Not only did Defendant not accept the fitness-for-duty certifications Mr. James provided from Prime Care and Dr. Nelson but it also required him to report to Occunet for a pre-employment physical. *See* (James Dep. at 71:22 – 72:20; Walker Dep. at 63:24 – 64:4; Barlow Dep. at 20:1-4, 20:19 – 21:13, & Ex. 3 thereto). If he had been sent for a return-to-work physical, Occunet only would have examined the fitness of Mr. James's back. *See* (Barlow Dep. at 20:16-18). Defendant, however, specifically requested that Occunet perform a pre-employment physical, including an extensive medical history revealing his past surgeries and other medical conditions. *See* (James Dep. at 72:15-20, 74:13-20; Walker Dep. at 62:24 – 63:7, 63:24 – 64:4; Barlow Dep. at 20:1-4, 20:19 – 21:19, & Ex. 2 thereto).

Once Mr. James had to disclose his past seizure, Occunet required him to produce all of his medical records. *See* (Dft's Resp. to Pltf's 1st Ints. at 7 ¶ 13; James Dep. at 74:21 – 75:23; Walker Dep. at 29:12-20 & Ex. 1 thereto; Barlow Dep. at 21:20 – 22:8 & Ex. 2 thereto). It then refused to certify him as medically eligible to work until he got documentation from Dr. Moots that he had been seizure free for six months. *See* (Barlow Dep. at 22:10 – 23:10, 24:7-19, & Exs. 4-5 thereto). Dr. Moots provided two letters stating Mr. James was safe to work but Dr. Barlow

rejected those letters because he disagreed with Dr. Moots' conclusion. *See* (James Dep. Exs. 7-8; Barlow Dep. 31:25 – 32:4, 40:1-8).

Defendant was aware by at least June 2, 2008 that Occunet was considering Mr. James's seizure history in its review of his ability to return to work after his back treatment but did nothing to limit its review to Mr. James's back. *See* (Walker Dep. at 35:15-20 & Ex. 2 thereto; Barlow Dep. at 21:9-13). Although Defendant knew that Dr. Moots had released Mr. James to work on March 12, 2008 after treating his seizure, it chose not to restore him to work after his May 2008 back pain solely because of his previous seizure. *See* (Dft's Resp. to Pltf's 1st Ints. at 9 ¶ 19; Walker Dep. at 41:5-12, 47:9-11, 49:25 – 50:12, & Ex. 9 thereto).

Defendant was not permitted to consider Mr. James's January 2008 seizure after it placed him on FMLA leave for back pain in May 2008. *See Hoge*, 384 F.3d at 246 *quoting* 29 C.F.R. § 825.310(c). His seizure had nothing to do with him missing work and ultimately being placed on FMLA leave in May 2008. His absences from work in May 2008 had nothing to do with seizures, which had not impacted his work since he returned to work in March 2008. *See* (James Dep. at 177:15 – 178:10, 179:6-25).

Defendant was aware that Dr. Moots released Mr. James to return to work on March 12, 2008. *See* (Walker Dep. at 19:21-24, 20:8-11, 21:3-6). Employers cannot require second or third opinions on a fitness-for-duty certification. 29 C.F.R. § 825.312(b). Defendant was required to seek clarification from Dr. Moots when he certified Mr. James as eligible to work if it worried that Mr. James had some medical restrictions. *Id.* It did not do so and Mr. James worked without incident for more than two months before his unrelated back pain led to his placement on FMLA leave.

It is immaterial that Dr. Barlow disagreed with Dr. Moots' conclusion in August 2008 that Mr. James was safe to work despite his seizure history. Most basically, this is because Mr. James was not placed on FMLA leave because of any seizure condition. Mr. James was only required to be certified as fit to work with respect to his back condition. *Hoge*, 384 F.3d at 246 *quoting* 29 C.F.R. 825.310(c). Mr. James provided proof that his back was fit to work on May 20, 2008 when he returned to work after his treatment. He also passed physical examinations of his back from both Occunet and Rehab Associates after he had been placed on FMLA leave. *See* (Dft's Resp. to Pltf's 1st Ints. at 6-7 ¶ 13; Harper Dep. at 99:18 – 100:22; Walker Dep. at 36:22 – 37:9, 39:4-13, & Exs. 3-4 thereto).

Dr. Barlow's opinion as to the impact of Mr. James's seizure history on his fitness for duty was also immaterial because employers can only require fitness-for-duty certification "from the health care provider of the employee." 29 U.S.C. § 2614(a)(4); *see also Hoge*, 384 F.3d at 246. Employers may seek clarification of a medical release from a treating doctor but they are not entitled to second or third opinions of fitness-for-duty certifications.[20] 29 C.F.R. 825.312(b).

