IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO: 5:09-CV-177-R

JOSH JAMES PLAINTIFF

vs.

JAMES MARINE, INC. DEFENDANT

DEPOSITION OF DR. RON BARLOW

The following deposition was taken on behalf of the Plaintiff in the above-styled and numbered cause pursuant to Notice on Wednesday, the 17th day of November, 2010, at the hour of 10:30 a.m., at the offices of Occunet, 2535 Broadway, in the City of Paducah, County of McCracken, State of Kentucky, before me, Luann Hollis, Certified Court Reporter and Notary Public in and for the State of Kentucky at Large, in accordance with the Kentucky Rules of Civil Procedure.

---

Lakeland Reporting
P.O. Box 1033
Calvert City, KY 42029
Phone/fax: 270-395-0021

EXHIBIT
tabbies
C

and that was through here. The one at Baptist was a shoulder injury. I don't think it was a workman's comp.
Q. Have you ever testified in a case that was under the Family Medical Leave Act to your knowledge?
A. No.
Q. Have you ever testified in a case involving the Americans with Disabilities Act to your knowledge?
A. No.
Q. Those two cases that you mentioned before, did you testify only in deposition, or did you also give trial testimony?
A. No, just deposition.
Q. Have you ever -- in those cases or any other way, have you ever been declared an expert by any court?
A. No.
Q. Opposite question. Have you ever been ruled not qualified to be an expert by any court?
A. No.
Q. The two cases that you had before this, did you testify for the employer in both of those?
A. Yes. I'm not sure if the one at Baptist was an employer or if it was the insurance company. I



just don't remember.
Q. You didn't testify for the patient or insured or whatever?
A. No.
Q. I don't see anything on your CV, but I'll ask, have you ever held any academic or research position?
A. I was on staff at the University of Kentucky, assistant professor or associate professor in allied health medicine.
Q. You were an assistant professor?
A. Yes.
Q. Was that the campus here in Paducah?
A. Yes, it was. Now, not at Paducah Community College, no. It was -- we had students from the allied health school at the University of Kentucky would train with us in the emergency room, so I was associate professor. I think it was associate professor. That's been so many years back, I can't even remember now. I do not hold that position now.
Q. Okay. Was that like sort of a clinical thing?
A. Yes, it was clinical.
Q. Students sort of shadowing you or guiding them?
A. Uh-huh.



Q. Okay. Do you remember roughly what years that would have been?
A. Very roughly, it would have been somewhere around I would say '82 to '84, something like that, very roughly.
Q. All right. In the course of that program, did you actually teach classes, or was it simply doing your medical work?
A. No, it was one-on-one teaching in the emergency room.
Q. Have you ever written any articles for publication?
A. Uh-uh, no.
Q. Have you ever performed any research or writing on the topic of seizures?
A. No.
Q. And you've never held any certification in neurology, have you?
A. No.
Q. Have you ever practiced in the area of neurology?
A. Not in neurology. Of course, in the emergency room, you do neurological checks on anyone that you suspect as having a neurological deficit, but not as a neurologist, no.



Q. Okay. So in the course of the emergency room, I mean, you would have seen people perhaps that would have had some neurological condition and --
A. Oh, yes.
Q. -- it would be the same thing, stabilize them and then refer them to a neurologist?
A. Right.
Q. Okay. Have you ever or do you hold any economic interest in James Marine or any of its subsidiaries?
A. None.
Q. How long have you performed occupational employee physicals or evaluations for James Marine?
A. I think probably James Marine contracted with us for about four years. Now, don't hold that to be exact, but somewhere in that neighborhood. We do not contract with them now.
Q. All right.
(Plaintiff's Deposition Exhibit No. 2 was marked for identification by reporter.)
Q. I've handed you Exhibit 2. I'll give you a moment -- it's two pages. I'll give you a moment to look over it. I'm going to start

with Page 2.
A. Okay. I'm familiar with it.
Q. Looking at Page 2, which is an October 1, 2010 letter over your signature, it says that part of the medical decision-making process in the case we're here about involved -- it's the third line there -- "working exclusively for James Marine for several years."
A. This should have been over Dr. Brad Mutchler's signature. How my name got on there, I do not know.
Q. So this was not a letter that you prepared?
A. No.
Q. Prior to today, had you seen this particular letter?
A. I saw it yesterday.
Q. And this wouldn't refer to you, as the last sentence says, "Board certification in emergency medicine," which --
A. No. No, that's Dr. Brad Mutchler, and how my name got on here, I do not know.
Q. Do you know -- during the roughly four-year period that James Marine was contracted with Occunet, do you know approximately how many employee evaluations would have been done for



