IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
PADCUAH DIVISION
CASE NO. 5:09-CV-177-R
***Electronically Filed***

JOSH JAMES PLAINTIFF

VS

JAMES MARINE, INC. DEFENDANT

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF IT'S MOTION FOR SUMMARY JUDGMENT**

Comes the defendant, James Marine, Inc. (hereafter "James Marine") and for its Memorandum of Law in Support of its Motion for Summary Judgment, hereby states as follows:

## INTRODUCTION

Plaintiff Josh James (hereafter "Plaintiff") was formerly employed by James Marine as a welder/crane operator at its Walker Boat Yard facility located on the Tennessee River in Paducah, Kentucky. In May 2008, Plaintiff was required to submit to a return-to-work physical following his complaints of back pain that necessitated a large number of pain injection shots to his back. During the examination process James Marine's occupation health provider, Occunet, learned that Plaintiff suffered from a seizure disorder. As a result, Occunet's physicians deferred his work status pending review of his medical records because they feared Plaintiff posed a threat to the safety of himself and others due to his seizure condition. Because of these safety concerns, a six month seizure free requirement was imposed upon his employment. The six month period was scheduled to expire on July 31, 2008.

In August 2008, Plaintiff submitted documentation from his treating neurologist that indicated he had continued to suffer "events" that were suggestive of partial seizures. As a result, Occunet refused to release him to work given the hazards associated with his job. He was ultimately terminated from his employment following time off work that far exceeded the amount of time permitted under the Family and Medical Leave Act, 29 USC § 2601 *et*. *seq*. ("FMLA").

Plaintiff filed suit against James Marine claiming it interfered with his rights under FMLA and that it violated the "regarded as disabled" prong of the Americans with Disabilities Act, 42 USC § 12101 *et*. *seq*. ("ADA") As shall be discussed, James Marine is entitled to summary judgment as a matter of law on these claims. James Marine has a duty to ensure the safety of its employees. It lawfully determined that Plaintiff was not qualified to perform the essential functions of his job because he was a direct threat to the safety of himself and others. The requirement that he be seizure free for six months was a legitimate safety qualification imposed upon Plaintiff's employment for which he was never able to comply.

Plaintiff subsequently applied for disability benefits with the Social Security Administration. In that process, Plaintiff specifically represented he was disabled because of his seizure disorder as well as migraine headaches that required narcotics to treat. He further acknowledged he was precluded from working around heavy machinery as a result of his health condition. These statements serve to further defeat his ADA claim as a matter of law. Accordingly, James Marine is entitled to summary judgment.

## FACTUAL BACKGROUND

**A. Plaintiff's work duties/seizure disorder.**

As a shipyard employee, Plaintiff's duties consisted of welding, fitting, using a cutting torch, operating a crane, and driving a forklift, a cherry picker and a Bobcat. (James Depo. p. 11-15)[1] Attached hereto as Exhibit 'A' is the company's job description for welders. In November 2006, Plaintiff was tragically diagnosed with a malignant brain tumor. (James Depo. p. 28) Surgery was required to remove the tumor resulting in medical leave from November 20 to February 27 2007. He returned to work and was able to resume his normal work duties.

On January 31, 2008 he suffered a seizure while at work. (James depo. p. 38) He lost consciousness for a period of time and next remembered "sitting on the dock and hearing the water that was running out of the corner of a barge they had just brought up on the dock, and the bright lights, because it was nighttime, from the lights on the dock stream and the dock." (James depo. p. 40-41) He was taken to Western Baptist Hospital. (James depo. p. 41) He was released to return to work by his treating physician, Dr. Paul Moots, a Nashville neuro-oncologist, on March 12, 2008. Though the release indicated that he could return to work "without restriction," it also indicated he was "restricted from driving for 4 more months."[2] (See, Exhibit 'B') As explained by Plaintiff, the reason he was restricted from driving was because "you don't want to have a seizure while you're driving. You could have a wreck, die, hurt somebody else." (James depo. p.

---

[1] Relevant portions of depositions relied upon in this response will be filed in the record by a separate filing.

[2] Plaintiff was restricted from driving for a total of six months measured from January 31, 2008. (James depo., p. 51)

51). Plaintiff also conceded that the same safety concerns applied to operating heavy equipment. (James depo., p. 51)

Plaintiff acknowledged that legitimate safety concerns existed given his potential of suffering a seizure. For example, he testified as follows at his October 22, 2010 deposition:

> Q. Well, just given what you do at James Marine, would you agree with me that given its nature of being a shipyard and welding and being a crane operator and things that you've testified you've done, that there would be a legitimate safety concern with somebody that had a possibility of having a seizure?
>
> A. Yeah. Yes.
>
> Q. Why is that?
>
> A. Because the job is very dangerous, very dangerous. I mean, you could- - like if I had been two foot closer to the edge of the dock when I had the seizure, I could have fallen in the water. That's a perfect example right there of the dangers of the job.
>
> Q. Any other dangers that you can think of?
>
> A. Sure. I mean, I can come up with them all day long. Say I'm operating a crane and I have a seizure, and I've got a steering rudder attached to the crane that I'm lifting or trying to put somewhere, I could drop it because of the seizure and injure somebody else.
>
> Q. What about just the act of welding itself?
>
> A. Yes, welding is dangerous. The type of welding we did at James Marine, stick welding, if you were to have a seizure and drop the welding lead with a welding rod in it, most people tend to think that it would bounce around and create a bunch of sparks and go all over the place. In my experience, it won't do that. It will ground out on the surface of the dock. It might get hot, but it won't throw sparks, it won't jump around, it won't electrocute you; so I don't really associate danger with welding, you know, just from having a seizure and dropping a welding lead.
>
> Q. But you would concede others would have safety concerns?
>
> A. Possibly, yes.

