IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
PADCUAH DIVISION
CASE NO. 5:09-CV-177-R
***Electronically Filed***

JOSH JAMES PLAINTIFF

VS

JAMES MARINE, INC. DEFENDANT

---

**DEFENDANT'S RESPONSE TO PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT**

---

Comes the defendant, James Marine, Inc. ("James Marine"), by and through the undersigned counsel, and in response to Plaintiff's Renewed Motion for Summary Judgment, states as follows:

**INTRODUCTION**

Plaintiff Josh James (hereafter "Plaintiff") was formerly employed by James Marine as a welder/crane operator at its Walker Boat Yard facility located on the Tennessee River in Paducah, Kentucky. He filed suit against James Marine alleging that it interfered with his job restoration rights under the Family and Medical Leave Act, 29 USC § 2601 *et*. *seq*. ("FMLA"). In May 2008, James Marine's occupational health provider, Occunet, imposed a six month seizure free requirement upon his employment. This qualification was imposed for safety reasons following a "direct threat" analysis performed by Occunet when it learned of Plaintiff's seizure disorder. Plaintiff also alleges James Marine violated the "regarded as disabled" prong of the Americans with Disabilities Act, 42 USC § 12101 *et*. *seq*. ("ADA") when it reassigned him to work in the fab shop upon his return to work following a seizure he suffered on January 31, 2008.

Plaintiff claims the reassignment was directed by his supervisor who was concerned about him working over water following his seizure.

Plaintiff has moved for summary judgment on the issue of the job reassignment as well as the FMLA interference claim. Likewise, James Marine has filed an extensive motion for summary judgment. Out of judicial economy, James Marine's Memorandum of Law in Support of its Motion for Summary Judgment is adopted and incorporated as if fully set forth herein. As demonstrated by James Marine's motion and as set forth herein, Plaintiff's claims fail as a matter of law. Plaintiff's Renewed Motion for summary judgment must be denied.

## FACTUAL BACKGROUND

As pointed out above, James Marine has filed a motion for summary judgment on all claims asserted by Plaintiff. The memorandum of law filed in support of James Marine's motion contains an extensive Factual Background section. James Marine will attempt to set forth only the salient facts in the record in this response for purposes of judicial economy.

### A. Plaintiff's seizure disorder/safety concerns of James Marine

Plaintiff suffers from a seizure disorder as a result of a malignant brain tumor tragically diagnosed in November 2006. On January 31, 2008 he suffered a seizure while at work. (James depo. p. 38) He lost consciousness for a period of time and next remembered "sitting on the dock and hearing the water that was running out of the corner of a barge they had just brought up on the dock, and the bright lights, because it was nighttime, from the lights on the dock stream and the dock." (James depo. p. 40-41) He was taken to Western Baptist Hospital. (James depo. p. 41) He was released to return to

work by his treating physician, Dr. Paul Moots, a Nashville neuro-oncologist, on March 12, 2008. Though the release indicated that he could return to work "without restriction," it also indicated he was "restricted from driving for 4 more months."[1] As explained by Plaintiff, the reason he was restricted from driving was because "you don't want to have a seizure while you're driving. You could have a wreck, die, hurt somebody else." (James depo. p. 51). Plaintiff also conceded that the same safety concerns applied to operating heavy equipment. (James depo., p. 51)

Plaintiff acknowledged that legitimate safety concerns existed given his potential of suffering a seizure. For example, he testified as follows at his October 22, 2010 deposition:

> Q. Well, just given what you do at James Marine, would you agree with me that given its nature of being a shipyard and welding and being a crane operator and things that you've testified you've done, that there would be a legitimate safety concern with somebody that had a possibility of having a seizure?
>
> A. Yeah. Yes.
>
> Q. Why is that?
>
> A. Because the job is very dangerous, very dangerous. I mean, you could- - like if I had been two foot closer to the edge of the dock when I had the seizure, I could have fallen in the water. That's a perfect example right there of the dangers of the job.
>
> Q. Any other dangers that you can think of?
>
> A. Sure. I mean, I can come up with them all day long. Say I'm operating a crane and I have a seizure, and I've got a steering rudder attached to the crane that I'm lifting or trying to put somewhere, I could drop it because of the seizure and injure somebody else.
>
> Q. What about just the act of welding itself?

---

[1] Plaintiff was restricted from driving for a total of six months measured from January 31, 2008. (James depo., p. 51). (See Exhibit 'B' to Defendant's Memorandum of Law in Support of its Motion for Summary Judgment).

A. Yes, welding is dangerous. The type of welding we did at James Marine, stick welding, if you were to have a seizure and drop the welding lead with a welding rod in it, most people tend to think that it would bounce around and create a bunch of sparks and go all over the place. In my experience, it won't do that. It will ground out on the surface of the dock. It might get hot, but it won't throw sparks, it won't jump around, it won't electrocute you; so I don't really associate danger with welding, you know, just from having a seizure and dropping a welding lead.