Defendant violated the FMLA by even sending Mr. James to Occunet. The FMLA regulations are clear that an employee must be reinstated upon a simple statement of fitness for duty from the employee's treating physician. 29 C.F.R. § 825.310(c). As such, an employer cannot require an employee whose own physician has certified him as fit to work to submit to a return-to-work physical by the company doctor prior to allowing the employee to return to work. *Jordan v. Beltway Rail Co. of Chicago*, No. 06 C 6024, 2009 WL 537053, at * 6 (N.D. Ill. Mar. 4, 2009); *Baumgarden v. Challenge Unlimited, Inc.*, No. 04-CV-568-WDS, 2005 WL 3164227, at * 3 (S.D. Ill. Nov. 28, 2005); *see also Brumbalough*, 427 F.3d at 1004 (Sixth Circuit stating

[20] This prohibition is contrasted to the procedure for an employee seeking to be placed on FMLA leave. Employers in that scenario are permitted to require second or third opinions from physicians they do not regularly employ before allowing the employee to take FMLA leave. *See* 29 C.F.R. 825.307(b) – (c).

"we hold that once an employee submits a statement from her health care provider which indicates that she may return to work, the employer's duty to reinstate her has been triggered under the FMLA.").

Dr. Moots was the treating physician for Mr. James's seizure. *See* (Barlow Dep. at 25:12-17). He had released Mr. James to work in March 2008 and, when requested by Occunet, did so again on August 4 and August 30, 2008. Defendant cannot escape its obligation to restore him to work months later by having Dr. Barlow, who did not treat Mr. James for his seizure or any other medical condition, *see* (Barlow Dep. at 24:2-6, 35:10-18), review and disapprove the treating physician's certification.

**3. <u>Mr. James's FMLA Leave Did Not Expire Before His Return To Work</u>**

Since his seizure history was wholly irrelevant, Defendant cannot escape liability by claiming Mr. James did not return to work at the end of a twelve-week period after his leave began. He was ready and able to work and had provided the required medical release from the doctors who treated his back pain in May 2008. The Sixth Circuit has held that an employer is estopped from denying restoration to an employee who was able to return to work by the latest date the employer said his FMLA benefit would end. *Wilkerson v. AutoZone, Inc.*, 152 Fed. Appx. 444, 449-50 (6th Cir. 2005).

Here, Defendant did not inform Mr. James that he was on FMLA leave until December 2008. Regardless, he had been able and willing to return to work since May 20, 2008, when he produced medical releases regarding his back treatment. *See* (James Decl. at ¶¶ 9-10). Defendant made his FMLA leave retroactive to May 16. His return four days later plainly was within twelve weeks of the date on which he was placed on FMLA leave.

Mr. James's previous absence from February 1 through March 12 for treatment of his seizure does not affect the conclusion that he did not exceed his FMLA leave because Defendant did not designate his seizure leave as an FMLA absence. Where a defendant fails to designate an employee's absence as FMLA leave, the employee is entitled to job restoration after a subsequent absence of twelve full weeks. This is true even where it means the employee ultimately received more than twelve weeks of sick leave because the FMLA encourages employers to provide more than the statutorily-required minimum leave. *Lafata v. Church of Christ Home For Aged*, 325 Fed. Appx. 416, 421 (6th Cir. 2009). Because Defendant did not designate his seizure absence as FMLA leave, that period is simply irrelevant to Mr. James's right to leave after his May 2008 medical treatment and the duration of such leave. *Id.*

If he had needed medical leave, Mr. James was entitled to twelve weeks of leave beginning on December 24, 2008, the date on which Defendant completed the FMLA designation notice and orally notified Mr. James that he had been placed on FMLA leave. That is of no consequence, however, because Mr. James was ready, willing, and able to work on May 20, 2008 and, having been certified as such by the doctors who treated his back pain, was entitled to restoration to his job. Defendant's failure to restore him violated the FMLA.

## **CONCLUSION**

For these reasons, the Court should grant summary judgment in favor of Mr. James and send this matter to trial solely on the issue of damages.

Respectfully submitted,

s/ D. Wes Sullenger
D. Wes Sullenger, KY BAR # 91861
TN BPR # 021714
Sullenger Law Office, PLLC
1324 Jefferson Street
Paducah, KY 42001
Voice: (270) 443-9401
Fax: (270) 443-3624

wes@sullengerfirm.com

*Attorney for the Plaintiff,*
*Josh James*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of December, 2010, a copy of the foregoing was filed via the Court's CM/ECF system, which will send a notice of electronic filing to:

David L. Kelly
Denton & Keuler, LLP
P.O. Box 929
Paducah, KY 42002-0929

s/ D. Wes Sullenger