James Marine?
A. No, I'd have no way of knowing that.
Q. Do you have any idea --
A. Yeah.
Q. -- just how many you would have done or been involved with?
A. Rough estimate, one or two a week, and that's a very rough estimate.
Q. All right.
A. Now, that would include physicals as well as workman comp injuries.
Q. You are aware, aren't you, that James Marine has designated you as its expert witness in this case?
A. I was not aware of that.
Q. Okay. The first page of this Exhibit 2, the April 14th letter --
A. Right.
Q. -- did you personally prepare this letter?
A. Yes.
Q. Were you -- did you understand that this would be submitted as a report of an expert witness?
A. No.
Q. Were you compensated for preparing this report?
A. No.



Q. Will you be compensated for giving any trial testimony in this case?
A. No.
Q. Are you at least indirectly familiar with James Marine through him being referred here?
A. Indirectly, yes.
Q. Now, according to this report, that happened on May 21, 2008?
A. Uh-huh.
Q. And he was referred here for a preemployment examination for James Marine?
A. Yes.
Q. Okay. Was the preemployment examination, was that what James Marine requested that you-all do?
A. Yes.
(Plaintiff's Deposition Exhibit No. 3 was marked for identification by reporter.)
Q. I hand you a document marked as Exhibit 3 that is from Occunet's records titled "Physical Examination" up at the top. And on the first line there, it has a date of May 21, 2008, and then it has four boxes to the side with a check next to "Preplacement," and then it has "Periodic" that's blank, "RTW" that's blank,



and "Other" that's blank. Now, the check is next to preplacement because that's what you-all were asked to do?
A. Uh-huh.
Q. Now, the other type of exams, what would a periodic exam be?
A. That could be an annual, a semiannual, whatever the company wanted. Specifically, some plants, some employers want their patients examined yearly. That would be a periodic exam.
Q. And then the next one to the right, "RTW"?
A. Return to work.
Q. And the difference, I guess, between preplacement and return to work would be just the scope of the exam?
A. Probably. On a return to work, you would concentrate more on a body part that was injured or deficit.
Q. So here where you've got a request for a -- excuse me, a preplacement exam, so you-all would do a complete examination of Josh?
A. Yes.
Q. Okay.
A. Well, let me qualify that. We would do within the scope of what the company wanted. A lot of

preemployments would include laboratory examination, pulmonary function test. If that's what they want, yes; but it looks like what James Marine wanted here was just a hands-on exam, assessment of capability.
Q. Okay. So look at all the body systems to see if he could do the job?
A. Right.
Q. All right. You or to your knowledge, the staff was never told that it was only necessary to look at his back and determine whether physically his back was up to the job?
A. No.
Q. Okay. So looking back at the report that's Exhibit 2, it says that after he presented, you-all got a past medical history that revealed a December of 2006 removal of a brain tumor and recent seizure in January of 2008?
A. Yes.
Q. Okay. Then it goes on to say that, based on that history of the brain tumor and the seizure, that you-all refused to approve him to return to work at that time?
A. Right.
Q. And it says that, "Denied him for work at that



time and requested receipt of his medical records from his treating doctors"?
A. Correct.
Q. You-all, I guess, wanted the medical records from the treating doctors because they would be the ones who decided what conditions he had and such?
A. That's right.
Q. Okay.
(Plaintiff's Deposition Exhibit No. 4 was marked for identification by reporter.)
Q. So after Josh comes in on May 21, you-all deny him work at that time, request the medical records, and then sort of going forward at various times -- I hand you Exhibit 4, which is a physician's written opinion dated June 16th where Josh was determined to be not medically qualified.
A. Uh-huh.
Q. Is that John L. Myers?
A. John Myers, yeah.
Q. Is he a physician --
A. Yes.
Q. -- here with Occunet?
A. He was. He is now practicing in, if I remember