Q. What about any climbing of ladders or things like that?

A. Of course.

Q. Because of the danger of falling?

A. Yes.

(James depo., p. 48-49)

Upon his return in March 2008, Plaintiff testified he gave the work release to his supervisor. However the Human Resource Director at the time, Chad Walker, was not aware of the driving restriction and did not recall ever being aware of the Moots release. (Walker depo. p. 20-21). Plaintiff claims he then began working in the fab shop "up the hill" because his supervisor was concerned about him working over water. (James depo. p. 63) He testified he performed "the same basic duties" at the fab shop which included "welding, cutting with the cutting torch, [and] using the big metal press" which he acknowledged was hazardous work: "if you stick your hand in between- - underneath the press itself, the big piece that comes down, if you stick your hand in there, I mean, anything could happen, the press could fall or somebody could hit the buttons not paying attention. I mean, it wasn't the fast-moving press, but still, you could lose an arm, finger, something. (James depo., p. 54-55) In addition, his job functions at the fab shop required him to continue operating heavy equipment including a "cherry picker and an overhead crane, a forklift, and a Bobcat." (James depo. p. 55)

Plaintiff testified that when he returned following his seizure, he never had any discussion with anyone at James Marine regarding any aspect of the release or his six month driving restriction. (James depo., p. 57) He further testified that since he was on a

"high dose" of anti-seizure medication he never felt the need to be concerned about safety nor apparently did his supervisors. (James depo., p. 58-59)

Only three people worked in the fab shop: Plaintiff, his foreman Tom Nichols and one other employee. (James depo. p. 59) The job required him to deliver the fabricated products to the ship yard, which is on the water. (James depo. p. 60) His duties also required him to be on the ship yard to measure templates on barges. (James depo. p. 60-61)

**B. Plaintiff is placed off work until he was seizure free for six months.**

On Thursday May 15, 2008 Plaintiff began complaining of back pain. The next day, he sought treatment for the pain at Western Baptist Prime Care. On Saturday May 17, his back hurt to the point that he sought treatment at the emergency room at Western Baptist Hospital. (James depo. p. 66) He received a steroid injection and a pain shot. (James depo. p. 66) On Monday, May 19 he sought treatment from Dr. Troy Nelson who gave him "10 or 12" point injections in his back. (James depo. p. 66-67)

The May 16 office note from Prime Care indicates Plaintiff hurt his back on April 22, 2008.[3] The note revealed that "he returns today saying his back pain has not changed" and that he has been taking "Robaxin and Lortab." (See Exhibit 'D', attached hereto) The note further indicated that Plaintiff "asks several times about Lortab" but was informed by the nurse practitioner that he "was uncomfortable giving him Lortab to go back to work as a welder where he could cover up the pain and worsen his condition."

He off work two days: Friday May 16 and Monday May 19. (James depo. p. 66-67) When he returned to work on Tuesday May 20 he was told to speak with Tom

[3] The office note from Prime Care for that event indicates he hurt his back on April 22 while he was at a park when he "ducked under a slide and his back started hurting." (See, Exhibit 'C', attached hereto. )

Freeman, the company's safety director. Freeman informed him that he needed to go to Occunet to get "a physical and make sure that you're able to do the work" because of his back. (James depo., p. 67-68) Chad Walker, the HR Director, testified that he recalled being informed by the safety director that Plaintiff had injured his back and was concerned about putting him back to work because of the large number of pain injection shots he reportedly received. (Walker depo., p. 22) Walker testified that they were concerned of the potential that Plaintiff could injure himself given the large number of pain injections and hence, a return-to-work physical needed to include a functional capacity evaluation. (Walker depo., p. 22-23)

Plaintiff arrived at Occunet on May 21, 2008. In the process, Occunet discovered his recent seizure and refused to permit him to return to work pending review of his seizure disorder. Occunet requested that he provide medical records relating to his seizure condition and on June 16, 2008, notified Plaintiff that he was not qualified to work until July 31, the six month anniversary date of his seizure. (Barlow depo., p. 21-22) James Marine presumed Plaintiff would be able to meet this safety requirement and arranged for Plaintiff to complete his functional capacity exam relating to his back condition pending his waiting period for the seizure disorder.

Plaintiff presented a letter dated August 4, 2008 from Dr. Moots. (See Exhibit 'E', attached hereto) The letter revealed that Plaintiff "has had two or three events over the last six months in which he had brief trouble speaking or numbness on the right side" resulting in an increase in his anti-seizure medication. The letter further revealed the need for "close monitoring" for additional seizures.

The office note from Dr. Moots dated July 16, 2008 indicates that Plaintiff reported “2 possible mini-seizures” since his last visit. (See Exhibit ‘F’, attached hereto). The note further indicated Plaintiff “had events in June that are suggestive of partial seizures including one event with speech arrest.” Plaintiff claims these events were anxiety attacks but conceded nothing in Dr. Moots’ notes or letter described his condition as an anxiety attack. (James depo., p. 79) As a result of his seizure activity, Dr. Barlow deferred him from work status until he could provide documentation that he had been seizure free for six months. (Barlow depo p.26-30)

Plaintiff submitted another letter dated August 30, 2008 from Dr. Moots. (Exhibit ‘G’, attached hereto) Again, Dr. Moots indicated that Plaintiff had suffered “two brief events that are suspected to have been minor partial seizures without generalization.” Dr. Barlow again refused to clear him to work because such seizure episodes posed considerable risk to himself and his co-workers. (Barlow depo. p.30; 36-42) Dr. Barlow explained the basis of his determination at his November 17, 2010 deposition:

> A. If they’ve been seizure-free for six months, hopefully, that means they’re going to be seizure-free for an extended period of time. Why six months, is it arbitrary, I think the Department of Transportation goes either three months or four months; and as far as I’m concerned, I like to see them seizure-free for a little bit longer than four to six months before I release them to a potentially hazardous environment.
>
> Q. And what would be your understanding of the environment that Mr. James was working in for James Marine?
>
> A. Potentially dangerous even without a person having seizures. It’s heavy industry, moving machinery, potentially dangerous encounters with moving machinery. It was my understanding that Mr. James was a welder, which means he is going to be using welding torches, cutting torches, extremely high heat, loss of—I won’t say “consciousness,” because no indication that other than when he had generalized seizures he loses consciousness, but loss of attention to what he’s doing could happen with partial seizures and could at that point pose potential danger.

Q. What would be the potential danger?

A. If he's holding a torch, loss of control of the torch. If he's driving machinery, loss of concentration on what he's doing as far as driving machinery, potential hazards from just not knowing what he's doing.

Q. What about working in and around water, would that have any impact on that opinion?

A. Certainly. Certainly. If he loses concentration, if he is out over water, certainly he could fall in the water. If he was not wearing a vest, he could drown.

Q. What is- -from your understanding, what is a partial seizure versus a generalized seizure?

A. A generalized seizure is a tonic-clonic seizure where there's muscle twitching, jerking, limb jerking. Partial seizures are absent seizures. There's just a loss of concentration that may manifest by just staring. It could be lip smacking, it could be twitching, but there's not a generalized tonic-clonic movement.

Q. What would be the reasoning to consider partial seizures as not compliant with the requirement that he be seizure free?

A. The partial seizure is still a seizure. He does not know what's going on from the time he's having a partial seizure. He's totally unaware of his environment for the episode.

Q. Given your experience in occupational medicine, is that a typical requirement that you would impose?

A. Yes.

Q. And why is that?

A. Simply because of the danger in any heavy industry- - potential dangers in heavy industry.

(Barlow depo., p. 37-39)

Plaintiff testified that he requested Dr. Moots to send a letter simply stating that Plaintiff has been seizure free for six months and to report nothing about partial seizures but Dr. Moots refused. (James depo. p. 80-81)

Following Occunet's refusal to clear him to work until he was seizure free for six months, Plaintiff was informed he would be on medical leave. (Defendant's Answers to First Interrogatories, ¶ 18, attached hereto as Exhibit 'H') As a result, Plaintiff applied for and received unemployment benefits. (James depo., p. 95) To qualify, he notified the state Unemployment Commission that he was no longer working due to a "leave of absence" because he "had seizure on 01/31/08 returned to work on 3/13/08 referred to Occunet on 5/21/08 Occunet said I could not work until I had been seizure free for 6 months." (See Exhibit 'I', attached hereto)

Plaintiff enrolled as a full time student for the fall 2008 semester at West Kentucky Tech. He took general classes necessary to qualify for the radiology program. (James depo., p. 139-142) On Christmas Eve 2008, he called James Marine to inquire if he would be receiving a bonus. (James depo., p. 96-97) He spoke with Chad Walker who informed him he was being terminated because he had exceeded the amount of time available under FMLA. (Walker depo., p. 61;65) He received a letter dated January 14, 2009 from James Marine confirming his termination. (See Exhibit 'J', attached hereto)

Plaintiff never submitted any further documentation establishing he had been seizure free for six months. In fact, the office note from Dr. Moots dated January 16, 2009 indicates he:

> "had two events with transit right side symptoms of numbness for 10-15 minutes. Was alert and able to talk. In one he was having a migraine. These are high intensity headaches with N/V. Maxalt made them worse. Topomax helped somewhat. He is now on keppra 1500 mg bid and prn lortab."

(See Exhibit 'K', attached hereto)

Under the neurologic findings, "seizures" are indicated as a "positive finding." Plaintiff confirmed that the "events" noted in the office note occurred after his July 16

office visit. (James depo., p. 133) Plaintiff further marked "seizures" as a condition applying to him on the Patient Follow-Up Form contained in the office note. (James depo., p. 134)

**C. Plaintiff applies for disability benefits.**

Plaintiff subsequently applied for social security disability. The date of his application was August 26, 2010. Plaintiff represented to the Social Security Administration that he stopped working on May 15, 2008 "[b]ecause of my condition(s)" which he listed as being 1) seizures, 2) brain tumor removed in 2006, 3) 10% of the tumor is remaining in head and 4) anxiety. (See Disability Report –Adult-Form SSA-3368, Exhibit 'L', attached hereto) In the job history section of the Disability Report, Plaintiff identified one of the jobs he was unable to perform as a "Welder/Crane Operator." Under Section 7 of the Form, Plaintiff indicated he was prescribed Adivan for anxiety, Keppra for seizures, and Lortab for migraines.

Attached in Exhibit 'M' is the Work History Report submitted as part of the disability application. Plaintiff again lists James Marine as a job he had previously held before he "became unable to work because of [his] illnesses, injuries, or conditions."

Attached in Exhibit 'N'is a Pain and Daily Activities Questionnaire signed by Plaintiff and submitted as part of the application. The questionnaire reveals that his "head pounds daily," and that he has anxiety attacks that frightens his wife who is afraid to leave him at home with the children. (See ¶ 1) Paragraph 4 reveals that Plaintiff is required to take "2 or 3" Lortab a day as needed for pain and Keppra twice a day at 1500 mg a dose.