Q. But you would concede others would have safety concerns?

A. Possibly, yes.

Q. What about any climbing of ladders or things like that?

A. Of course.

Q. Because of the danger of falling?

A. Yes.

(James depo., p. 48-49)

Plaintiff confirmed that the effects of his seizure disorder as well as migraine headaches and anxiety precluded him from safely performing these job functions as part of his application for Social Security Disability benefits. In those proceedings, he specifically represented that he "can't operate heavy equipment, driving is questionable", that he is unable to operate a crane, that he "zones in and out", that he does not drive for more than 10-15 minutes because of his conditions, that his concentration is affected, that "the doctor told him he couldn't work at a restaurant because he might have a seizure and there could be hot grease", that James Marine was one of the jobs he previously held before he "became unable to work because of [his] illnesses, injuries, or conditions", that

his "head pounds daily," and that seizures were a "very significant aspect of his disability."[2]

**B. Plaintiff's reassignment to the fab shop/contradictions in his testimony.**

Upon his return in March 2008, Plaintiff testified he gave the work release to his supervisor. However the Human Resource Director at the time, Chad Walker, was not aware of the driving restriction and did not recall ever being aware of the Moots release. (Walker depo. p. 20-21). Plaintiff claims he then began working in the fab shop "up the hill" because his supervisor was concerned about him working over water. (James depo. p. 63)

Plaintiff testified at his October 14, 2010 deposition that he performed the "same basic duties" at the fab shop, and that "this was new metal instead of old rusty barges, *so it was a little bit better work, actually*." (James depo. p. 54) (Emphasis added) He testified that his duties consisted of "welding, cutting with the cutting torch, using the big metal press that they have up there on the hill in the fab shop, bending metal for corners for barges or towboats." (James depo. p. 54-55). He also testified as follows when asked if the fab shop position required him to operate heavy equipment:

> Q. Did you continue to operate equipment when you started working in the fab shop?
>
> A. Yes, it did.
>
> Q. What kind of equipment?
>
> A. Cherry picker and an overhead crane, a forklift and a Bobcat.

(James depo. p. 55)

---

[2] See, Exhibits 'L' – 'P' attached to Defendant's Memorandum of Law in Support of its Motion for Summary Judgment as well as Amble depo., p. 17-26.

Plaintiff testified that his duties in the fab shop also required him to deliver welded products fabricated in the fab shop to the ship yard. (James depo., p. 60) He was also required to access the docks to obtain measurements. For example, he testified as follows:

> A. Tome would take me down there to measure a hole that had been cut in a barge and, you know, he was teaching me this is what we do, this is where we measure, this is how we would take templates. He'd say, 'This is how we make a template,' or we had some templates that we could just bend, and he'd say, you know, 'This is how you use the templates to get all of your measurements and your lines right.'
>
> Q. Would that entail getting onto a barge?
>
> A. It could have, be we never had to get onto a barge.
>
> Q. Just- -
>
> A. Onto the dock.
>
> Q. Okay. Why didn't you ever have to get on the barge, just the circumstances didn't arise?
>
> A. Exactly.
>
> Q. It could have, it's just it didn't- -
>
> A. Could have, but didn't, yes.

(James depo. p. 60-61)

Plaintiff was asked specifically if his allegations of disability discrimination had anything to do with the issue of working in the fab shop versus out on the docks. He unequivocally responded, "*It doesn't appear to. I don't think so.*" (James depo., p. 63-64) (Emphasis added)

Despite his previous sworn testimony, Plaintiff now claims that working in the fab shop was an adverse job action. In further contravention of his sworn deposition

testimony, he now asserts he was precluded from operating a crane, fitting, or installing newly fabricated material on barges. (Declaration of Josh James ¶ 6, attached to Plaintiff's Motion for Summary Judgment) Obviously this contravenes his deposition testimony where he indicated he performed "the same basis duties" as before and that he continued to operate a "cherry picker and an overhead crane, a forklift, and a Bobcat." (James depo., p. 54-55) As shall be discussed, James Marin is entitled to summary judgment on his reassignment claim. He can not defeat Defendant's right to summary judgment by relying on an affidavit or declaration contradicting his previous deposition testimony.