right, in Evansville; but, yes, he was employed by Occunet at that time.
Q. And then I'll hand you Exhibit 5, as well.
(Plaintiff's Deposition Exhibit No. 5 was marked for identification by reporter.)
Q. Exhibit 5 is another physician's written opinion, this one over your signature and dated August 11 of 2008, and again, determined Josh was not medically qualified?
A. Uh-huh.
Q. Now, both of those determinations by Dr. Myers and the one by you were both based on Josh having a seizure history?
A. That's correct.
Q. Neither one of those had -- the denials had anything to do with Josh's back?
A. No.
Q. Okay. In fact, Josh had actually passed physical examinations pertaining to his back?
A. To my knowledge, yes.
Q. And so your note on Exhibit 5, your determination about the seizure history and the denial of medical qualification, that would have been based on review of medical records from Josh's doctors?



A. Correct.
Q. Okay. Great. You did not personally examine Josh, did you?
A. No.
Q. Never at any point?
A. No.
Q. And your note, Exhibit 5, says -- I think I can actually read, so I'm impressed -- that he had to have documentation of seizure-free times six months?
A. Correct.
Q. You wanted something from his neurologist as far as documentation?
A. Uh-huh.
Q. Is that a "yes"?
A. Yes. I'm sorry.
Q. You would have wanted that because the neurologist was the treating physician?
A. Yes.
Q. Would the neurologist be the person who has the expertise in evaluating seizures and determining --
A. Yes.
Q. All right. If we go back to your expert report, the Exhibit 2, there's six

bullet-pointed lists or items in the middle. Do those sort of reflect the high points of Josh's medical history that led to your conclusion?
A. Yes.
Q. All right. Each of those was based on Josh's seizure history, correct?
A. Yes.
Q. So we start by saying that on January 31, Josh went to Western Baptist Emergency Room after he had a seizure at work?
A. Yes.
Q. And then on February 6th, he followed up with Dr. Moots at Vanderbilt regarding his seizure?
A. Yes.
Q. Dr. Moots became Josh's treating physician; is that correct?
A. Yes. Now, whether he had other treating physicians, I'm not aware.
Q. Okay. So then the next entry there is June 16, 2008, which says that Josh was placed off work until July 31, 2008, by Dr. Myers, which was his six-month date for being free, so that refers to the document that we had marked as Exhibit 4 earlier?
A. Let me see, yes.



Q. And that six months seizure-free, that was a condition that Dr. Myers had imposed, correct?
A. Correct.
Q. That wasn't something that Dr. Moots --
A. No.
Q. In fact, were you aware that Dr. Moots had already released Josh to return to work after his seizure?
A. I cannot tell you yes or no on that. I do not remember.
Q. Okay. So next on Exhibit 2, you refer to August 4, 2008, and said, "Dr. Moots okayed work with close monitoring."
A. Uh-huh. Is that Exhibit 5? Is that the one in which you're referring to?
Q. I'm sorry. I was referring to Exhibit 2 where you -- the fourth bullet point down, you have "8/4/2008, Dr. Moots okayed work with close monitoring."
A. Oh, okay, yes. I see it.
(Plaintiff's Deposition Exhibit No. 6 was marked for identification by reporter.)
Q. I've handed you Exhibit 6, which is an August 4, 2008 letter from Dr. Paul Moots of Vanderbilt. Your entry on Exhibit 2 dated -- or identified



as August 4, 2008, is referring to Dr. Moots' letter that's Exhibit 6, correct?
A. Right.
Q. Okay. And his letter, the August 4th letter, Dr. Moots said that Josh had not had any generalized or major seizures since January of 2008?
A. Yes.
Q. And he also said down at the next to last -- I guess the last three sentences of the second paragraph that "Josh felt he was able to work full-time and Dr. Moots agreed as long as there was close monitoring with follow-up appointments every four months"?
A. Yes.
Q. Okay. Now, going back --
A. I'm not sure what the "close monitoring" meant, though.
Q. Okay. Did you at any point have any communications with Dr. Moots --
A. No.
Q. -- about what he meant?
A. No.
Q. Okay. So next up on the Exhibit 2, you have your next bullet point dated August 11, 2008.