The Function Report-Adult, also submitted as part of his application is attached hereto as Exhibit ‘O’. Question 10 asks “[w]hat were you able to do before your illnesses, injuries, or conditions that you can’t do now? Plaintiff responded “can’t operate heavy equipment, driving is questionable.” In response to question 12(c), Plaintiff indicated he needed reminders to take his medicine as “I tend to forget it.” He further indicated that his attention span had been affected and that he “zones in & out a lot.” (See Questions19(c), 20 (a) and (d)).

As part of the application process, Plaintiff was evaluated by a psychologist, Bruce Amble Ph.D. He was interviewed by Dr. Amble who also prepared a report of his interview and findings which is attached hereto as Exhibit ‘P’. Dr. Amble testified at his March 8, 2011 deposition that Plaintiff informed him that “he began having seizures about a year after his surgery and has anxiety attacks and headaches almost on a daily basis” (Amble depo., p. 15-17) Plaintiff further told him that “the doctor told him he couldn’t work at a restaurant because he might have a seizure and there could be hot grease.” (Amble depo. p. 17) He informed Dr. Amble that he could no longer work because of his seizures and his inability to concentrate and that he used to be able to operate a crane but he couldn’t any longer. (Amble depo. p. 19-20) Amble confirmed he would not have included this information in his report if Plaintiff had not provided it. (Amble depo., p. 19) Amble further noted that Plaintiff was “identified with seizure problems” and that seizures were brought up by Plaintiff as a “very significant aspect of his disability.” (Amble depo., p. 24) Plaintiff represented that he did not feel he could work competitively because of his seizure condition. (Amble depo., p. 25) Plaintiff

further reported that "he has a lot of headaches and numbness in his body." (Amble depo., p. 26)

Plaintiff was apparently denied benefits at this stage of the process because it was determined that he could perform past relevant work such as a dishwasher and display cook. (See Disability Determination Explanation, Exhibit 'Q', attached hereto) As revealed in this Explanation, however, the Social Security Administration agreed he was forever restricted from climbing ladders/ropes/scaffolds and was to "avoid all exposure" to "Hazards (machinery, heights, etc.)"

Plaintiff has not provided any discovery regarding the status of his social security disability proceedings.[4] Plaintiff's counsel has orally advised that he has since withdrawn his application and not appealed.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate and should be rendered when "the pleadings, depositions, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party." *Little v. BP Exploration & Oil Co.*, 265 F. 3d 357, 361 (6th Cir. 2001). See also *Williams v. International Paper Co.*, 227 F. 3d 706, 710 (6th Cir. 2000); *White v. Turfway Park Racing Association, Inc.*, 909 F. 2d 941, 943–44 (6th Cir. 1990). The Supreme Court has formulated a dual burden that governs the determination of whether summary judgment should be granted: "[t]he movant has the burden of showing

[4] Plaintiff only produced the disability application after Defendant moved this Court to compel it. The Court entered an Order on January 24, 2011 requiring Plaintiff to authorize release of his Social Security Disability Application.

that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Thus, if the moving party establishes an absence of evidence in support of the nonmoving party's case, the "nonmoving party has the burden of coming forward with evidence raising a triable issue of fact." *McKay v. Toyota Motor Mfg.*, 878 F. Supp. 1012, 1013 (E.D. Ky. 1995). See also *Anderson*, supra. However, when defending against summary judgment, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). Nor is it sufficient for the nonmoving party simply to set forth "conclusory allegations." *Cincinnati Bell Telephone Co. v. Allnet Communication Services, Inc.*, 17 F. 3d 921, 923 (6th Cir. 1994). See also *Williams*, supra, and *White*, supra. If a reasonable jury could not return a verdict for the nonmoving party on the basis of the evidence as construed in its favor, summary judgment should be granted to the movant. See *Burchett v. Kiefer*, 310 F. 3d 937, 942 (6th Cir. 2002).

**LEGAL ARGUMENT**

Plaintiff claims relief under both the ADA and FMLA. As shall be discussed, these claims fail as a matter of law. The ability to safely perform his job was a condition of employment as acknowledged by Plaintiff when he was hired. (See Exhibit 'R', attached hereto) Plaintiff's duties required him to operate presses and heavy equipment such as an overhead crane. He was also required to drive a forklift, a cherry picker and a Bobcat, as well as to use a cutting torch and welding rod and to climb ladders and

scaffolds. In light of these safety sensitive duties, James Marine lawfully imposed a six month seizure free requirement upon his employment when its occupational health provider, Occunet, learned of his seizure disorder. His employment was terminated because he could not meet this safety qualification.

The FMLA does not require job restoration if an employee is unable to perform the essential functions of his job upon return from leave. Accordingly, his interference claim under the job restoration requirements of the FMLA also fails. Finally, he was ultimately granted leave for his seizure condition that far exceeded the 12 week requirement under the Act.

**A. Plaintiff cannot show he was a "qualified individual" because he posed a "direct threat" to the health and safety of himself and others.**

To recover on a claim of discrimination brought under the ADA, an employee must first make out a prima facie case of discrimination that 1) he was or perceived as disabled, 2) he was otherwise qualified to perform the essential functions of the job, and 3) he suffered an adverse employment action. *Monette v. Electonic Data Systems Corp*., 90 F.3d 1173 (6th Cir. 1996). Here, Plaintiff can not establish he was qualified to perform the essential functions of his job because he was a "direct threat" to the safety of himself and others.