**C. Plaintiff is placed off work until he was seizure free for six months.**

On Thursday May 15, 2008 Plaintiff began complaining of back pain. The next day, he sought treatment for the pain at Western Baptist Prime Care. On Saturday May 17, his back hurt to the point that he sought treatment at the emergency room at Western Baptist Hospital. (James depo. p. 66) He received a steroid injection and a pain shot. (James depo. p. 66) On Monday, May 19 he sought treatment from Dr. Troy Nelson who gave him "10 or 12" point injections in his back. (James depo. p. 66-67)

The May 16 office note from Prime Care indicates Plaintiff hurt his back on April 22, 2008.[3] The note revealed that "he returns today saying his back pain has not changed" and that he has been taking "Robaxin and Lortab."[4] The note further indicated that Plaintiff "asks several times about Lortab" but was informed by the nurse practitioner that he "was uncomfortable giving him Lortab to go back to work as a welder

[3] The office note from Prime Care for that event indicates he hurt his back on April 22 while he was at a park when he "ducked under a slide and his back started hurting." (See, Exhibit 'C', attached to Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment. )

[4] Exhibit 'D' to Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment.

where he could cover up the pain and worsen his condition." He off work two days: Friday May 16 and Monday May 19. (James depo. p. 66-67) When he returned to work on Tuesday May 20 he was told to speak with Tom Freeman, the company's safety director. Freeman informed him that he needed to go to Occunet to get "a physical and make sure that you're able to do the work" because of his back. (James depo., p. 67-68) Chad Walker, the HR Director, testified that he recalled being informed by the safety director that Plaintiff had injured his back and was concerned about putting him back to work because of the large number of pain injection shots he reportedly received. (Walker depo., p. 22) Walker testified that they were concerned of the potential that Plaintiff could injure himself given the large number of pain injections and hence, a return-to-work physical needed to include a functional capacity evaluation. (Walker depo., p. 22-23)

Plaintiff arrived at Occunet on May 21, 2008. In the process, Occunet discovered his recent seizure and refused to permit him to return to work pending review of his seizure disorder. Occunet requested that he provide medical records relating to his seizure condition and on June 16, 2008, notified Plaintiff that he was not qualified to work until July 31, the six month anniversary date of his seizure. (Barlow depo., p. 21-22) James Marine presumed Plaintiff would be able to meet this safety requirement and arranged for Plaintiff to complete his functional capacity exam relating to his back condition pending his waiting period for the seizure disorder.

Plaintiff presented a letter dated August 4, 2008 from Dr. Moots.[5] The letter revealed that Plaintiff "has had two or three events over the last six months in which he had brief trouble speaking or numbness on the right side" resulting in an increase in his

[5] See Exhibit 'E' to Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment.

anti-seizure medication. The letter further revealed the need for "close monitoring" for additional seizures.

The office note from Dr. Moots dated July 16, 2008 indicates that Plaintiff reported "2 possible mini-seizures" since his last visit. [6] The note further indicated Plaintiff "had events in June that are suggestive of partial seizures including one event with speech arrest." Plaintiff claims these events were anxiety attacks but conceded nothing in Dr. Moots' notes or letter described his condition as an anxiety attack. (James depo., p. 79) As a result of his seizure activity, Dr. Barlow deferred him from work status until he could provide documentation that he had been seizure free for six months. (Barlow depo p.26-30)

Plaintiff submitted another letter dated August 30, 2008 from Dr. Moots.[7] Again, Dr. Moots indicated that Plaintiff had suffered "two brief events that are suspected to have been minor partial seizures without generalization." Dr. Barlow again refused to clear him to work because such seizure episodes posed considerable risk to himself and his co-workers. (Barlow depo. p.30; 36-42) Dr. Barlow explained the basis of his determination at his November 17, 2010 deposition:

> A. If they've been seizure-free for six months, hopefully, that means they're going to be seizure-free for an extended period of time. Why six months, is it arbitrary, I think the Department of Transportation goes either three months or four months; and as far as I'm concerned, I like to see them seizure-free for a little bit longer than four to six months before I release them to a potentially hazardous environment.
>
> Q. And what would be your understanding of the environment that Mr. James was working in for James Marine?
>
> A. Potentially dangerous even without a person having seizures. It's heavy industry, moving machinery, potentially dangerous encounters with moving

[6] See Exhibit 'F' to Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment.
[7] See Exhibit 'G' to Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment.

machinery. It was my understanding that Mr. James was a welder, which means he is going to be using welding torches, cutting torches, extremely high heat, loss of—I won't say "consciousness," because no indication that other than when he had generalized seizures he loses consciousness, but loss of attention to what he's doing could happen with partial seizures and could at that point pose potential danger.

Q. What would be the potential danger?

A. If he's holding a torch, loss of control of the torch. If he's driving machinery, loss of concentration on what he's doing as far as driving machinery, potential hazards from just not knowing what he's doing.

Q. What about working in and around water, would that have any impact on that opinion?

A. Certainly. Certainly. If he loses concentration, if he is out over water, certainly he could fall in the water. If he was not wearing a vest, he could drown.

Q. What is- -from your understanding, what is a partial seizure versus a generalized seizure?

A. A generalized seizure is a tonic-clonic seizure where there's muscle twitching, jerking, limb jerking. Partial seizures are absent seizures. There's just a loss of concentration that may manifest by just staring. It could be lip smacking, it could be twitching, but there's not a generalized tonic-clonic movement.

Q. What would be the reasoning to consider partial seizures as not compliant with the requirement that he be seizure free?