You wrote, "Mr. James was released to work by Dr. Moots and then seen in our office. At this time I deferred him from work status."
A. Uh-huh.
Q. So you would have been aware -- or your office would have been aware on August 11 that Dr. Moots had released Josh to return to work?
A. Yes.
Q. You-all chose not to let him go back to work?
A. That's correct. If we look at Dr. Moots' note here, the second paragraph, "He has had two or three events over the last six months." Ill-defined events. We don't know if those were seizures or not, so I'm not inclined to let this Mr. James go back to work if there's any possibility he's going to have a seizure on the job. That's my thinking, and that's the reason I did not let him go back to work.
Q. Okay. So the next point on your list dated August 30, 2008, indicates that" Mr. James was released to work by Dr. Moots even though he is still suspected of having minor partial seizures. In view of the suspected partial seizures, it was felt that it would be unsafe for Mr. James to work at his assigned job because of potential

danger to himself or any coworkers. We have no record of any follow-up of any kind after this visit."
A. That is correct.
(Plaintiff's Deposition Exhibit No. 7 was marked for identification by reporter.)
Q. Now, the reference you're making, I think, was to an August 30, 2008 letter from Dr. Moots, which I've handed you as Exhibit 7. Okay. And in there, it looks like the third line down, it says he's "only had two brief events that are suspected to have been minor partial seizures without generalization."
A. Uh-huh.
Q. So that's what you were referring to when you said that he had had suspected minor partial seizures?
A. Yes.
Q. And Dr. Moots went on to say that "We follow him closely, and as long as he is compliant with his medications and follow-up, I think he is safe to work"?
A. That's what it says.
Q. And he says to "Contact me with any additional questions," and you didn't contact him at that



time either?
A. No.
Q. Okay. Now, there's some handwriting below Dr. Moots' name there. Is that your handwriting?
A. That is.
Q. Would you read that so we can all tell what it says?
A. "Even if these episodes are partial seizures, there still exists considerable risk on or off the job for this person because of the possibility of an accident from a seizure episode."
Q. Okay. So you felt like Josh still posed some danger?
A. Yes.
Q. Now, that was your view and not Dr. Moots' view?
A. Yes, that's correct.
Q. All right. Looking back to Exhibit 2 again, after the bullet point list, you've got a paragraph of text there. The paragraph starts by saying, "Based on the job description provided by his company at the time of his physical examination" -- do you see where I'm



referring to?
A. Yes.
Q. There is no job description in the medical records that Occunet produced. Do you know what job description that would refer to?
A. I suspect it was by word of mouth stating that he was a welder.
Q. Word of mouth from Josh or from the company?
A. Both.
Q. Okay. Do you recall having any particular conversations --
A. No. I did not have a conversation. What I'm saying is that if the nurse practitioner that did his initial evaluation had talked to the company, that would have been relayed by the company or it could have been relayed by Josh.
Q. Okay. So that sentence goes on to say that, "in addition to him still having suspected partial seizures and potentially causing an unsafe work environment for himself and/or his coworkers." So that's going back to Dr. Moots' August 30 letter about the partial suspected seizures?
A. Yes. Correct.
Q. And, of course, we've already covered that



Dr. Moots said he felt like Josh was safe to work, and your writing on there indicates essentially you disagreed with that?
A. Yes, I did.
Q. And that -- I mean, that was because of the potential. There weren't any seizures occurring at any time you saw Josh?
A. No.
Q. And you wrote that there was considerable risk on or off the job. What would the off-the-job risks be?
A. Driving. Well, that's one. Using any kind of machinery, a chain saw, I mean, just off the job.
Q. Okay. Now, you also indicate -- or, well, did you believe that compliance with his medications would be an issue?
A. I had no reason to suspect that that would be an issue, no.
(Plaintiff's Deposition Exhibit No. 8 was marked for identification by reporter.)
Q. I hand you Exhibit 8, which is an e-mail from Keela Hobby to Chad Walker of James Marine.
A. Now, who is Keela Hobby?
Q. I was going to ask you that same question.