Plaintiff was off work from February 1, 2008 to March 12, 2008 following the seizure he suffered at work. During this period, he applied and received short-term disability benefits as a result of his employment. (James depo., p. 43) He did not request nor admittedly did James Marine ever designate this time as FMLA leave. Nonetheless, he was restored to his employment. His return to work was not conditioned upon receipt of any medical certification from his healthcare provider certifying he was fit to resume

work as permitted by the FMLA, 29 USC § 2614(a) (4) and the attendant regulations. See, 29 CFR 825.312(a).[5] He nonetheless provided a work release from a Nashville neuro-oncologist to his supervisor. The release indicated he could return to work without restrictions except that he was restricted from driving for six months to be measured from the date of his seizure. Chad Walker, the HR Director at the time, testified he was not provided the release and was unaware of the six month driving restriction. Plaintiff further acknowledged he never had any discussions with anyone at James Marine regarding any aspect of the release or his six month driving restriction other than he was told to work in the fab shop because his supervisor was concerned about him working over the water (James depo., p. 57) Plaintiff, however, acknowledged he performed the "the same basic duties" at the fab shop which included "welding, cutting with the cutting torch, [and] using the big metal press" as well as operating a "cherry picker and an overhead crane, a forklift, and a Bobcat." (James depo. p. 55)

As discussed in the Factual Background section above, he was sent to Occunet in May, 2008 following pain injections he received to his back. Medical examinations of employees are clearly permitted provided it is "job-related and consistent with business necessity." See, 42 USC § 12112(d)(4)(A); 29 CFR § 1630.14(c). As pointed out by the Sixth Circuit in *Sullivan v. River Valley School Dist*, 197 F.3d 804, 812 (6th Cir. 2000), "[w]hile it is true that the ADA limits an employer's ability to request unfounded examinations to prevent 'the unwanted exposure of the employee's disability and the stigma it may carry,' an employer may order a well-founded examination. *Id., quoting EEOC v. Prevo's Family Market, Inc.*, 135 F.3d 1089, 1094 n. 8 (6th Cir. 1998).

[5] The fitness for duty certification regulation was previously contained at 29 CFR § 310(c).

Plaintiff can not seriously dispute James Marine's right to require a physical examination following his report of "10 or 12" pain injections to his back. As pointed out in *Sullivan*, "health problems that significantly affect an employee's performance of essential job functions justify ordering a physical examination." *Id*. at 812. Though Plaintiff missed two days work because of his back, he was not on FMLA leave nor is there any evidence that his back condition justified any leave requirements under the Act. In fact, he claims he was perfectly fit to work and was in fact prepared to work until he was directed to Occunet for the return to work physical. Accordingly, the job restoration requirements of the FMLA have no bearing on the return to work physical and functional capacity evaluation performed in May/June 2008.

The ADA regulations contemplate that an employee's medical history may be obtained as a result of the employment medical examination. See 29 CFR 1630.14(c) (1). Here his history revealed a seizure disorder which triggered a direct threat analysis permitted under the ADA. See, *EEOC v. Prevo's Family Market, Inc.*, 135 F.3d 1089, 1094 (6th Cir. 1998): "The statute allows employers to require as a qualification for employment that the disabled individual does not pose a 'direct threat to the health and safety of other individuals in the workplace." See also, 29 CFR § 1630.2(r), "[d]irect [t]hreat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." This regulation expanded the risk to include safety of the individual and was upheld by the Supreme Court in *Chevron USA Inc., v Echazabal*, 536 US 73 (2002).

Additionally, an employer may impose qualification standards that tend to screen out or otherwise deny employment to disabled individuals where the standard is job

related and consistent with business necessity and satisfactory performance cannot be affected by reasonable accommodation. 42 USC § 12113(a). "The term 'qualification standards' may include a requirement that an individual shall not pose a direct threat to the health and safety of other individuals in the workplace." 42 USC § 12113(b). See *Mauro v. Borgess Medical Center*, 137 F.3d 398 (6th Cir. 1998).

**1. Standards for determining "direct threat."**

The ADA regulations require that the "determination that an individual poses a 'direct threat' be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. See 29 CFR § 1630.2(r). The factors to consider include: 1) the duration of the risk, 2) the nature and severity of the potential harm, 3) the likelihood that the potential harm will occur, and 4) the imminence of the potential harm. *EEOC v. Prevo's Family Market, Inc.*, 135 F.3d at 1095 (citing 29 CFR§ 1630.2(r). The requirement that Plaintiff be seizure free for six months clearly met these standards.

James Marine did not impose the six month seizure free requirement until Occunet, a health provider with expertise in occupational health matters, advised that such a requirement was necessary from a safety perspective. The decision was based on an individualized assessment following Dr. Barlow's review of his seizure condition which included a review of his medical records and the specific job functions performed by Plaintiff. Dr. Barlow was intimately familiar with the marine industry and the particular requirements of Plaintiff's position, including the fact he operated heavy equipment and welded at heights.

Further, the fact that Plaintiff's own treating physician specifically restricted him from driving for six months following his seizure confirms the safety implications of his condition. As pointed out by Dr. Barlow, the reason an individual is restricted from driving for six months following a seizure is "protection for the patient as well as other people on the road" because "if there is loss of concentration, it could result in a wreck, bodily injury." (Barlow depo. p. 41) As further testified by Dr. Barlow, "If they can't drive, shouldn't drive and restricted from driving, why should he be out working in heavy industry?" (Barlow depo. p. 41)

The six month seizure free restriction was obviously limited in duration. James Marine did not impose any generalized restriction against individuals with seizure disorders. It simply imposed a requirement as to Plaintiff, who was employed in a safety sensitive position, that he be seizure free for six months before resuming his duties.