A. The partial seizure is still a seizure. He does not know what's going on from the time he's having a partial seizure. He's totally unaware of his environment for the episode.

Q. Given your experience in occupational medicine, is that a typical requirement that you would impose?

A. Yes.

Q. And why is that?

A. Simply because of the danger in any heavy industry- - potential dangers in heavy industry.

(Barlow depo., p. 37-39)

Plaintiff testified that he requested Dr. Moots to send a letter simply stating that Plaintiff has been seizure free for six months and to report nothing about partial seizures but Dr. Moots refused. (James depo. p. 80-81)

Following Occunet's refusal to clear him to work until he was seizure free for six months, Plaintiff was informed he would be on medical leave.[8] As a result, Plaintiff applied for and received unemployment benefits. (James depo., p. 95) To qualify, he notified the state Unemployment Commission that he was no longer working due to a "leave of absence" because he "had seizure on 01/31/08 returned to work on 3/13/08 referred to Occunet on 5/21/08 Occunet said I could not work until I had been seizure free for 6 months."[9]

Plaintiff enrolled as a full time student for the fall 2008 semester at West Kentucky Tech. He took general classes necessary to qualify for the radiology program. (James depo., p. 139-142) On Christmas Eve 2008, he called James Marine to inquire if he would be receiving a bonus. (James depo., p. 96-97) He spoke with Chad Walker who informed him he was being terminated because he had exceeded the amount of time available under FMLA. (Walker depo., p. 61;65) He received a letter dated January 14, 2009 from James Marine confirming his termination.[10]

Plaintiff never submitted any further documentation establishing he had been seizure free for six months. In fact, the office note from Dr. Moots dated January 16, 2009 indicates he:

> "had two events with transit right side symptoms of numbness for 10-15 minutes. Was alert and able to talk. In one he was having a migraine. These are high

[8] See Exhibit 'H' to Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment.
[9] See Exhibit 'I' to Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment.
[10] See Exhibit 'J' to Memorandum of Law in Support of Its Motion for Summary Judgment.

intensity headaches with N/V. Maxalt made them worse. Topomax helped somewhat. He is now on keppra 1500 mg bid and prn lortab." [11]

Under the neurologic findings, "seizures" are indicated as a "positive finding." Plaintiff confirmed that the "events" noted in the office note occurred after his July 16 office visit. (James depo., p. 133) Plaintiff further marked "seizures" as a condition applying to him on the Patient Follow-Up Form contained in the office note. (James depo., p. 134)

**D. Plaintiff applies for disability benefits.**

Plaintiff subsequently applied for social security disability. The date of his application was August 26, 2010. Plaintiff represented to the Social Security Administration that he stopped working on May 15, 2008 "[b]ecause of my condition(s)" which he listed as being 1) seizures, 2) brain tumor removed in 2006, 3) 10% of the tumor is remaining in head and 4) anxiety. [12] In the job history section of the Disability Report, Plaintiff identified one of the jobs he was unable to perform as a "Welder/Crane Operator." Under Section 7 of the Form, Plaintiff indicated he was prescribed Adivan for anxiety, Keppra for seizures, and Lortab for migraines.

The Work History Report submitted as part of the disability application. Plaintiff again lists James Marine as a job he had previously held before he "became unable to work because of [his] illnesses, injuries, or conditions." [13]

The Pain and Daily Activities Questionnaire signed by Plaintiff and submitted as part of the application. The questionnaire reveals that his "head pounds daily," and that he has anxiety attacks that frightens his wife who is afraid to leave him at home with the

[11] See Exhibit 'K' to Memorandum of Law in Support of Its Motion for Summary Judgment.
[12] See Exhibit 'L' to Memorandum of Law in Support of Its Motion for Summary Judgment.
[13] See Exhibit 'M' to Memorandum of Law in Support of Its Motion for Summary Judgment.

children. (See ¶ 1) Paragraph 4 reveals that Plaintiff is required to take "2 or 3" Lortab a day as needed for pain and Keppra twice a day at 1500 mg a dose.[14]

A Function Report-Adult was also submitted as part of his application.[15] Question 10 asks "[w]hat were you able to do before your illnesses, injuries, or conditions that you can't do now? Plaintiff responded "can't operate heavy equipment, driving is questionable." In response to question 12(c), Plaintiff indicated he needed reminders to take his medicine as "I tend to forget it." He further indicated that his attention span had been affected and that he "zones in & out a lot." (See Questions19(c), 20 (a) and (d)).