A. I don't know.
Q. She has an "@occunet.net" e-mail address.
A. Keela Hobby.
Q. This was also Exhibit 14 to Chad Walker's deposition, and I believe he testified that she had at least at one time been an employee over here.
A. That's possible. But I very seldom come to the office, so I don't remember a Keela. Sorry, I don't.
Q. That's fine. She at least certainly seemed to know you. She sent this e-mail where she starts by saying, "Dr. Barlow will not approve Josh James." And then down at the next-to-last line, she says, "Dr. Barlow said that these partial seizures still present considerable risk in that type of work, and who can guarantee he will be compliant with his meds."
A. I have no idea where that part of the statement came from or why.
Q. Do you recall having a conversation with anybody about Josh James and compliance with his meds?
A. I just -- no, none.
Q. Okay.
A. If there was ever a question about him being



compliant with his medications, I'm not aware of it.
Q. And now, the concern that you've already talked about, and that's the -- that sentence on Exhibit 2 goes on to refer to about potential risks, potential of having a seizure, and that was a risk that you were concerned about that you had identified, not from Dr. Moots, correct?
A. That's correct.
Q. Now, the concern about him having a seizure or having the potential to have a seizure had nothing to do with any back injury Josh had ever had?
A. That back injury keeps coming up, and I'm not aware of any back injury on Mr. James. I just don't know anything about a back injury other than hearsay, and the first I heard of that was yesterday.
Q. Okay. Now, that sentence on Exhibit 2 -- or I guess, excuse me, the last sentence on that paragraph in Exhibit 2 says, "Based on his neurologist, he still experiences episodes of brief trouble speaking or numbness on the right side."
A. Yes.



Q. That referred to Exhibit 6, which was Dr. Moots' August 4 letter, correct?
A. Yes, uh-huh. And where he's saying, "It is uncertain whether these are partial seizures or not."
Q. Okay. But it was uncertain, according to Dr. Moots; he didn't label those as seizures?
A. That's correct. But the other side of the coin, he didn't say they were not seizures.
Q. Okay. Would it be correct to say that your evaluation of Josh and your decisions about him not being allowed to return to work were based entirely on reviewing medical records?
A. That's correct.
Q. Okay. And I think you've testified that you didn't review or had no knowledge of any medical records pertaining to Josh's back?
A. No.
Q. Did you at some point believe that Josh should never have been allowed to work after he had suffered his seizure in January?
A. I don't ever remember feeling that way or saying that he could not work anywhere along the line, but I did want him to be seizure-free for at least six months before releasing him to



return to a work environment.
Q. When you were deciding about Josh's situation, did you review any treatises about the diagnosis, treatment, or impact of seizures or seizure disorder?
A. No.
Q. Did you review any journal articles?
A. No.
Q. Consult with any other physicians?
A. No.
Q. I mean, you didn't do anything other than look at the medical records from Dr. Moots?
A. That's correct.
Q. Okay.
MR. SULLENGER: Let's take a two-minute break.
(A short break was taken.)
MR. SULLENGER: I think I'm done for the time being.

CROSS-EXAMINATION BY MR. KELLY:
Q. Dr. Barlow, what is the underlying reasoning from your perspective of having someone be seizure-free for a period of six months before they're released back to work in this particular

environment?
A. If they've been seizure-free for six months, hopefully, that means they're going to be seizure-free for an extended period of time. Why six months, is it arbitrary, I think the Department of Transportation goes either three months or four months; and as far as I'm concerned, I like to see them seizure-free for a little bit longer than four to six months before I release them to a potentially hazardous environment.
Q. And what would be your understanding of the environment that Mr. James was working in for James Marine?
A. Potentially dangerous even without a person having seizures. It's heavy industry, moving machinery, potentially dangerous encounters with moving machinery. It was my understanding that Mr. James was a welder, which means he is going to be using welding torches, cutting torches, extremely high heat, loss of -- I won't say "consciousness," because no indication that other than when he had generalized seizures he loses consciousness, but loss of attention to what he's doing could happen even with partial