Plaintiff himself acknowledged the dangers associated with his job including the potential that he or a coworker could be killed or seriously injured if he suffered a seizure at work. (James depo., p. 48-49) Such dangers were confirmed by Dr. Barlow. (Barlow depo. p. 37-38) Even if the risk that Plaintiff would experience a seizure was small, the inherently dangerous nature of his position deserves significant weight in the analysis of whether Plaintiff is a 'direct threat.' *See, e.g., Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 894 (9th Cir. 2001)(finding that "the severity and scale of the potential harm to others presented by [the plaintiff's] employment. . . pose[d] a significant risk under the direct-threat analysis" even though "the likelihood of an accident [was] small.") (citing *Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 231(3d Cir 2000). The severity as well as imminence of the harm that could occur if Plaintiff- -who welded, operated a crane, drove

a forklift, cherry picker, and a Bobcat- -suffered a seizure would be substantial. As such, Plaintiff can not establish he was "otherwise qualified" for the job.

**2. Plaintiff could not be reasonably accommodated.**

Plaintiff must be able to demonstrate that he was a "qualified individual with a disability who, with or without reasonable accommodation, can perform the essential functions of his position." 42 USC § 12111(8).[6] "Reasonable accommodations" include modifications to the job or work environment that enable a qualified individual with a disability to perform the essential functions of the job. 42 USC § 12111(9); 29 CFR § 1630.2(o). "A job function is essential if its removal would fundamentally alter the position." *Kiphart v. Saturn Corp*., 251 F.3d 573, 584 (6th Cir. 2001). Employers are not required to eliminate or reassign essential job functions, *See Laurin v. Providence Hospital*, 150 F.3d 52, 56 (1st Cir. 1998), nor must an employer create a new position to accommodate a disabled employee. *Monette*, 90 F.3d at 1187. The ADA does not require an employer to reassign an employee to a position that is not vacant. Moreover, an employer is not required by the ADA to employ someone who poses a "direct threat" to himself or others if the threat cannot be eliminated by making a reasonable accommodation.

Plaintiff's job functions included welding, operating equipment, operating a crane, driving a forklift, a cherry picker and a Bobcat. A ship yard employee is required to perform these essential functions. No objectively reasonable accommodation could be made for an individual who could not meet the company's six month seizure free

---

[6] In reality, Plaintiff does not allege he suffered from a disability but rather, proceeds under the regarded as prong of the ADA. (Complaint ¶ ) As such, the Sixth Circuit is clear that a plaintiff claiming discrimination under the regarded as standard is not entitled to an accommodation. *Workman v. Frito Lay*, 165 F.3d 460 (6th Cir. 1999). Since James Marine's summary judgment motion analyzes the case under the direct threat standard, it will nonetheless address the issue of reasonable accommodations.

qualification without altering the nature of the functions themselves. No evidence exists that Plaintiff qualified for a non-safety sensitive position or that any such positions were even vacant.

**3. Plaintiff's termination did not violate the ADA.**

Plaintiff could not comply with the six month seizure free requirement which as addressed above, was a legitimate safety qualification imposed on his employment. Upon conclusion of the six month period- -July 21, 2008- - the letter submitted by Plaintiff from his treating physician indicated that Plaintiff "had two or three events over the last six months in which he had brief trouble speaking or numbness on the right side" resulting in an increase in his anti-seizure medication. The letter further revealed the need for "close monitoring" for additional seizures. The office note from Dr. Moots dated July 16, 2008 indicates that Plaintiff reported "2 possible mini-seizures" since his last visit. (See Exhibit 'F') The note further indicated Plaintiff "had events in June that are suggestive of partial seizures including one event with speech arrest."

While his treating physician's letters indicated that Plaintiff "feels able to work full time" to which Dr. Moots agreed, Plaintiff still failed to meet the six month seizure free qualification since he continued to suffer from "events" that were suggestive of partial seizures. As pointed out by Dr. Barlow in written response, "Even if these episodes are partial seizures there still exist considerable risk on and off the job for this person because of the possibility of an accident from a seizure episode." (See, Exhibit 'G'. As he testified, a partial seizure still involves a loss of concentration and a person suffering from a partial seizure "does not know what's going on from the time he's

having a partial seizure. He's totally unaware of his environment for the episode." (Barlow depo., p. 38-39)

Plaintiff was advised that he could not resume employment until he demonstrated he was seizure free for six months. He never submitted any further documentation. He was ultimately terminated. However, since he was not otherwise qualified for his job, his ADA claim fails as a matter of law.

**B. Plaintiff must be estopped from claiming he was not a direct threat to safety.**

The United States Supreme Court in *Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795 (1999) addressed the issue of judicial estoppel which applies when a plaintiff claims in one proceeding that he was too disabled to work (as Plaintiff has claimed in his social security application) but claims in another proceeding that he was discriminated against under the ADA because he was in fact able to work with or without reasonable accommodations. In *Cleveland*, the Court found that the applicant's claims of being disabled under social security applications do not automatically judicially estop an ADA claim. The Court noted: "Despite the appearance of conflict that arises from the language of the two statutes, the two claims do not inherently conflict to the point where courts should apply a special negative presumption… That is because there are too many situations in which an SSDI claim and an ADA claim can comfortably exist side by side." *Id*. at 802-03. This is so, the Court reasoned, because the ADA allows for "reasonable accommodation" of the disability, while the Social Security Administration does not when determining SSDI eligibility. *Id*. at 803

The Court in *Cleveland* warned, however, that an ADA plaintiff "cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim.