As part of the application process, Plaintiff was evaluated by a psychologist, Bruce Amble Ph.D. He was interviewed by Dr. Amble who also prepared a report of his interview and findings.[16] Dr. Amble testified at his March 8, 2011 deposition that Plaintiff informed him that "he began having seizures about a year after his surgery and has anxiety attacks and headaches almost on a daily basis" (Amble depo., p. 15-17) Plaintiff further told him that "the doctor told him he couldn't work at a restaurant because he might have a seizure and there could be hot grease." (Amble depo. p. 17) He informed Dr. Amble that he could no longer work because of his seizures and his inability to concentrate and that he used to be able to operate a crane but he couldn't any longer. (Amble depo. p. 19-20) Amble confirmed he would not have included this information in his report if Plaintiff had not provided it. (Amble depo., p. 19) Amble further noted that Plaintiff was "identified with seizure problems" and that seizures were brought up by Plaintiff as a "very significant aspect of his disability." (Amble depo., p.

---

[14] See Exhibit 'N' to Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment.
[15] See Exhibit 'O' to Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment.
[16] See Exhibit 'P' to Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment.

24) Plaintiff represented that he did not feel he could work competitively because of his seizure condition. (Amble depo., p. 25) Plaintiff further reported that "he has a lot of headaches and numbness in his body." (Amble depo., p. 26)

## LEGAL ARGUMENT

### A. Plaintiff can not prevail on his reassignment claim.

Despite his previous sworn testimony to the contrary, Plaintiff now claims James Marine violated the ADA by regarding him as disabled when it reassigned him to work in the fab shop upon his return to work following a seizure.[17] As to be discussed, however, Plaintiff can not demonstrate the elements necessary to prove this claim, particularly in light of his previous sworn testimony.

#### 1. Plaintiff did not suffer an adverse job action.

Plaintiff must demonstrate that he 1) is disabled or regarded as disabled within the meaning of the ADA, 2) that he is qualified to perform the essential functions of his job with or without accommodation, and 3) that he was discriminated against which requires that he suffer an "adverse job action" as a result. *Spees v. James Marine, Inc*., 617 F.3d 380, 395 (6th Cir. 2010). Plaintiff can not establish he suffered from an adverse job action as a matter of law. As addressed by the Sixth Circuit in *Spees v. James Ma*rine, *Inc*., 617 F.3d at 391:

> An adverse employment action has been defined as "a materially adverse change in the terms and conditions of [a plaintiff's] employment." *White v. Burlington N. & Santa Fe Ry. Co*., 364 F.3d 789, 795 (6th Cir. 2004) (en banc) (citation omitted). A "bruised ego" or a "mere inconvenience or an alteration of job responsibilities" is not sufficient to constitute an adverse employment action. *Id*.

[17] Effective January 1, 2009 the ADA was amended by the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008). The events that give rise to Plaintiff's claims occurred during the summer of 2008. As the Sixth Circuit held in *Milholland v. Sumner County Bd. of Educ*., 569 F.3d 562 (6th Cir. 2009) these amendments do not apply retroactively. Accordingly, the amended version of the ADA does not govern.

> at 797. Adverse employment actions are typically marked by a "significant change in employment status," including "hiring, firing failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id*. at 798 (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)).
>
> Reassignments and position transfers can qualify as adverse employment actions, particularly where they are accompanied by "salary or work hour changes." *See Kocsis v. Multi-Care Mgmt., Inc*., 97 F.3d 876, 885-86 (6th Cir. 1996) (holding that a job transfer was not an adverse employment action because the plaintiff "enjoyed the same . . . rate of pay and benefits, and her duties were not materially modified"). And even if a reassignment is not paired with a salary or work-hour change, it can nonetheless be considered an adverse employment action where there is evidence that the employee received "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id*. at 886 (citation omitted).

Plaintiff testified in his deposition that he performed the "same basic duties" at the fab shop, and that "this was new metal instead of old rusty barges, *so it was a little bit better work, actually*." (James depo. p. 54) (Emphasis added) He testified that his duties consisted of "welding, cutting with the cutting torch, using the big metal press that they have up there on the hill in the fab shop, bending metal for corners for barges or towboats." (James depo. p. 54-55). He also testified he continued operating heavy equipment including a "cherry picker and an overhead crane, a forklift and a Bobcat." (James depo., p. 55) No evidence exists that his pay was cut. He worked the same shift and same number of hours.

In addition, he specifically testified in his deposition that he did not believe James Marine did anything wrong by directing him to work in the fab shop:

> Q. I'm not asking for a legal conclusion. I'm just asking whether or not you believe they did anything wrong.
>
> A. *It doesn't appear to. I don't think so.*

(James depo., p. 64) (Emphasis added)

Plaintiff now seeks summary judgment but in doing so, completely ignores his deposition testimony and instead, offers testimony in the form of a sworn Declaration of Josh James (attached to Plaintiff's Motion for Summary Judgment). Pursuant to the Declaration, Plaintiff now claims to have in fact suffered an adverse job action as a result of the reassignment and testifies that James Marine did in fact harm him because in his subjective view, working in the fab shop presented less career opportunities than working on the docks over water. He also contravenes specific facts firmly established in his deposition testimony. For example, he now claims he 1) was precluded from operating heavy equipment such as a crane, 2) could not access the dock or barges to install welded products, and 3) believes working on older metal such as barges was a better job because it was "more challenging" (he testified in his deposition that the fab shop job was "a little bit better work actually.") (James depo., p. 54)

To grant Plaintiff's motion for summary judgment on this issue, this Court would have to disregard his previous sworn deposition testimony. Predictably, courts have uniformly refused to do so. See, *Aull v. Osborne*, 2009 U.S. Dist. Lexis 21492 (W.D. Ky. Mar. 16, 2009 where Judge McKinley commented:

> [W]hen a plaintiff stakes himself to a version of the facts in his sworn deposition testimony, he cannot create a genuine issue of material fact by pointing to other evidence that contradicts his testimony, effectively asking the district court to disregard his own version of the facts.