seizures and could at that point pose potential danger.
Q. What would be the potential danger?
A. If he's holding a torch, loss of control of the torch. If he's driving machinery, loss of concentration on what he's doing as far as driving machinery, potential hazards from just not knowing what he's doing.
Q. What about working in and around water, would that have any impact on that opinion?
A. Certainly. Certainly. If he loses concentration, if he is out over water, certainly, he could fall in the water. If he was not wearing a vest, he could drown.
Q. What is -- from your understanding, what is a partial seizure versus a generalized seizure?
A. A generalized seizure is a tonic-clonic seizure where there's muscle twitching, jerking, limb jerking. Partial seizures are absent seizures. There's just a loss of concentration that may be manifest by just simply staring. It could be lip smacking, it could be twitching, but there's not a generalized tonic-clonic movement.
Q. What would be the reasoning to consider partial seizures as not compliant with the requirement



that he be seizure-free?
A. The partial seizure is still a seizure. He does not know what's going on from the time he's having a partial seizure. He's totally unaware of his environment for the episode.
Q. Given your experience in occupational medicine, is that a typical requirement that you would impose?
A. Yes.
Q. And why is that?
A. Simply because of the danger in any heavy industry -- potential dangers in any heavy industry.
Q. And would you consider work at James Marine to be heavy industry?
A. Yes.
Q. Have you ever been to the James Marine site?
A. I've not been to James Marine's site. I have been to other sites comparable. Ingram Barge Company, I've visited their place a couple of times.
MR. KELLY: I have no further questions. Thank you.

REDIRECT EXAMINATION BY MR. SULLENGER:



Q. Just a couple or three things real quick. Dr. Moots had specifically released Josh to work on or around water, hadn't he?
A. Yes. I think the only restriction Dr. Moots had put on him was no driving and close monitoring.
Q. Okay. And you disagreed?
A. I disagreed.
Q. Okay. In his letters, specifically Exhibit 6, which is the August 4th letter, Dr. Moots, when he referred to the two or three events over the last six months, he identified on those as "brief trouble speaking or numbness on the right side." There's no mention of loss of consciousness or attention, is there?
A. No. But it does say, "whether these are partial seizures," which would entail loss of concentration, loss of awareness; not consciousness, loss of awareness if they were considered to be partial seizures.
MR. SULLENGER: Okay. No more questions.

RECROSS-EXAMINATION BY MR. KELLY:
Q. Dr. Barlow, what is the general theory behind not permitting someone to drive for a period of

OCCUNET

2535 Broadway · Paducah, KY 42001 · (270) 575-3001 · Fax (270) 575-0418

April 14, 2010

David Kelly
c/o Denton & Keuler
PO Box 929
Paducah, KY 42002

Re: Joshua James DOB [redacted]

To Whom It May Concern:

Please accept this written statement regarding my medical opinion for Mr. Joshua James. Mr. James presented to our office on 5/21/2008 for a pre-employment examination for James Marine, Incorporated as a Welder. At the time of his exam, a past medical history was provided by the patient that revealed a 12/2006 removal of a brain tumor and recent seizure activity from 1/2008. Mr. James was not approved for work at that time, pending receipt of medical records from all treating physicians regarding the above-mentioned incidents.

- 1/31/2008, Mr. James was taken to Western Baptist Hospital ER after having a seizure at work.
- 2/6/2008, Mr. James followed up with Dr. Moots in Vanderbilt after this seizure episode.
- 6/16/2008, Mr. James was placed off work until July 31, 2008 by Dr. Myers (Occunet), which was his 6 month date for being seizure free.
- 8/4/2008, Dr. Moots okayed work with 'close monitoring' – with a follow up visit every 4 months. Dr. Moots mentions Mr. James having generalized seizures prior to this date.
- 8/11/2008 Mr. James was released to work by Dr. Moots and then seen in our office. At this time, I deferred him from work status.
- 8/30/2008, Mr. James was released to work by Dr. Moots even though the he is still suspected of having 'minor partial seizures'. In view of the suspected partial seizures, it was felt that it would be unsafe for Mr. James to work at his assigned job because of the potential danger to himself and/or co-workers. We have no record of any follow up of any kind after this visit.