Rather, the plaintiff must *proffer a sufficient explanation*." *Id*. at 806. (Emphasis added). The Court defined what constitutes a "sufficient explanation" for the apparent contradiction as follows:

> To defeat summary judgment, [an] explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of the job, with or without 'reasonable accommodation.'

The Court in *Cleveland* as well as courts considering the issue following *Cleveland* have distinguished between explanations that are a "context-related legal conclusion" i.e., the differing legal standards of "disability" under the statutes from factual representations made in the application process. See, *Opsteen v. Keller Structures, Inc*., 408 F.3d 390, 392 (7th Cir. 2005) ("Contradictions are unacceptable: a person who applied for disability benefits must live with the factual representations made to obtain them, and if these show inability to do the job then an ADA claim may be rejected without further inquiry.") See also, *Johnson v Exxon Mobil Corp*., 426 F.3d 887, 892 (7th Cir. 2005) ("As this court has noted, *Cleveland* does not stand for the proposition that defendants should be allowed to explain why they gave false statements on their SSDI applications, which is essentially what [Plaintiff] seeks to do here); *Motley v. New Jersey State Police*, 196 F.3d 160, 167 (3rd Cir. 1999): "There may be cases where, looking at the previous facts and statements by a party, the assertions are such that the party cannot prove that he was a qualified individual because his previous statements take the position that he could not perform the essential functions of the job, with or without accommodation. That is the case here."

Plaintiff has specifically represented to the Social Security Administration that he suffered from health conditions that precluded him from working. He represented that one of the conditions was a seizure disorder. As part of the disability proceedings, he specifically represented that he "can't operate heavy equipment, driving is questionable", that he is unable to operate a crane, that he "zones in and out", that he does not drive for more than 10-15 minutes because of his conditions, that his concentration is affected, that "the doctor told him he couldn't work at a restaurant because he might have a seizure and there could be hot grease", that James Marine was one of the jobs he previously held before he "became unable to work because of [his] illnesses, injuries, or conditions", that his "head pounds daily," and that seizures were a "very significant aspect of his disability." (See, Exhibits 'L' – 'P; Amble depo., p. 17-26)

Plaintiff's application identifies the onset date of his disability as May 15, 2008 which also corresponds to the last day he was ever employed on a significant basis. The disability application was the product of a discovery dispute between the parties and resulted in an Order of this Court compelling its production. Realizing the potentially negative impact of the application to this civil action, Plaintiff supplied a "Second Declaration of Josh James" indicating that in reality he meant to list the onset date of his disability as being August 31, 2010.[7] However, Plaintiff still can not overcome the devastating contradictions between factual assertions made in his application and the claims asserted in this case. He has presented no evidence or explanation as to why he claimed in this action to be unaffected by his seizure disorder yet claims now that he has been affected—only beginning in August 31, 2010. He has always claimed in this civil action that he has never been affected by his seizure disorder except for the one event on

[7] Plaintiff's Second Declaration of Josh James is attached to his Renewed Motion for Summary Judgment.

January 31, 2008. Yet, his application is replete with representations that he has been unable to work because of his seizure disorder and that he is unable to work around heavy equipment or operate a crane.

He has not supplied any evidence to suggest that such seizure condition only manifested itself on August 31, 2010. In his first Declaration of Josh James [8] that he executed on December 10, 2010 (before he was required to produce the social security application) he testified he was able to work on May 20, 2008 "and at all times thereafter" in direct contradiction with the representations made in his social security application even given the amended onset date of August 31, 2010.

Given the factual representations made in the context of the disability proceedings, Plaintiff must be judicially estopped from now claiming he did not pose a direct threat to the safety of himself and others. His application is replete with evidence that he was certainly claiming to the social security administration that his seizure disorder precluded him from working, particularly in a safety sensitive work environment inherent in a welding/crane operator position. Summary judgment is mandated on his ADA claim as a result.

**C. Plaintiff's FMLA interference claim fails as a matter of law.**

Plaintiff asserts an interference claim under FMLA pursuant to 29 USC § 2615(a)(1) which provides that "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or attempt to exercise, any right provided in this subchapter." An employer's intent is not controlling. *Arban v. West Publishing Corp.*, 345 F.3d 390, 401(6th Cir. 2003). To prevail, Plaintiff must establish that James Marine interfered with a FMLA right to medical leave or to reinstatement following FMLA

[8] Attached to Plaintiff's Renewed Motion for Summary Judgment

leave. *Arban,* 345 F.3d at 401. Here, Plaintiff alleges that James Marine interfered with the right to reinstatement when it refused to permit Plaintiff to return to work following his return to work physical in May, 2008. As discussed below, this claim fails as a matter of law.

**1) Plaintiff was lawfully placed off work following his return to work evaluation in May, 2008.**

Plaintiff was not on FMLA leave in May, 2008 when he was sent for a return to work physical at Occunet; nor was he returning from FMLA leave at the time. He missed two days of work- - May 16 and May 19- - because of back pain. He was sent to Occunet for an evaluation because of the large number of pain injections reportedly received to his back. Employment examinations are permissible under the ADA provided it is job-related and consistent with business necessity." See, 42 USC § 12112(d)(4)(A); 29 CFR § 1630.14(c). See *Sullivan v. River Valley School Dist,* 197 F.3d at 812, "an employer may order a well-founded examination." *See also, Prevo's Family Market*, 135 F.3d at 1095, "health problems that significantly affect an employee's performance of essential job functions justify ordering a physical examination."