See also, *Reid v. Sears, Roebuck and Co*., 790 F.2d 453, 460 (6th Cir. 1986), "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts . . . earlier deposition testimony") (quoting *Biechle v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984)). See also *Peck v. Bridgeport Machines, Inc.*, 237 F.3d 614 (6th Cir. 2001); *Hughes v. Vanderbilt*

*University*, 215 F.3d 543 (6th Cir. 2000). Just as a plaintiff cannot avoid a summary judgment in such circumstances, a plaintiff is likewise precluded from *obtaining* a summary judgment by stitching together an affidavit that that rejects and contravenes his prior deposition testimony.

Plaintiff can not establish he suffered an adverse job action under the standards outlined in *Spees v. James Marine, Inc.*, *supra*. Plaintiff did not suffer "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation" as required to prove this aspect of his claim.

**2. Plaintiff was not regarded as limited in performing a broad class of jobs.**

Plaintiff's "regarded as disabled" claim is limited to his reassignment to the fab shop following the seizure he suffered at work. A six month seizure free requirement was later imposed upon his employment which ultimately resulted in his termination. Plaintiff analyzes that issue under the FMLA, not the ADA.

To prove his "regarded as" claim with respect to the reassignment, Plaintiff must demonstrate that James Marine regarded him as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(i). Under the former version of the ADA, courts rejected claims based on an employer's determination that a plaintiff was limited in performing a particular job, rather than a broad range or class of jobs. See *Sullivan v. River Valley School Dist.*, 197 F.3d 804, 811 (6th Cir. 1999).

Upon his return to work in March 2008, Plaintiff testified he was told by his supervisor to work in the fab shop because he was concerned about him working over water. At the fab shop Plaintiff performed the "same basic duties" except that welding involved "new metal instead of old rusty barges, *so it was a little bit better work, actually*." (James depo. p. 54) (Emphasis added) He testified that his duties consisted of "welding, cutting with the cutting torch, using the big metal press that they have up there on the hill in the fab shop, bending metal for corners for barges or towboats." (James depo., p. 54-55) He testified he was required to access the ship yard dock to take measurements of templates and would have been required to get on a barge but the circumstances did not arise. (James depo., p. 60-61) He continued to operate heavy equipment including a "cherry picker and an overhead crane, a forklift and a Bobcat." (James depo., p. 55) The only function he did not perform was welding on barges in the ship yard.

By imposing this restriction, Plaintiff was not regarded or perceived as being restricted from a "broad class" of jobs. He continued to weld, use a cutting torch and in his own words, perform the "same basic" functions as before his reassignment. He continued to perform these functions until a six month seizure free requirement was imposed upon his employment following Occunet's "direct threat" analysis in May/June 2008. This shall be addressed below. Accordingly, Plaintiff can not establish an essential element of a "regarded as" claim in relation to his initial reassignment to the fab shop. His motion for summary judgment must be denied.

**C. Plaintiff's FMLA interference claims fail as a matter of law.**

Plaintiff asserts an interference claim under FMLA pursuant to 29 USC § 2615(a)(1) which provides that "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or attempt to exercise, any right provided in this subchapter." An employer's intent is not controlling. *Arban v. West Publishing Corp.*, 345 F.3d 390, 401(6th Cir. 2003). To prevail, Plaintiff must establish that James Marine interfered with a right to medical leave or to reinstatement following FMLA leave. *Arban*, 345 F.3d at 401. Here, Plaintiff asserts James Marine interfered with his right to job restoration following his treatment for back pain in May, 2008. He asserts that since he had been released to work by his doctors, James Marine violated the FMLA by sending him to Occunet for a work physical that ultimately resulted in the imposition of a six month seizure free requirement upon his employment.

**1. Plaintiff was never on FMLA leave for back pain.**

James Marine ordered an employment physical in May 2008 because Plaintiff had reportedly received a large number of pain injections to his back. As a result of this process, Occunet learned of his seizure disorder and subsequently determined he posed a direct threat to himself and others until he could demonstrate he was six months seizure free given the hazards of his job. Plaintiff was not on FMLA leave at the time he was sent to Occunet for the work physical; nor was he returning from FMLA leave at the time. He missed two days of work- - May 16 and May 19- - because of back pain. He was subsequently placed on medical leave in May 2008 not because of his back, but to permit him time to comply with the six month seizure free requirement imposed upon his employment. Plaintiff's claim that he was on FMLA leave because of his back has no

support in the evidence of record. Plaintiff himself acknowledged in his claim for unemployment benefits that he was on a leave of absence due to the six month seizure free requirement, not his back condition.