Based upon the job description provided by his company at the time of the physical examination, in addition to him still having suspected partial seizures and potentially causing an unsafe work environment for himself and/or his co-workers, there would exist a potential risk, as per his job description, while working due to his potential of having a seizure or minor seizures as he had at the time of the exam. Also, based on his neurologist, he still experiences episodes of brief trouble speaking or numbness on the right side.

Please feel free to call our office at (270)575-3001 if we can be of any further assistance.

Sincerely,

R. K. Barlow, MD

Ron Barlow, MD

EXHIBIT LH
2 11-17-16
DR. BARLOW
PENGAD 800-631-6989

OCCUNET
270-575-3901 • 1-800-251-9548
www.occunet.net

October 1, 2010

Re: Letter dated 4/14/10 regarding Joshua James DOB 10/20/82

To Whom It May Concern,

Please be it known the medical decision-making process for this case is based upon; sound medical judgment, experience gained from touring job sites of the marine companies to include riding towboats, working exclusively with James Marine for several years and having specific knowledge of their job-site and working conditions, and performing pre-employment physicals and assessing medical injuries for the marine industry for nearly 10 years. My Board Certification in Emergency Medicine and more than 22 years experience in the Emergency Room also is attributable to this decision.

Sincerely,

Ron Barlow, MD

lm/rgb

Providing Occupational Health [illegible] Services for Western Kentucky & Southern Illinois Since 1998

Fax: 270-575-0418
2535 Broadway • Paducah, KY 42001

# PHYSICAL EXAMINATION

**Date** 5-21-08 **Pre-Placement** X **Periodic** ___ **RTW** ___ **Other** ___

**Name** Josh James **Employer** James Marine

**SS#** 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 **Age** 25 **BD** 10-20-82 **Sex** M

**Hgt** 5-11 (70) **Wgt** (175) **Temp** ___ **Pulse** 72 **Resp** ___

**Blood Pressure** 120 / 70 ___ / ___ ___ / ___

| | Normal | Abnorm | | Normal | Abnorm |
|---|---|---|---|---|---|
| 1. General Appearance/Gait | ✓ | | 11. Inguinal/Umbilical Area | ✓ | |
| 2. Head/Face/Scalp | ✓ | | 12. Genito/Urinary/~~Rectal~~ | ✓ | |
| 3. Eyes/Pupils/Fundi | ✓ | | 13. Hemoccult Neg Pos N/A Confir/Control | — | — |
| 4. Ears/Nose/Throat | ✓ | | 14. Prostate (M) Pelvic (F) | — | — |
| 5. Mouth/Teeth/Gums | ✓ | | 15. Spine/Back | ✓ | |
| 6. Skin/(Scars) | | ✓ | 16. Extremities/Joint | ✓ | |
| 7. Neck/Thyroid | ✓ | | 17. Vascular/Lymph Nodes | ✓ | |
| 8. Chest/Breast/Lungs | ✓ | | 18. Neurologic | ✓ | |
| 9. Heart | ✓ | | 19. Reflexes/Rhomberg/DRT's | ✓ | |
| 10. Abdomen | ✓ | | 20. Psychiatric | ✓ | |

**Comments:** Dip SG 1.025 Alb TR
GLU ⊖ Blood ⊖

2006 Brain tumor removed –
Jan 31 2008 seizure ? scar tissue from brain tumor removal –
Back pain – [illegible] 5/17/08 – [illegible] any pain
[illegible] MRI 5/16/08 [illegible]
welder

**Recommendations (Referrals/Follow-Up):**

– need records on back injury – release to RTW –
– medications issue need review
– record from seizure Jan 08 + release to RTW
will send to [illegible] for L spine [illegible] all medical record obtained
Discussed [illegible] –