Plaintiff was precluded from working after the physicians at Occunet discovered his seizure disorder. At that point, a "direct threat" analysis was performed that included a review of his medical records and specific job functions. Again, James Marine did not violate the FMLA by undertaking a direct threat evaluation at a point in time that was well after Plaintiff was restored to his position following his seizure on January 31, 2010. As provided by 29 USC § 825.312(h):

> Requirements under the Americans with Disabilities Act (ADA), as amended, apply. After an employee returns from FMLA leave, the ADA requires any medical examination at an employer's expense by the employer's health care

> provider be job-related and consistent with business necessity. For example, an attorney could not be required to submit to a medical examination or inquiry just because her leg had been amputated. The essential functions of an attorney's job do not require use of both legs; therefore such an inquiry would not be job related. An employer may require a warehouse laborer, whose back impairment affects the ability to lift, to be examined by an orthopedist, but may not require this employee to submit to an HIV test where the test is not related to either the essential functions of his job or to his/her impairment. If an employee's serious health condition may also be a disability within the meaning of the ADA, the FMLA does not prevent the employer from following the procedures for requesting medical information under the ADA.

*See also, Porter v. U.S. Alumoweld Co., Inc*., 125 F.3d 243, 247 (4th Cir. 1997), "After an employee returns from FMLA leave, the ADA requires any medical examination at an employer's expense by the employer's health care provider be job related and consistent with business necessity."

Defendant legitimately inquired of Plaintiff's seizure disorder to determine if he posed a direct threat to the safety of himself or others as permitted under the ADA. As pointed out by the Sixth Circuit in *Denman v Davey Tree Expert Co*., 266 Fed. Appx 377, 378 (6th Cir. 2007), "An employer's request for medical information is job-related and consistent with business necessity when: 1) the employee requests an accommodation; 2) the employee's ability to perform the essential functions of the job is impaired; or 3) *the employee poses a direct threat to himself or others*." (Emphasis added)

Accordingly, James Marine did not interfere with any right provided Plaintiff under the FMLA. Summary judgment is mandated on this claim.

**2) Plaintiff suffered no prejudice by James Marine's failure to specifically designate his time off beginning in May 2008 as FMLA leave.**

As a condition of his employment, James Marine lawfully imposed a six month seizure free qualification upon Plaintiff's employment. He was notified in May, 2008 that he would be on leave pending receipt of his six month seizure free certification. This

was expected to be July 31, 2008 Plaintiff was obviously aware of his leave status. For example, he notified the Unemployment Commission he was on a “leave of absence” because of the six month seizure free requirement. (Exhibit ‘I’) As set forth above, Plaintiff ultimately could not comply with the six month seizure free requirement and was eventually terminated. He was orally notified of his termination on December 24, 2008 when he called Chad Walker inquiring of a bonus. He was provided written notice of the termination by letter dated January 14, 2009 from Jill Harper notifying him that he had exhausted all available leave under the FMLA.

Admittedly, James Marine did not specifically designate his time off work beginning in May 2008 as time off under FMLA until after-the-fact. (Harper depo. p 48-60) However, it can not be disputed that Plaintiff was permitted 12 weeks of leave as required under the FMLA. See 29 USC § 2612(a)(1)(D). As such, he can not establish any prejudice by James Marine’s technical violation in failing to designate. This is in accord with the Supreme Court ruling in *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002) which specifically held that a plaintiff asserting a claim based on a violation of the FMLA must demonstrate prejudice as a result of a defendant's allegedly improper notice.

As summarized by the Sixth Circuit in *Wilkerson v. Autozone, Inc.*, 152 F. App'x 444, 449 (6th Cir. 2005):

> In *Ragsdale*, the Supreme Court struck down a regulation, 29 C.F.R. § 825.700(a) (2001), under which an employer that failed to designate an employee's leave as FMLA-qualifying was prohibited from counting that leave against the employee's FMLA entitlement. *See 535 U.S. at 89-96, 122 S. Ct. 1155.* The regulation was invalid, the Court explained, "because it alter[ed] the FMLA's cause of action in a fundamental way: It relieve[d] employees of the burden of proving any real impairment of their rights and resulting prejudice." *Id.* at 90**.** By not requiring a showing of prejudice, the regulation allowed an employee to sue under the FMLA

without having been denied the Act's substantive entitlements. *See id. at 90-91, 122 S. Ct. at 1155***.**

Since Plaintiff was in fact provided leave in the amounts required under the FMLA *and* has suffered no prejudice by James Marine's failure to designate the leave, James Marine is entitled to summary judgment on this aspect of Plaintiff's interference claim.

**CONCLUSION**

For all the foregoing reasons, this Court should grant James Marine's motion for summary judgment. Plaintiff is not entitled to any relief under the ADA or the FMLA as set forth above based on the evidence of record. James Marine is entitled to a summary judgment as a matter of law.

Respectfully submitted,

DENTON & KEULER, LLP
P.O. Box 929
Paducah, KY 42002-0929
(270) 443-8253
(270) 442-6000 (fax)

By s/David L. Kelly
David L. Kelly

ATTORNEYS FOR DEFENDANT

**CERTIFICATE OF SERVICE**

I hereby certify that on the 29th day of April, 2011, I electronically filed with the clerk of court by using the CM/ECF system, the foregoing document which will send a notice of electronic filing to the following:

HON D WES SULLENGER
SULLENGER LAW OFFICE PLLC
1324 JEFFERSON ST
PADUCAH KY 42001
By: s/David L. Kelly
David L. Kelly