James Marine lawfully required Plaintiff to submit to the employment physical. Employment examinations are permissible under the ADA provided it is job-related and consistent with business necessity." See, 42 USC § 12112(d)(4)(A); 29 CFR § 1630.14(c). See *Sullivan v. River Valley School Dist*, 197 F.3d at 812, "an employer may order a well-founded examination." *See also, Prevo's Family Market*, 135 F.3d at 1095, "health problems that significantly affect an employee's performance of essential job functions justify ordering a physical examination."

Plaintiff can not seriously dispute James Marine's right to require a physical examination following his report of "10 or 12" pain injections to his back. As pointed out in *Sullivan*, "health problems that significantly affect an employee's performance of essential job functions justify ordering a physical examination." *Id*. at 812. Though Plaintiff missed two days work because of his back, he was not on FMLA leave nor is there any evidence that his back condition justified any leave requirements under the Act. In fact, he claims he was perfectly fit to work and was in fact prepared to work until he was directed to Occunet for the return to work physical. Accordingly, the job restoration requirements of the FMLA have no bearing on the return to work physical and functional capacity evaluation performed in May/June 2008.

**2. The six month seizure free requirement did not interfere with Plaintiff's rights under the FMLA.**

Plaintiff was precluded from working after the physicians at Occunet learned of his seizure disorder. At that point, a "direct threat" analysis was performed that included

a review of his medical records and specific job functions.[18] James Marine did not violate the FMLA by undertaking a direct threat evaluation at a point in time that was well *after* Plaintiff was restored to his position following his seizure on January 31, 2010. As provided by 29 USC § 825.312(h):

> Requirements under the Americans with Disabilities Act (ADA), as amended, apply. After an employee returns from FMLA leave, the ADA requires any medical examination at an employer's expense by the employer's health care provider be job-related and consistent with business necessity. For example, an attorney could not be required to submit to a medical examination or inquiry just because her leg had been amputated. The essential functions of an attorney's job do not require use of both legs; therefore such an inquiry would not be job related. An employer may require a warehouse laborer, whose back impairment affects the ability to lift, to be examined by an orthopedist, but may not require this employee to submit to an HIV test where the test is not related to either the essential functions of his job or to his/her impairment. If an employee's serious health condition may also be a disability within the meaning of the ADA, the FMLA does not prevent the employer from following the procedures for requesting medical information under the ADA.

*See also, Porter v. U.S. Alumoweld Co., Inc*., 125 F.3d 243, 247 (4th Cir. 1997), "After an employee returns from FMLA leave, the ADA requires any medical examination at an employer's expense by the employer's health care provider be job related and consistent with business necessity."

Defendant legitimately inquired of Plaintiff's seizure disorder to determine if he posed a direct threat to the safety of himself or others as permitted under the ADA. As pointed out by the Sixth Circuit in *Denman v Davey Tree Expert Co*., 266 Fed. Appx 377, 378 (6th Cir. 2007), "An employer's request for medical information is job-related and consistent with business necessity when: 1) the employee requests an accommodation; 2)

[18] Defendant fully analyzed the standards governing the "direct threat" prong under the ADA in its Memorandum of Law in Support of Its Motion for Summary Judgment which is adopted and incorporated herein.

the employee's ability to perform the essential functions of the job is impaired; or 3) *the employee poses a direct threat to himself or others*." (Emphasis added)

The ADA regulations contemplate that an employee's medical history may be obtained as a result of the employment medical examination. See 29 CFR 1630.14(c) (1). Here his history revealed a seizure disorder which triggered a direct threat analysis permitted under the ADA. See, *EEOC v. Prevo's Family Market, Inc.,* 135 F.3d 1089, 1094 (6th Cir. 1998): "The statute allows employers to require as a qualification for employment that the disabled individual does not pose a 'direct threat to the health and safety of other individuals in the workplace." See also, 29 CFR § 1630.2(r), "[d]irect [t]hreat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." This regulation expanded the risk to include safety of the individual and was upheld by the Supreme Court in *Chevron USA Inc., v Echazabal*, 536 US 73 (2002).

Additionally, an employer may impose qualification standards that tend to screen out or otherwise deny employment to disabled individuals where the standard is job related and consistent with business necessity and satisfactory performance cannot be affected by reasonable accommodation. 42 USC § 12113(a). "The term 'qualification standards' may include a requirement that an individual shall not pose a direct threat to the health and safety of other individuals in the workplace." 42 USC § 12113(b). See *Mauro v. Borgess Medical Center*, 137 F.3d 398 (6th Cir. 1998).