**Occupational Healthcare Resources Consultants, Inc.**

[signature] ~~MD~~

EXHIBIT LH
3
11-17-10
DR. BARLOW
PENGAD 800-631-6989

OCCUNET

# Physician's Written Opinion Concerning Medical Approval and/or Medical Clearance

1. **Individual Name** JOSHUA JAMES

2. **Company Name** JAMES MARINE

## 3. This Section Completed By Physician

**(Please check all applicable blocks)**

_______________ ***has received a medical examination in accordance with***

[ ] 29 CFR 1910.134/ANSI Z88.2-1992 (Respirator)
[ ] 29 CFR 1910.120 (Hazardous Waste Operations)
[ ] 29 CFR 1910.1001/1926.1101 (Asbestos)
[ ] 29 CFR 1910.178 Subpart K (Mobile Equipment Operator)
[ ] 29 CFR 1910.146/ANSI Z117.1-1995 (Confined Space Entry)
[ ] Other _______________

***and has been found to be:***

[ ] Medically qualified to work full-time at the job to which he/she has been assigned
[ ] Medically qualified except as noted below in section 4
[ ] Medically qualified to wear respiratory equipment [ ] Corrective lenses required
[ ] Medically qualified for hazardous waste operations
[ ] Medically qualified for asbestos
[√] In accordance with OSHA requirements, the above named individual has been informed of the results of his or her medical examination and of any medical condition that may result from his/her exposure to asbestos.
[√] The employee has been advised of increased risk of lung cancer attributable to the combined effect of smoking and asbestos exposure.
[ ] Medically qualified for confined space entry
[ ] Medically qualified for mobile equipment operation

[√] Not medically qualified - does not meet minimal company standards

**4. Recommendations or restrictions (if any):**
Cannot return to work until July 31 (Seizure free x 6mos)

| | |
|---|---|
| **5. Physician's Signature** [signature] | **6. Examination Date** 6/16/08 |
| **7. Physician's Printed Name:** John L. Myers MD | |


**Street Address:** 2535 Broadway
**City/StateZip:** Paducah, KY 42001
**Phone No.:** (270) 575-3001 (800) 251-9548 **Fax No.:** (270) 575-0418


EXHIBIT LH
4 11-17-10
DR. BARLOW
PENGAD 800-631-6989

JJ000054

OCCUNET

## Physician's Written Opinion Concerning Medical Approval and/or Medical Clearance

**1. Individual Name** JOSHUA JAMES

**2. Company Name** JAMES MARINE

### 3. This Section Completed By Physician
**(Please check all applicable blocks)**

_______________ ***has received a medical examination in accordance with***

[ ] 29 CFR 1910.134/ANSI Z88.2-1992 (Respirator)
[ ] 29 CFR 1910.120 (Hazardous Waste Operations)
[ ] 29 CFR 1910.1001/1926.1101 (Asbestos)
[ ] 29 CFR 1910.178 Subpart K (Mobile Equipment Operator)
[ ] 29 CFR 1910.146/ANSI Z117.1-1995 (Confined Space Entry)
[ ] Other _______________

***and has been found to be:***

[ ] Medically qualified to work full-time at the job to which he/she has been assigned
[ ] Medically qualified except as noted below in section 4
[ ] Medically qualified to wear respiratory equipment [ ] Corrective lenses required
[ ] Medically qualified for hazardous waste operations
[ ] Medically qualified for asbestos
[√] In accordance with OSHA requirements, the above named individual has been informed of the results of his or her medical examination and of any medical condition that may result from his/her exposure to asbestos.
[√] The employee has been advised of increased risk of lung cancer attributable to the combined effect of smoking and asbestos exposure.
[ ] Medically qualified for confined space entry
[ ] Medically qualified for mobile equipment operation

[X] Not medically qualified - does not meet minimal company standards

**4. Recommendations or restrictions (if any):**
pt must have documentation of seizure free x 6 months -

| | |
|---|---|
| **5. Physician's Signature** R. B. Barlow, MD | **6. Examination Date** 8/11/08 |
| **7. Physician's Printed Name:** Ronald Barlow, M.D. | |
| **Street Address:** 2535 Broadway<br>**City/StateZip:** Paducah, KY 42001<br>**Phone No.:** (270) 575-3001 (800) 251-9548 **Fax No.:** (270) 575-0418 | |

EXHIBIT LH 5 11-17-10 DR. BARLOW
PENGAD 800-631-6989

JJ000051