James Marine did not impose the six month seizure free requirement until Occunet, a health provider with expertise in occupational health matters, advised that such a requirement was necessary from a safety perspective. The decision was based on

an individualized assessment following Dr. Barlow's review of his seizure condition which included a review of his medical records and the specific job functions performed by Plaintiff. Dr. Barlow was intimately familiar with the marine industry and the particular requirements of Plaintiff's position, including the fact he operated heavy equipment and welded at heights.

Further, the fact that Plaintiff's own treating physician specifically restricted him from driving for six months following his January 31, 2008 seizure confirms the safety implications of his condition. As pointed out by Dr. Barlow, the reason an individual is restricted from driving for six months following a seizure is "protection for the patient as well as other people on the road" because "if there is loss of concentration, it could result in a wreck, bodily injury." (Barlow depo. p. 41) As further testified by Dr. Barlow, "If they can't drive, shouldn't drive and restricted from driving, why should he be out working in heavy industry?" (Barlow depo. p. 41)

Finally, Plaintiff confirmed the legitimacy of Occunet's direct threat analysis when he subsequently represented in his Social Security disability proceedings that he "can't operate heavy equipment, driving is questionable", that he is unable to operate a crane, that he "zones in and out", that he does not drive for more than 10-15 minutes because of his conditions, that his concentration is affected, that "the doctor told him he couldn't work at a restaurant because he might have a seizure and there could be hot grease", that James Marine was one of the jobs he previously held before he "became unable to work because of [his] illnesses, injuries, or conditions", that his "head pounds daily," and that seizures were a "very significant aspect of his disability."

**3. Plaintiff suffered no prejudice by James Marine's failure to specifically designate his time off beginning in May 2008 as FMLA leave.**

As a condition of his employment, James Marine lawfully imposed a six month seizure free qualification upon Plaintiff's employment. He was notified in May, 2008 that he would be on leave pending receipt of his six month seizure free certification. This was expected to be July 31, 2008. Plaintiff was obviously aware of his leave status. For example, he notified the Unemployment Commission he was on a "leave of absence" because of the six month seizure free requirement. (See Exhibit 'I', attached to Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment) As set out in the Factual Background above, Plaintiff ultimately could not comply with the six month seizure free requirement and was eventually terminated. He was orally notified of his termination on December 24, 2008 when he called Chad Walker inquiring of a bonus. He was provided written notice of the termination by letter dated January 14, 2009 from Jill Harper notifying him that he had exhausted all available leave under the FMLA.

Admittedly, James Marine did not specifically designate his time off work beginning in May 2008 as time off under FMLA until after-the-fact. (Harper depo. p 48-60) However, it can not be disputed that Plaintiff was permitted 12 weeks of leave as required under the FMLA. See 29 USC § 2612(a)(1)(D). As such, he can not establish any prejudice by James Marine's technical violation in failing to designate. This is in accord with the Supreme Court ruling in *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002) which specifically held that a plaintiff asserting a claim based on a violation of the FMLA must demonstrate prejudice as a result of a defendant's allegedly improper notice.

As summarized by the Sixth Circuit in *Wilkerson v. Autozone, Inc.*, 152 F. App'x 444, 449 (6th Cir. 2005):

> In *Ragsdale*, the Supreme Court struck down a regulation, 29 C.F.R. § 825.700(a) (2001), under which an employer that failed to designate an employee's leave as FMLA-qualifying was prohibited from counting that leave against the employee's FMLA entitlement. *See 535 U.S. at 89-96, 122 S. Ct. 1155.* The regulation was invalid, the Court explained, "because it alter[ed] the FMLA's cause of action in a fundamental way: It relieve[d] employees of the burden of proving any real impairment of their rights and resulting prejudice." *Id.* at 90**.** By not requiring a showing of prejudice, the regulation allowed an employee to sue under the FMLA without having been denied the Act's substantive entitlements. *See id. at 90-91, 122 S. Ct. at 1155***.**

Since Plaintiff was in fact provided leave in the amounts required under the FMLA *and* has suffered no prejudice by James Marine's failure to designate the leave, James Marine is entitled to summary judgment on this aspect of Plaintiff's interference claim.

## CONCLUSION

For all the reasons set forth herein, Plaintiff's Renewed Motion for Summary Judgment must be denied.

Respectfully submitted,

DENTON & KEULER, LLP
P.O. Box 929
Paducah, KY 42002-0929
(270) 443-8253
(270) 442-6000 (fax)

By s/David L. Kelly
David L. Kelly

ATTORNEYS FOR DEFENDANT

**CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of May, 2011, I electronically filed with the clerk of court by using the CM/ECF system, the foregoing document which will send a notice of electronic filing to the following:

HON D WES SULLENGER
SULLENGER LAW OFFICE PLLC
1324 JEFFERSON ST
PADUCAH KY 42001

By: s/David L. Kelly
David L. Kelly