**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**

| | | |
|---|---|---|
| **JOSH JAMES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.: 5:09-cv-00177-TBR** |
| **v.** | ) | |
| | ) | **JURY DEMAND** |
| **JAMES MARINE, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

**PLAINTIFF JOSH JAMES'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

COMES NOW the Plaintiff, Josh James, through his undersigned counsel, and files his Response to Defendant's Motion For Summary Judgment. Defendant's Motion reflects a fundamental misunderstanding of the difference between a pre-employment medical examination and a return-to-work examination under the ADA and of the roles of the ADA and the FMLA. Because Mr. James was an existing employee, Defendant could only require a certification that he could return to work after he suffered back pain. Even if Defendant could require an additional medical examination after Mr. James submitted his medical releases, it could only require a fitness-for-duty examination limited to the back pain that led him to miss work. The Court should deny Defendant's Motion because it violated the ADA by requiring Mr. James to undergo a pre-employment medical examination to discover medical conditions that had not impacted his job performance.

The Court should also deny Defendant's Motion because Defendant's admitted refusal to let Mr. James return to work because of a seizure condition it discovered through the illegal medical examination violated the FMLA. Mr. James provided medical releases for his back pain

that Defendant had to accept because it was the only condition for which he sought time off work in May 2008. He had not suffered any seizures and had not sought time off work for seizures. Defendant failed in its duty to return Mr. James to work when he provided medical proof that he was fit to return to work after treatment for the condition that led him to miss work. As such, the Court should deny Defendant's Motion in its entirety and should enter summary judgment for Mr. James.

## STATEMENT OF FACTS[1]

**MR. JAMES WORKED FOR DEFENDANT UNTIL IT REFUSED TO LET HIM RETURN FROM MEDICAL LEAVE IT FORCED HIM TO TAKE FOR BACK PAIN**

### A. Mr. James Worked As a Welder And Crane Operator Until Defendants Rejected a Post-Illness Medical Release

Mr. James suffered a seizure as he finished a work shift at Defendant's Walker Boat Yard facility on January 31, 2008. *See* (Dft's Resp. to Pltf's 1st Ints. at 8 ¶ 17; Compl. ¶ 7; Answer ¶ 7; James Dep. at 38:21 – 39:5). When his supervisors requested medical releases before his return, Mr. James saw Dr. Paul Moots in Nashville. *See* (James Dep. at 41:22 – 42:10). Dr. Moots was a neuro-oncologist who was the treating physician for Mr. James's seizure. *See* (James Dep. at 44:13-22, 104:3-5; Barlow Dep. at 25:12-17).

Dr. Moots took Mr. James off work from February 1 through March 12, 2008, when he released Mr. James to return to work without restrictions. He specifically authorized Mr. James to work around water. *See* (Compl. ¶ 8; Answer ¶ 8; James Dep. at 42:10-16, 42:23-5, 46:16-21, & Ex. 6 thereto). Dr. Moots knew when he released Mr. James to return to work that Mr. James's job involved welding, operating a cutting torch, climbing ladders, working around water, and operating cranes. *See* (James Dep. at 49:24 – 50:8).

[1] In order to minimize redundancy, except where indicated, documents supporting all factual references herein are attached to Mr. James's Renewed Motion for Summary Judgment. *See* (DN # 29-1 to 29-11).

Defendant's safety director and human resources director were advised that Mr. James's treating physician had released him. *See* (Walker Dep. at 19:21-24, 20:8-11, 21:3-6). Mr. James returned to work on March 13, 2008 following his seizure. *See* (Dft's Resp. to Pltf's 1st Ints. at 9 ¶ 19; James Dep. at 114:13-15). Yet, although he had been released to return to his regular duties and to work around water, facility superintendent Roy Mannon removed Mr. James from his regular job and placed him in the land-based Fab Shop "because you've had a seizure, [and] I don't feel safe with you working on the water." *See* (James Dep. at 54:16 – 55:2, 59:4-6, 62:9-13, 62:18-23, 63:3-7, 175:19 – 176:4, 178:11-21).

**B. <u>When Mr. James Suffered a Flare-Up Of a Back Injury, Defendant Refused To Let Him Return To Work Despite Medical Releases</u>**

Mr. James's back began hurting badly while he worked in Defendant's Fab Shop on Thursday, May 15, 2008. *See* (James Dep. at 64:5 – 65:2, 114:16-20; Compl. ¶ 10; Answer ¶ 10). He completed his shift that evening then went to Prime Care on May 16, where he was treated with medication. *See* (James Dep. at 66:1-14, 117:7-17). When his back still hurt on Saturday, May 17, Mr. James went to the emergency room at Western Baptist Hospital. There, he received a steroid injection and a pain shot. *See* (James Dep. at 66:15-18). Finally, because he still had some stiffness in his lower back on Monday, May 19, Mr. James went to Dr. Troy Nelson, who gave him trigger point steroid injections in his back.[2] *See* (James Dep. at 66:19 – 67:3).

The back injury that flared up in May 2008 was not a symptom of any prior condition that required him to need time off work. *See* (Harper Dep. at 51:25 – 53:14 & Ex. 10 thereto). Accordingly, Mr. James did not request any medical leave. *See* (Harper Dep. at 50:18 – 51:8, 51:22-24, & Ex. 9 thereto). Nevertheless, Defendant unilaterally placed Mr. James on FMLA

---

[2] Mr. James received steroid injections. He did not, as Defendant contends, receive "a large number of pain injection shots." *See* (Dft's Mem. at 7).

leave as of May 16, 2008.[3] *See* (Compl. ¶ 22; Answer ¶ 22; Harper Dep. Ex. 12); *see also infra* at 11 n.7.

After being absent on Friday and Monday, Mr. James returned to work on Tuesday, May 20, and provided return-to-work notes from both Prime Care and Dr. Nelson. *See* (James Dep. at 67:5-10; Harper Dep. at 62:8-15, 62:24 – 63:4, 63:11-17, 64:8 – 65:8, & Exs. 13-14 thereto). Still, then-human resources director Chad Walker and safety director Tom Freeman "decided that it would be unwise if he had a back problem and had just been recently treated for a back problem to let him return to work." *See* (Walker Dep. at 22:14-22). Defendant was aware that Mr. James had been released to return to work but it simply "didn't agree with putting him back to work after receiving the medications he received for the type of pain he was having." *See* (Walker Dep. at 23:13 – 24:2, 24:11 – 26:12).

Because he had received treatment and, in their opinion, had "[t]he potential for him hurting himself badly at work," *see* (Walker Dep. at 22:23 – 23:2), Defendant required Mr. James to undergo a physical examination at Occunet before he could return to work. While Defendant regularly employed Occunet to perform medical evaluations on its applicants and employees, *see* (Compl. ¶ 10; Answer ¶ 10), it had never previously required such a return-to-work exam of any other employee. *See* (Dft's Resp. to Pltf's 1st Ints. at 7-8 ¶ 15; Compl. ¶ 10; Answer ¶ 10).

[3] Mr. James assumes May 16, 2008 was the date on which he was involuntarily placed on FMLA leave because it was the first day missed work and obtained treatment for his back pain. Defendant, however, did not complete the FMLA designation notice required to initiate the FMLA process until December 24, 2008. On that form, it listed May 15, 2008 as his leave date, though it said his leave began on May 16, 2008 in its letter terminating Mr. James. *See* (Pltf's Mem. In Supp. Of His Renewed Mot. for SJ at 4 n.6 & 26-27; *compare* Harper Dep. Exs. 11 & 12).

### 1. <u>Defendant Required Mr. James To Undergo a Pre-Employment Examination That Involved His Prior Medical History</u>

Mr. James immediately reported to Occunet, where he was required to undergo a pre-employment physical instead of a return-to-work examination. *See* (James Dep. at 68:8-10, 72:9-20). Defendant sent Mr. James to Occunet for "a return-to-work fit test" but specifically directed the test would be "the same thing" as a pre-employment physical. *See* (Walker Dep. at 62:24 – 63:7; Barlow Dep. at 19:10 – 20:4 & Ex. 3 thereto). This required Mr. James to provide an extensive medical history including his past surgeries and other medical conditions. *See* (James Dep. at 74:13-20; Walker Dep. at 63:24 – 64:4). Instead of only examining his back to ensure his recent pain did not impair his ability to work, Defendant wanted an examination of the capabilities of all of Mr. James's bodily systems. *See* (Barlow Dep. at 20:13 – 21:13).

Occunet discovered from its medical history form that Mr. James had undergone brain surgery[4] and suffered a seizure. *See* (Walker Dep. at 28:16-23 & Ex. 1 thereto; James Dep. at 74:21-23; Barlow Dep. at 21:14-19 & Ex. 2 thereto). Mr. James had not had any seizure issues and had not presented any safety problem after he returned to work in March 2008. *See* (James Dep. at 177:15 – 178:10). None of his work absences after he returned to work in March 2008, including his absences on May 16 and 19, 2008, had anything to do with seizures or related conditions. *See* (James Dep. at 179:1-25; Harper Dep. at 67:3-10 & Exs. 13-14 thereto). Yet, after reviewing Mr. James's medical history, Occunet refused to approve his return to work and demanded that Mr. James provide all his medical records from his treating physicians. *See*

[4] In November 2006, Mr. James had been diagnosed with a malignant brain tumor. *See* (James Dep. at 29:10 – 30:5). Mr. James's family doctor immediately removed Mr. James from work and referred him to a specialist who surgically removed the tumor. *See* (James Dep. at 29:6-9, 30:6-15, 103:10-13). After conferring with Defendant's human resources staff, Mr. James took FMLA leave from November 20, 2006 through February 27, 2007. *See* (James Dep. at 31:16-20; Harper Dep. at 50:16 – 51:11 & Ex. 9 thereto). At the end of his leave, Mr. James returned to his normal duties at work and suffered no impact on his ability to work. *See* (James Dep. at 31:25 – 32:5, 33:18-22, 103:18-25; Walker Dep. at 18:6-16).

(Dft's Resp. to Pltf's 1st Ints. at 6-7 ¶ 13; James Dep. at 74:24 – 75:23; Walker Dep. at 29:12-20 & Ex. 1 thereto; Barlow Dep. at 21:20 – 22:8 & Ex. 2 thereto).

Mr. James complied but still was not allowed to return to work. *See* (James Dep. at 76:14-20). Instead, Occunet refused to release Mr. James to return to work until he could be certified as seizure free for six months. *See* (James Dep. at 76:21 – 77:5; Harper Dep. at 66:15 – 67:2 & Ex. 15 thereto; Barlow Dep. at 22:10 – 23:10 & Exs. 4-5 thereto).

Occunet's restriction was not based on any new seizure. *See* (Barlow Dep. at 32:5-8). After an initial examination by a nurse practitioner consisting only of a hernia check and touching his back in a few places, Mr. James never saw any physician. Dr. Barlow never examined Mr. James and refused even to speak with him. *See* (James Dep. at 73:25 – 74:8, 77:10-23; Barlow Dep. at 24:2-6). Occunet's refusal to let Mr. James return to work was based solely on the records of his January 2008 seizure. *See* (Barlow Dep. at 23:21 – 24:1, 35:10-18).

Occunet then required Mr. James to provide documentation from Dr. Moots, the treating physician for his seizure, stating he had been seizure free for six months and could work around water without any restrictions. *See* (Walker Dep. at 43:8 – 44:7; Barlow Dep. at 24:7-19 & Ex. 5 thereto). Mr. James tried to comply with Occunet's requirement by having Dr. Moots write a letter. *See* (James Dep. at 77:24 – 78:4).

Dr. Moots wrote an August 4, 2008 letter in which he described Mr. James's recent medical history. *See* (James Dep. Ex. 7). Dr. Moots identified a couple of events during the six-month period that he thought might have been partial seizures, resulting in a precautionary increase in Mr. James's medication, though Mr. James believed they were only panic or anxiety attacks unrelated to any seizure disorder. *See* (James Dep. at 78:21 – 79:19, 80:10-22, 83:16-20, 189:11 – 190:4, & Ex. 7 thereto). Still, Dr. Moots stated Mr. James was safe to work. *See*

(James Dep. Ex. 7). Dr. Moots said the letter would suffice to show Mr. James had been seizure free for six months. *See* (James Dep. at 80:1-7). Defendant requested and received a copy of the letter, which it acknowledges released Mr. James to return to work full time. *See* (Walker Dep. at 52:24 – 53:7 & Ex. 10 thereto).

Then, on August 30, 2008, Dr. Moots sent another letter regarding Mr. James's condition. *See* (James Dep. Ex. 8). The second letter specified that Mr. James had not suffered any "generalized seizures and only had two brief events that are suspected to have been minor partial seizures without generalization." *See* (James Dep. at 88:9-14 & Ex. 8 thereto). Mr. James did not ask Dr. Moots to clarify or revise this statement, however, because the doctor went on to make clear that Mr. James was safe to work by writing: "We follow him closely, and as long as he is compliant with his medications and follow-up, I think he is safe to work." Mr. James has always been compliant with his seizure medications. *See* (James Dep. at 180:15 – 181:16 & Ex. 8 thereto). Defendant also saw Dr. Moots' second letter and acknowledges that Dr. Moots again stated Mr. James was safe to work. *See* (Walker Dep. at 57:2-8, 57:19-22, & Ex. 13 thereto).

Soon thereafter, even though Mr. James never suffered any seizure except on January 31, 2008, *see* (James Dep. at 175:14-18; Amble Dep. Ex. 5), Occunet rejected Dr. Moots' letters as certification that Mr. James had been seizure free for six months. *See* (James Dep. at 92:18 – 93:17). On September 18, 2008, Occunet notified Defendant that Dr. Barlow would not approve Mr. James to return to work. Dr. Barlow believed the possible partial seizures Dr. Moots mentioned in his letters made Mr. James a risk at work. *See* (Walker Dep. at 58:15 – 59:9 & Ex. 14 thereto). Dr. Barlow had requested documentation from Dr. Moots, a neurologist with expertise in evaluating seizures that Dr. Barlow lacked. *See* (Barlow Dep. at 15:14 – 16:8,

24:20-23). Yet, Dr. Barlow refused to certify Mr. James as able to work because he disagreed with Dr. Moots' conclusion that Mr. James could work safely.[5] *See* (Barlow Dep. at 31:25 – 32:4, 40:1-8).

All of Mr. James's doctors had released him to return to work. *See* (James Dep. at 95:24 – 96:3). The only medical restriction that conceivably applied to Mr. James prohibited him from driving for four months after his March 12, 2008 release.[6] *See* (James Dep. at 50:19 – 51:6, 185:6-10, & Ex. 6 thereto). Mr. James did not drive on public roads in the course of his work. *See* (James Dep. at 182:21-24). The only driving he might have done involved driving a truck the length of a dock to retrieve tools. *See* (James Dep. at 182:5-20). This was not unsafe because the path did not have traffic or other individuals who could be injured if Mr. James had had a seizure.[7] *See* (James Dep. at 183:11-24). Additionally, Defendant could have accommodated Mr. James by placing him in the tool room, where he had worked on some prior occasions, *see* (James Dep. at 11:13-22), or by having other employees perform operations that involved driving until his driving restriction expired since Defendant's employees were interchangeable in their functions. *See* (James Dep. at 21:11 – 23:19).

Moreover, on or about July 28, 2008, while he was off work pursuant to Dr. Barlow's prohibition, Mr. James underwent the return-to-work portion of his physical examination at

---

[5] Although Dr. Barlow testified that he disagreed with Dr. Moots' decision to let Mr. James return to work without proving conclusively that he had been seizure free for six months, Dr. Barlow admitted his six-month limitation was "arbitrary" and lacked any scientific or regulatory support. *See* (Barlow Dep. at 15:14-19, 31:25 – 32:4, 36:2-13, 36:22 – 37:11).

[6] While the driving restriction did not apply to his operation of heavy equipment, *see* (James Dep. at 188:6-12), the driving restriction would have expired in July, at which point Mr. James could have performed any necessary driving if he had been allowed to return to work. In the meantime, he could have worked in the tool room or performed other non-driving jobs as a temporary accommodation but for Defendant's medically unnecessary restriction against allowing him to work around water.

[7] Defendant is incorrect in claiming Mr. James still drove and worked on water in the Fab Shop. He did no more than ride in the passenger seat of a truck and watch someone else do measuring work on the dock, several feet from the water. *See* (James Dep. at 60:1 – 62:4).

Rehab Associates Physical Therapy. Defendant acknowledges that Rehab Associates determined "that he was capable of performing his job functions." *See* (Dft's Resp. to Pltf's 1st Ints. at 6-7 ¶ 13; Harper Dep. at 99:18 – 100:22; Walker Dep. at 36:22 – 37:9 & Ex. 3 thereto). Nevertheless, Defendant removed Mr. James from his welding duties because "Dr. Ron Barlow of Occunet refused to certify that he was qualified to return to work due to safety concerns for Plaintiff and his co-workers until it could be demonstrated that Plaintiff was seizure free for a period of six months." *See* (Dft's Resp. to Pltf's 1st Ints. at 4 ¶ 7; Barlow Dep. at 22:10 – 23:20, 34:10-18, & Exs. 4-5 thereto).

**a. <u>Defendant Refused To Let Mr. James Return To Work Because Of His Seizure History</u>**

Defendant knew at least by June 2, 2008 that Occunet was looking at Mr. James's seizure as part of its decision regarding whether it would certify him as qualified to return to work. *See* (Walker Dep. at 35:15-20 & Ex. 2 thereto). By June 17, 2008, Defendant knew Mr. James had passed a physical examination indicating he could work so far as his back was concerned but that Occunet would not approve him to perform any work for Defendant until he could prove he had been seizure free for six months. *See* (Walker Dep. at 39:4-21, 40:13-21, & Ex. 4 thereto).

Defendant then refused to let Mr. James return to work on the basis of Occunet's restriction. *See* (Harper Dep. at 67:25 – 68:4). Defendant acknowledges it has nothing to indicate Mr. James had a seizure on May 15 or 16, 2008 or at any time other than January 31, 2008. *See* (Harper Dep. at 69:9 – 70:7). It further acknowledges that Dr. Nelson and Prime Care, which treated Mr. James's back injuries, released him to return to work "without any restrictions," while Dr. Moots had released him to return to work with no restrictions except against driving for four months. *See* (Harper Dep. at 70:8 – 71:13 & Exs. 16-17 thereto).

Yet, that did not get Mr. James back to work because, as human resources co-director Jill Harper testified: "He had gone in [to Occunet] for his back, and they had obviously had access to all of his medical information and found out about the seizure disorder that he had been experiencing, and they had been our occupational provider for about ten years and knew of the industry and knew of the dangers and the hazards associated with his work. And they were not comfortable releasing him." *See* (Harper Dep. at 68:4-12).

Thus, Defendant refused to restore Mr. James to work after his back treatments in May 2008 even though he had been fully released to work without restrictions. *See* (James Dep. at 67:5-10; Harper Dep. at 62:8-15, 62:24 – 63:4, 63:11-17, 64:8 – 65:8, & Exs. 13-14 thereto). Then, Defendant refused to let Mr. James return to work even after he passed a physical examination of his back at Occunet and a return-to-work examination at Rehab Associates. *See* (Dft's Resp. to Pltf's 1st Ints. at 6-7 ¶ 13; Harper Dep. at 99:18 – 100:22; Walker Dep. at 36:22 – 37:9, 39:4-13, & Exs. 3-4 thereto).

Although Mr. James had already been released to return to work and actually had returned to work following his seizure, *see* (Dft's Resp. to Pltf's 1st Ints. at 9 ¶ 19), Defendant refused to let him return to work in May 2008 solely because of his previous seizure. *See* (Walker Dep. at 41:5-12, 47:9-11, 49:25 – 50:12, & Ex. 9 thereto). Defendant refused to restore Mr. James to his job because Dr. Barlow believed Mr. James's seizure history made him unsafe to work and based "upon its own judgment" regarding Mr. James's ability to work. *See* (Dft's Resp. to Pltf's 1st Ints. at 4 ¶ 7, 7 ¶ 13, & 9 ¶ 19; Dft's Resp. to Pltf's Req. for Adms. at 1 ¶ 1).

Ms. Harper testified that she has received training on the FMLA's requirement that employers restore an employee to work upon a simple return-to-work certification from the employee's physician. *See* (Harper Dep. at 78:5-11). She also admitted that, even though all of

Mr. James's doctors had released him to work, Defendant required him to go to Occunet and prohibited him from working based on Dr. Barlow's belief that he was not medically qualified to work. *See* (Harper Dep. at 79:16 – 80:16). Defendant recognized – as Occunet pointed out to then-human resources director Chad Walker – that the final decision on returning Mr. James to work rested with it. Defendant, however, chose to listen to Dr. Barlow despite releases from all of Mr. James's treating physicians. *See* (Walker Dep. at 59:14 – 60:17 & Ex. 14 thereto).

### C. Defendant Terminated Mr. James Because Of His Seizure History

Mr. James understood he was simply "[i]n limbo" after May 19, 2008 while he waited to get his medical situation resolved because he received no communications from Defendant's management regarding his situation. *See* (James Dep. at 90:20 – 92:2). Mr. James received no information until he called Defendant on Christmas Eve 2008. During that phone call, Chad Walker told Mr. James he had been terminated. *See* (James Dep. at 96:4-11, 97:13-18).

Mr. Walker told Mr. James that he had been terminated earlier in the year even though Defendant has stated it did not decide to terminate Mr. James until "late December 2008 or early January 2009." *See* (Dft's Resp. to Pltf's 1st Ints. at 5 ¶ 9; James Dep. at 97:13-18, 100:24 – 101:7). Defendant then formally notified Mr. James of his termination in a letter dated January 14, 2009. Defendant's letter stated Mr. James's leave had expired on August 7, 2008 and his termination was effective on that date.[8] *See* (Compl. ¶ 22; Answer ¶ 22; Harper Dep. at 54:22 – 55:6, 61:6-11, & Ex. 11 thereto; Walker Dep. at 61:21 – 62:2).

---

[8] Defendant, however, did not initiate the FMLA process until December 24, 2008. *See* (Harper Dep. at 58:10-23 & Ex. 12 thereto). Further, although the termination letter states it was a follow up to communications with Mr. James at the "outset of his request for medical leave," Defendant had no such communications with him. It had no communications with Mr. James from the time of his conversation with Tom Freeman on May 20 through his phone call with Chad Walker on December 24, 2008. *See* (Harper Dep. at 55:7-12 & Ex. 11 thereto; James Dep. at 90:20 – 92:2, 97:23 – 98:3). In fact, the January 2009 termination letter was the first and only notice Mr. James received that he was on FMLA leave, as he had not requested medical leave. *See* (Harper Dep. at 61:12-17; James Decl. at ¶ 9). Additionally, the FMLA designation form that Defendant completed on December 24, 2008 states Mr. James notified it that he needed leave on May 15, 2008, *See* (Harper Dep. at 58:24 – 59:5 & Ex. 12 thereto), which was

Ms. Harper ultimately wrote that Defendant terminated Mr. James because he was "unable to return to work and the exhaustion of [his] FMLA." Mr. James exhausted his FMLA solely because Dr. Barlow would not allow him to return to work. *See* (Harper Dep. at 80:17 – 81:4 & Ex. 11 thereto). Once it had required Mr. James to undergo an evaluation by Dr. Barlow, Defendant would not restore him to work until he could demonstrate to Dr. Barlow's satisfaction that he had been seizure free for six months. *See* (Harper Dep. at 81:1-12). As such, Defendant terminated Mr. James on the basis of both Dr. Barlow's opinions and its own judgment as to the hazards and dangers of his job. *See* (Harper Dep. at 81:13 – 82:1, 83:17 – 84:5, & 85:2-22, 90:6 – 91:5; Dft's Resp. to Pltf's Req. for Adms. at 1 ¶ 1).

## **STANDARD OF REVIEW**

Summary judgment is only proper when no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is "material" if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). Viewing the evidence and drawing all reasonable inferences in favor of the non-moving party, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 547, 587, 106 S.Ct. 1348 (1986), the Court should only grant a summary judgment motion if no reasonable jury could return a verdict in favor of the non-moving party. *See Anderson*, 477 U.S. at 248.

At the summary judgment stage, the plaintiff need only offer evidence from which a reasonable jury might conclude that the defendant's proffered justification was merely a pretext for discrimination. In this regard, the Sixth Circuit has held that the Court may not defer to the defendant's alleged "business judgment" or determine, as a matter of law, whether its judgment

---

before Mr. James even visited a doctor about his back pain.

was reasonable. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 n.6 (6th Cir. 2008). Whether an employer's judgment was reasonable or was motivated by illegal considerations is a question for the jury in discrimination cases. *Id.* The Court's sole "role is merely to assess whether the plaintiff has presented enough evidence for a reasonable jury to accept the plaintiff's claim that the employer made an unlawful business decision." *White*, 533 F.3d at 393 n.6.

## ARGUMENT

### I. DEFENDANT VIOLATED THE ADA BY ILLEGALLY REQUIRING A PRE-EMPLOYMENT MEDICAL EXAMINATION THEN PUNISHING MR. JAMES FOR AN IRRELEVANT MEDICAL CONDITION

Defendant violated the ADA when it required Mr. James, an existing employee, to undergo a pre-employment medical examination, rather than a fitness-for-duty examination, after a back injury then used the seizure information it discovered through that illegal examination to prohibit Mr. James from returning to work.[9] Defendant's "direct threat" argument is misplaced because Defendant had no evidence that Mr. James, who had only missed work because of back pain, posed a danger in May 2008 due to any seizure episode that could permit it to inquire into his seizure history. Employers are only permitted to require or conduct medical examinations under the limited circumstances authorized by the ADA. *See* 42 U.S.C. § 12112(d).

#### A. <u>Only Fitness-For-Duty Examinations Can Be Required Of Existing Employees</u>

Defendant violated the ADA by using a pre-employment examination to conduct a broad inquiry into Mr. James's medical history. Existing employees can only be required to undergo fitness-for-duty examinations of limited scope. The ADA treats individuals differently with

[9] Defendant has offered no analysis of and apparently does not move for summary judgment regarding Mr. James's claim that Defendant violated the ADA by removing him from his job welding, fitting, and operating a crane on its dock and placing him in a job in the Fab Shop requiring less skill and fewer duties. As such, Mr. James will not further analyze that issue. The Court should grant Mr. James summary judgment on this claim for the reasons set out in Mr. James's Memorandum In Support of His Renewed Motion for Summary Judgment. *See* (DN # 29-13 at 13-18).

regard to the permissibility and scope of medical examinations at different stages of the application process. *Farmiloe v. Ford Motor Co.*, 277 F.Supp.2d 778, 781-82 (N.D. Ohio 2002) *comparing* 42 U.S.C. § 12112(d)(2) - (d)(4).

During the "post-offer, pre-employment" stage, when an employer has offered an applicant a job but the applicant has not yet begun work, the employer can make pre-employment medical examinations of the individual. *Farmiloe*, 277 F.Supp.2d at 781-82 *quoting* 42 U.S.C. § 12112(d)(3). Once an individual has begun employment with the employer, however, the employer may only require medical examinations that are job-related and consistent with business necessity. *Farmiloe*, 277 F.Supp.2d at 781-82 *quoting* 42 U.S.C. § 12112(d)(4).

The difference between the permissible scope of the medical examinations at these stages is significant. Employers have considerable latitude in post-offer, pre-employment medical examinations to pry into an applicant's medical history. *See EEOC Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations*, at "The Post-Offer Stage," (visited May 3, 2011) <http://www.eeoc.gov/policy/docs/preemp.html>. During pre-employment examinations, employers can make sweeping inquiries that include queries into "an individual's workers' compensation history, prior sick leave usage, illnesses/diseases/impairments, and general physical and mental health. Disability-related questions and medical examinations at the post-offer stage do not have to be related to the job." *Id.*

Where, as here, an individual is an active employee, however, the ADA prohibits employers from requiring a medical examination unless the examination "is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A); *see also Sullivan v.*

*River Valley School Dist.*, 197 F.3d 804, 811 (6th Cir. 1999) (quoting same). The implementing regulations apply this principle by permitting employers to "make inquiries into the ability of an employee to perform job-related functions." 29 C.F.R. § 1630.14(c).[10] Thus, an employer can only request such a medical examination if reasonable cause exists to question whether the employee remains capable of performing job-related functions. *Sullivan*, 197 F.3d at 811 *quoting* 42 U.S.C. 1211(d)(4)(B).[11]

**1. <u>Only Mr. James' Back Pain Justified a Medical Examination</u>**

Employers are not allowed to conduct wide-ranging medical examinations of an existing employee to identify medical impairments that do not presently impact the employee's job performance. A medical examination may be deemed job related and consistent with business necessity and, therefore, permissible when the employer "has a reasonable belief, based on objective evidence, that: . . . (2) an employee will pose a direct threat due to a medical condition. . . ." *EEOC Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans With Disabilities Act (ADA)*, ¶ 5 ("When may a disability-related inquiry or medical examination be 'job-related and consistent with business necessity'?") (visited May 3, 2011) <http://www.eeoc.gov/policy/docs/guidance-inquiries.html> (hereinafter "*Enforcement Guidance: Disability-Related Inquiries*"). Still, "[a]n employer's reasonable belief that an employee's ability to perform essential job functions will be impaired by a medical condition or that s/he will pose a direct threat due to a medical condition must be based on *objective evidence* obtained, or reasonably available to the employer, **<u>prior to making</u>** a

[10] The protections of this section apply to all employees, regardless of whether they are disabled. *Indergard v. Georgia-Pacific Corp.*, 582 F.3d 1049, 1052-53 (9th Cir. 2009).

[11] Defendant's misunderstanding of the applicable medical examination standards is reflected in its citation of 29 C.F.R. § 1630.14(c) as support for its claimed right to an unlimited medical examination. *See* (Dft's Mem. at 16). Section 1630.14(c) only addresses limited fitness-for-duty examinations that are job-related and consistent with business necessity. It is distinct from § 1630.14(b), which allows broader post-offer, pre-employment medical examinations of the sort Defendant conducted.

disability-related inquiry or requiring a medical examination." *Enforcement Guidance: Disability-Related Inquiries*, ¶ 5 (italics in original; bold and underline added).

The only evidence Defendant had of any medical condition that could potentially impair Mr. James's ability to work prior to sending him to Occunet was his treatment for back pain. When Mr. James reported to work on May 20, 2008, he provided medical releases pertaining to back treatment he had received over the previous few days. He made no mention of suffering any seizure – because he had not – or of having any other medical reason for his work absence. Defendant should have accepted these medical releases or, if it found them insufficient in some way, sought clarification from the providers who issued them. *See id.* at ¶ 11 ("May an employer require an employee to go to a health care professional of the employer's (rather than the employee's) choice when the employee requests a reasonable accommodation?").[12]

By the same token, only Mr. James's back condition could have caused Defendant to disregard Mr. James's medical releases and send him to its own doctor. The treatment for back pain Mr. James had received over the previous four days was the only evidence Defendant had available ***prior to making its decision to require a medical examination***, *id.* at ¶ 5, that Mr. James had any present medical condition that could have posed some hazard in the workplace. Mr. James had not suffered a seizure since January 31, 2008. He had returned to work in March and had not had any incidents or made any complaints that could have led Defendant objectively to believe that a seizure condition was impacting Mr. James's work prior to its demand for a medical examination.

[12] Mr. James neither needed nor requested any accommodation to perform his job duties. Defendant, however, treated him as an impaired employee and thereby placed its response to his medical releases at issue.

**B. <u>Even If The Examination Had Been Permissible, Defendant Could Not Look Beyond Mr. James's Back Pain</u>**

Even if Defendant had been allowed to send Mr. James to its own doctor rather than respecting the medical releases from the providers who treated his back pain, it could only narrowly examine the specific condition that justified a fitness-for-duty examination. Even where medical examinations are authorized, the ADA limits their scope. *Farmiloe*, 277 F.Supp.2d at 782.

"[T]he ADA limits an employer's ability to request unfounded examination to prevent 'the unwanted exposure of the employee's disability and the stigma it may carry.'" *Sullivan v. River Valley School District*, 197 F.3d 804, 812 (6th Cir. 1999); *see also Heston v. Underwriters Labs., Inc.*, 297 F.Supp.2d 840, 845 (M.D.N.C. 2003) (limitation is intended "to limit the gathering and use of medical information as one of the ways to reduce the possibility of discrimination. . . ."). The employer may not request "wide-ranging assessments of mental or physical debilitation that could conceivably affect the quality of an employee's job performance." *Sullivan*, 197 F.3d at 812; *see also* 42 U.S.C § 12112(d)(3)(C); 29 C.F.R. § 1630.14(c)(2) (employers may not use this confidential information about an employee's medical condition or history for any purpose inconsistent with the statute or regulation).

Thus, "[t]he EEOC's stated position on the scope of medical inquiry is that an employer may not request an employee's complete medical records under the disguise of job-relatedness and business necessity." *Farmiloe*, 277 F.Supp.2d at 782-83 *discussing Enforcement Guidance: Disability-Related Inquiries*, ¶ 13 ("How much medical information can an employer obtain about an employee when it reasonably believes that an employee's ability to perform the essential functions of his/her job will be impaired by a medical condition or that s/he will pose a direct threat due to a medical condition?") (noting employers generally cannot obtain an

employee's complete medical records because, as here, they may reveal afflictions unrelated to the reason for the examination).

The *Farmiloe* court, thus, recognized that employers are limited to medical examinations only as to the medical condition that directly led to the need for the examination. 277 F.Supp.2d at 783 (noting EEOC example that employer could require examination when employee with depression was hospitalized and had medication adjusted but "[t]his examination, however, must be limited to the effect of her depression on her ability, with or without reasonable accommodation, to perform essential job functions. *Inquiries about her entire psychiatric history or about the details of her therapy sessions would, for example, exceed this limited scope.*") Accordingly, the court held an employer's knowledge of an employee's history of valium addiction, anxiety, and depression did not allow it to obtain the employee's complete medical files. *Id.* at 783-84 ("The inquiry must be limited to the suspected impairments, namely what Ford alleges are Mr. Farmiloe's valium addiction and drug abuse problems.").

Mr. James was an existing employee who, Defendant acknowledges, was viewed as a "direct threat" in the workplace. Chad Walker testified that Defendant only refused to let Mr. James return to work on May 20, 2008 because it was concerned about the nature of the treatment he had received for his back pain. *See* (Walker Dep. at 22:14-22, 23:13 – 24:2, 24:11 – 26:12). Even if this concern were permissible in light of the medical releases Mr. James provided and Defendant's ability to follow up with those medical providers, it could only justify a fitness-for-duty examination of his back condition.

Because Mr. James only missed work in May 2008 for treatment of back pain and not for anything related to the seizure he suffered months earlier, Defendant could not obtain or rely on medical records related to Mr. James's seizures. *See Farmiloe*, 277 F.Supp.2d at 783-84.

Because of the narrow scope of fitness-for-duty examinations, Defendant could not dig into Mr. James's medical records to look at his seizure history. As such, Defendant could not remove Mr. James from work because of his seizure history.[13]

Similarly, because it could not look into his seizure history, Defendant could not, consistent with the ADA, demand Dr. Moots provide any updated status as to Mr. James's seizure condition that had not impacted his job performance and was unrelated to the work he missed in May 2008. Thus, because Defendant could not obtain letters from Dr. Moots stating that Mr. James had suffered events that might have been minor seizures, Defendant could not refuse to let Mr. James return to work on the basis of those letters it received only as a result of an illegal pre-employment examination. Yet, Defendant did exactly that. *See* (Harper Dep. at 68:4-12) (Mr. James went to Occunet for his back and Occunet called him a danger after requesting his full medical history then discovering his previous seizure). In doing so, Defendant violated the ADA. The Court, therefore, should deny Defendant's summary judgment motion and enter summary judgment in favor of Mr. James.

## II. DEFENDANT VIOLATED THE FMLA BY NOT REINSTATING MR. JAMES TO WORK

Defendant also violated Mr. James's FMLA rights by refusing to restore him to work when he produced releases for his May 2008 back pain, which, as discussed, was the only

---

[13] Lacking the authority to look into his seizure conditions after his back injury, Defendant's argument that it could look into Mr. James's seizure condition out of some obligation to provide an accommodation he did not request fails. Under the ADA as it existed in 2008, an individual whose condition was controlled with medication was not a qualified individual with a disability. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999); *see also Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 521 (1999) (mechanic whose high blood pressure was corrected with medication was not qualified individual with disability). Because Mr. James was compliant with the medications that controlled his seizure condition, he was not a qualified individual with a disability whom Defendant needed to accommodate. Therefore, Defendant's statements that it refused to let Mr. James return to work and placed him on FMLA leave because of his seizure disorder rather than the back pain for which he had recently been treated admits a violation of the ADA by regarding Mr. James as disabled based on a condition that was controlled and not impacting his job performance.

condition for which Defendant legally could have placed Mr. James on FMLA leave.[14] The FMLA provides eligible employees with up to twelve weeks of unpaid leave during a twelve-month period to address serious health conditions that make them unable to perform the essential functions of their jobs. 29 U.S.C. § 2612(a)(1)(D). The Act "also creates the concomitant right for an employee who has taken leave 'to be restored by the employer to the position of employment held by the employee when the leave commenced.'" *Hoge v. Honda of America Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004) *citing* 29 U.S.C. § 2614(a)(1)(A); *Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d 405, 407 (6th Cir. 2003).

In order to prevail on his claim that Defendant interfered with his FMLA rights, Mr. James must prove that Defendant interfered with his right to reinstatement to his employment following his FMLA leave. *Hoge*, 384 F.3d at 244. He is not required to show that he was treated worse than other employees. He must only show that he was denied an entitlement under the Act. In this regard, Defendant may be held to violate the Act regardless of the intent behind its conduct. *Id.*

### A. <u>Defendant Unlawfully Refused To Restore Mr. James To Work</u>

It is undisputed that Defendant did not restore Mr. James to work and ultimately terminated him after it placed him on FMLA leave effective on or about May 16, 2008. *See* (Compl. ¶ 22; Answer ¶ 22; Harper Dep. Ex. 11). This violated the FMLA because Mr. James provided proper medical releases for the back pain that led to the leave. Employers must restore

[14] As set out in the previous section, Defendant's assertion that it placed Mr. James on leave because of a seizure condition discovered through an illegal medical examination violated the ADA and could not have been the basis for FMLA leave. The Court should enter summary judgment in favor of Mr. James under the ADA based on Defendant regarding Mr. James as disabled due to his seizure history and forcing him to take leave. Mr. James will analyze the FMLA issue as though Defendant placed him on leave based on his back treatment, which was the only medical condition Defendant could place at issue in this matter, although summary judgment for Mr. James on the ADA claim would moot any FMLA analysis.

an employee to work unless the employee is ineligible for restoration because of a statutory exception. *See Hoge*, 384 F.3d at 245.

### 1. **Mr. James Was Entitled To Restoration Because His Doctors Released Him To Work After His Back Treatment**

Defendant was required to restore Mr. James to his job on May 20, 2008 because the doctors who treated him for his back pain released him to work. The FMLA allows employers to condition job restoration on receipt of medical certification if the employer has a "uniformly applied practice or policy" requiring such certification. Such a policy may only require certification "from the *health care provider of the employee* that the employee is able to resume work." 29 U.S.C. § 2614(a)(4) (emphasis added); *see also Hoge*, 384 F.3d at 246. Moreover, the employer may require fitness-for-duty certification "only with regard to the particular health condition that caused the employee's need for FMLA leave." *Hoge*, 384 F.3d at 246 *quoting* 29 C.F.R. § 825.310(c).

Defendant has identified no uniform policy requiring medical certification upon return to work after an injury. Even if it had such a policy and had properly invoked the policy, however, it required more from Mr. James than medical certification.[15] Beginning with Mr. James on May 20, 2008, Defendant required a physical examination by its company doctor in addition to his medical releases. Defendant never had imposed such a requirement before Mr. James attempted to return to work after his back treatment. *See* (Dft's Resp. to Pltf's 1st Ints. at 7-8 ¶ 15).

Mr. James produced releases from both Prime Care and Dr. Nelson when he returned to work on May 20. *See* (James Dep. at 67:5-10; Harper Dep. at 62:8-15, 62:24 – 63:4, 63:11-17,

---

[15] Defendant was not entitled to a fitness-for-duty certification for Mr. James because it failed to complete the FMLA designation notice indicating that such a certification would be required until December 24, 2008, after it contends it had terminated Mr. James. *See* 29 C.F.R. 825.312(d) & (e). Thus, Mr. James would have been entitled to job restoration even if he had not produced any medical releases. Still, for the sake of completeness, Mr. James will analyze this issue as if Defendant had been entitled to fitness-for-duty certification.

64:8 – 65:8, & Exs. 13-14 thereto). Thus, Mr. James produced releases from his health care providers regarding his back pain, the only condition for which he needed time off work that precipitated Defendant requiring him to take FMLA leave. The plain language of the FMLA requires an employer to return an employee to his job or an equivalent position as soon as the employee provides the medical certification permitted by 29 U.S.C. § 2614(a).[16] *Hoge*, 384 F.3d at 246-47. Employers cannot delay restoration of an employee because even "a 'reasonable' delay in restoration after reasonable notice [of the employee's release to return to work] is given would force the employee to take more FMLA leave than is required and would interfere with an employee's exercise of FMLA rights." *Id.* at 249 *citing* 29 U.S.C. § 2615(a)(1); 29 C.F.R. § 825.312(e).

Moreover, employers cannot impose special conditions on fitness-for-duty certifications. A medical certification that authorizes an employee to return to work is sufficient to trigger the employer's duty to reinstate the employee even if it does not address whether the employee can work without restrictions. *Clark v. Gospel Light Pubs.*, No. 1:06-CV-327, 2007 WL 2462654, at * 7 n.3 (S.D. Ohio Aug. 27, 2007) *citing* 29 C.F.R. § 825.310(c) & *Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996, 1003-04 (6th Cir. 2005).

Mr. James was entitled to job restoration on May 20, 2008 when he produced releases from the physicians who treated him for the back pain that caused him to miss work on the preceding two work days and led Defendant to place him on FMLA leave. Defendant's disagreement with restoring Mr. James to work based on the medical releases he provided, *see* (Walker Dep. at 26:8-12), was insufficient to deny him restoration. Defendant, if it had

---

[16] Further, even if Defendant had been permitted to place Mr. James on FMLA leave because of his seizure condition, it was required to reinstate him when his treating provider released him to work. Dr. Moots originally released Mr. James to work on March 12, 2008. Dr. Moots also indicated in the letters he submitted in August 2008 that Mr. James could work safely.

legitimate questions about Mr. James's ability to perform his duties, was required to restore him to work then seek clarification from his treating providers regarding any restrictions his back treatment might have required.[17] *Clark*, 2997 WL 2462654, at * 7 at n.3; 29 C.F.R. § 825.312(b). Instead, Defendant simply refused to let Mr. James return to work in violation of the FMLA.[18]

### 2. Defendant Also Violated The FMLA By Refusing Restoration Based On His Previous Seizure

Defendant's further refusal to restore Mr. James because of his January 31, 2008 seizure violated the FMLA both because Mr. James had been released to work by the physician who treated him and because it was not allowed to look into that condition. Defendant was entitled to fitness-for-duty certification "only with regard to the particular health condition that caused [his] need for FMLA leave." *Hoge*, 384 F.3d at 246 *quoting* 29 C.F.R. § 825.310(c).

Not only did Defendant reject the fitness-for-duty certifications Mr. James provided from Prime Care and Dr. Nelson but it also required him to report to Occunet for a pre-employment physical. *See* (James Dep. at 71:22 – 72:20; Walker Dep. at 63:24 – 64:4; Barlow Dep. at 20:1-4, 20:19 – 21:13, & Ex. 3 thereto). If he had been sent for a return-to-work physical, Occunet only would have examined the fitness of Mr. James's back. *See* (Barlow Dep. at 20:16-18). Defendant, however, specifically requested that Occunet perform a pre-employment physical,

---

[17] An employer can require that the certification specifically address the employee's ability to perform the essential functions of the employee's job by providing the employee with a list of the essential functions no later than with the designation notice required by 29 C.F.R. § 825.300(d) and indicating in the designation notice that the certification must address the employee's ability to perform those essential functions. 29 C.F.R. § 825.312(b). Defendant, however, did not provide Mr. James with any listing of the essential functions of his job at any time and, at any rate, did not fill out the designation notice until December 24, 2008, after it contends it had already terminated him.

[18] Assuming *arguendo* that Defendant could have examined Mr. James's seizure history, it had to address any alleged confusion regarding Dr. Moots' statements in his March 12, 2008 medical release or August 2010 letters by contacting Dr. Moots for an explanation. Defendant, as discussed in the text, could not deny job restoration on that basis.

including an extensive medical history revealing his past surgeries and other medical conditions. *See* (James Dep. at 72:15-20, 74:13-20; Walker Dep. at 62:24 – 63:7, 63:24 – 64:4; Barlow Dep. at 20:1-4, 20:19 – 21:19, & Ex. 2 thereto).

Defendant was aware at least by June 2, 2008 that Occunet was considering Mr. James's seizure history in its review of his ability to return to work after his back treatment but did nothing to limit its review to Mr. James's back. *See* (Walker Dep. at 35:15-20 & Ex. 2 thereto; Barlow Dep. at 21:9-13). Although Defendant knew that Dr. Moots had released Mr. James to work on March 12, 2008 after treating his seizure, it chose not to restore him to work after his May 2008 back pain solely because of his previous seizure. *See* (Dft's Resp. to Pltf's 1st Ints. at 9 ¶ 19; Walker Dep. at 41:5-12, 47:9-11, 49:25 – 50:12, & Ex. 9 thereto).

Defendant was not permitted to consider Mr. James's January 2008 seizure as a cause for FMLA leave in May 2008. *See Hoge*, 384 F.3d at 246 *quoting* 29 C.F.R. § 825.310(c). Mr. James's absences from work in May 2008 had nothing to do with seizures, which had not impacted his work since he returned to work in March 2008. *See* (James Dep. at 177:15 – 178:10, 179:6-25).

Defendant was aware that Dr. Moots released Mr. James to return to work on March 12, 2008. *See* (Walker Dep. at 19:21-24, 20:8-11, 21:3-6). Employers cannot require second or third opinions on a fitness-for-duty certification. 29 C.F.R. § 825.312(b). Defendant was required to seek clarification from Dr. Moots when he certified Mr. James as eligible to work if it worried that Mr. James had some medical restrictions. *Id.* It did not do so and Mr. James worked without incident for more than two months before his unrelated back pain led to his

placement on FMLA leave. Dr. Barlow's later disagreement with Dr. Moots' releases is immaterial because the treating physician's opinion is the only one with legal significance.[19]

It is immaterial that Dr. Barlow disagreed with Dr. Moots' conclusion in August 2008 that Mr. James was safe to work despite his seizure history. Most basically, this is because Mr. James could not have been placed on FMLA leave because of any seizure condition. As discussed *supra* at 13-19, Mr. James was only required to be certified as fit to work with respect to his back condition.[20] *Hoge*, 384 F.3d at 246 *quoting* 29 C.F.R. 825.310(c). Mr. James provided proof that his back was fit to work on May 20, 2008 when he returned to work after his treatment. He also passed physical examinations of his back from both Occunet and Rehab Associates after he had been placed on involuntary FMLA leave. *See* (Dft's Resp. to Pltf's 1st Ints. at 6-7 ¶ 13; Harper Dep. at 99:18 – 100:22; Walker Dep. at 36:22 – 37:9, 39:4-13, & Exs. 3-4 thereto).

Defendant violated the FMLA by even sending Mr. James to Occunet. The FMLA regulations are clear that an employee must be reinstated upon a simple statement of fitness for duty from the employee's treating physician.[21] 29 C.F.R. § 825.310(c). As such, an employer cannot require an employee whose own physician has certified him as fit to work to submit to a

---

[19] This prohibition is contrasted to the procedure for an employee seeking to be placed on FMLA leave. Employers in that scenario are permitted to require second or third opinions from physicians they do not regularly employ before allowing the employee to take FMLA leave. *See* 29 C.F.R. 825.307(b) – (c).

[20] Indeed, even the regulation Defendant quotes in claiming that it could broadly examine Mr. James's entire medical history before allowing him to return from FMLA leave refutes the proposition by noting that only the condition causing the leave may be examined. *See* (Dft's Mem. at 26-27) *quoting* 29 U.S.C. § 825.312(h) (stating employer can require laborer with back problem to see orthopedist but could not require submission to HIV testing unrelated to employee's job). Mr. James's seizure history was unrelated to his job because it was controlled by medicine in the same way an employee who might have been exposed to HIV is not impacted by the potential for having the disease unless the employee is cut, at which point the potential for spreading the disease is no longer controlled by the skin.

[21] Defendant's argument that it can conduct a direct threat assessment after an employee returns to work is misplaced. It first had to reinstate Mr. James to work. Then, if it had safety concerns, Defendant was required to follow up with the doctors who treated his back condition and to limit any direct threat assessment to his back condition, which Defendant acknowledges did not constitute a threat in the workplace or limit his ability to work.

return-to-work physical by the company doctor prior to allowing the employee to return to work. *Jordan v. Beltway Rail Co. of Chicago*, No. 06 C 6024, 2009 WL 537053, at * 6 (N.D. Ill. Mar. 4, 2009); *Baumgarden v. Challenge Unlimited, Inc.*, No. 04-CV-568-WDS, 2005 WL 3164227, at * 3 (S.D. Ill. Nov. 28, 2005); *see also Brumbalough*, 427 F.3d at 1004 (Sixth Circuit stating "we hold that once an employee submits a statement from her health care provider which indicates that she may return to work, the employer's duty to reinstate her has been triggered under the FMLA.").

Dr. Moots was the treating physician for Mr. James's seizure. *See* (Barlow Dep. at 25:12-17). He had released Mr. James to work in March 2008 and, when requested by Occunet, did so again on August 4 and August 30, 2008. Defendant cannot escape its obligation to restore him to work months later by having Dr. Barlow, who did not treat Mr. James for his seizure or any other medical condition, *see* (Barlow Dep. at 24:2-6, 35:10-18), review and disapprove the treating physician's certification.

### 3. <u>Mr. James's FMLA Leave Did Not Expire Before His Return To Work</u>

Since his seizure history was wholly irrelevant, Defendant cannot escape liability by claiming Mr. James did not return to work at the end of a twelve-week period after his leave began. He was ready and able to work and had provided medical releases from the doctors who treated his back pain in May 2008. The Sixth Circuit has held that an employer is estopped from denying restoration to an employee who was able to return to work by the latest date the employer said his FMLA benefit would end. *Wilkerson v. AutoZone, Inc.*, 152 Fed. Appx. 444, 449-50 (6th Cir. 2005).

Here, Defendant did not inform Mr. James that he was on FMLA leave until January 2009. Regardless, he had been able and willing to return to work since May 20, 2008, when he

produced medical releases regarding his back treatment. *See* (James Decl. at ¶¶ 9-10). Defendant made his FMLA leave retroactive to May 16. His attempted return four days later was within twelve weeks of the date on which he was placed on FMLA leave.

Mr. James did not, as Defendant suggests, seek more than twelve weeks of FMLA leave. He had not taken any FMLA leave prior to May 16, 2008 and he did not intend to take such leave at that time. Regardless, Mr. James was ready, willing, and able to work on May 20, 2008 and, having been certified as such by the doctors who treated his back pain, was entitled to reinstatement to his job. Defendant's failure to reinstate him violated the FMLA.

## III. MR. JAMES'S SOCIAL SECURITY APPLICATION IS IRRELEVANT TO THIS MATTER

The Court should reject Defendant's contention that Mr. James's application for Social Security disability benefits estops him from proceeding with this matter. Defendant did not rely on those documents or any statements in them in refusing to reinstate Mr. James to his job two years earlier as required by the FMLA. Moreover, despite the date the agency placed on his initial application, the details of his application documents are consistent with Mr. James's assertion that he was, in fact, never unable to work and only sought benefits as of August 31, 2010 when no one would hire him because of his medical history. The United States Supreme Court has held that an application for Social Security benefits does not automatically defeat an ADA claim, but the plaintiff must explain the apparent inconsistency between the two proceedings. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805, 807, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999).

**A. Social Security Information Is Only Relevant When It Creates An Inconsistency With a Claim in Litigation**

Mr. James's disability application is not relevant in, much less a bar to, this matter because none of his statements in that proceeding contradict his claims in this litigation. In *Cleveland*, the Supreme Court reversed lower court decisions dismissing an ADA case simply because the plaintiff had applied for and received Social Security disability benefits. The Supreme Court concluded the Social Security disability scheme and the ADA scheme are separate and distinct. 526 U.S. at 801-05. Therefore, receipt of Social Security benefits does not create any presumption (conclusive or rebuttable) with respect to a parallel ADA claim. *Id.* at 805. The Supreme Court, however, noted that an employee must explain apparent contradictions between an application for Social Security benefits and the elements of an ADA claim. *Id.* at 807.

When an inconsistency exists between a claim in litigation and the plaintiff's disability application, courts may dismiss the claim if the plaintiff does not offer sufficient explanation for the contradiction. *See, e.g., Winters v. Crittenden County Bd. of Educ.*, No. 5:04CV-144-R, 2006 WL 228918, at * 3 (W.D. Ky. Jan. 24, 2006) *quoting Cleveland*, 526 U.S. at 806 ("[A] plaintiff's sworn assertion in an application for disability benefits that she is, for example, 'unable to work' will appear to negate an essential element of her ADA case – *at least if she does not offer a sufficient explanation*.") (emphasis added). Thus, this Court dismissed the claim in *Winters* because the plaintiff stated in her deposition that she was permanently and totally disabled with no explanation of how she was able to perform her job in light of that status. 2006 WL 228918, at * 3; *see also, e.g., Conners v. SpectraSite Comms., Inc.*, 465 F.Supp.2d 834, 857 (S.D. Ohio 2006) (dismissing claim where, "[w]hile an individual's status as disabled for the purpose of obtaining social security disability benefits is not dispositive as to the individual's status as a

'qualified employee' under the ADA," the employee admitted he could not have performed any work for defendant).

**B. <u>No Inconsistency Exists With This Matter</u>**

Unlike the plaintiff in *Winters*, no inconsistency exists between Mr. James's claims in this lawsuit and his application for disability benefits. Both the events before Mr. James filed his application and the application itself demonstrate that Mr. James was able to work. Most obviously, Mr. James did everything he was directed to do during 2008 in hopes of satisfying Dr. Barlow and being reinstated to his job. He obtained letters from Dr. Moots, successfully completed a physical examination of his back, and stayed in contact with both Occunet and Defendant. Mr. James believed, as Dr. Moots stated in his letters, that he was able to work for Defendant.

Then, after being orally notified of his termination by Defendant in December 2008, Mr. James testified that he did not apply for Social Security benefits until August 2010. *See* (James Dep. at 170:20-25). The Application Summary he received when he requested a copy of his application indicates he applied on August 31, 2010. *See* (Ex. A, JJ000374). Thus, the application did not exist in May 2008 when Defendant refused to reinstate Mr. James to his job or for nearly two years after January 2009, when Defendant formally terminated him based on its refusal to reinstate him to his job. Indeed, Defendant admits it relied solely on Dr. Barlow's opinions and its own judgment as to the hazards and dangers of Mr. James's job. *See* (Harper Dep. at 81:13 – 82:1, 83:17 – 84:5, & 85:2-22, 90:6 – 91:5; Dft's Resp. to Pltf's Req. for Adms. at 1 ¶ 1).

Further, once Mr. James applied for disability benefits in August 2010, more than two years after Defendant first refused to reinstate him to his job, he continued seeking work. He

only filed for benefits because potential employers seemed to see him as disabled after he described the reason he did not return to work for Defendant. *See* (James Dep. at 172:8 – 173:21).

Most importantly, the application documents themselves are not inconsistent with Mr. James's claims in this matter. In the disability application interview, Mr. James stated May 15, 2008 was the last date he had worked for Defendant, which was his last regular employment. *See* (James 2d Decl. ¶ 4). For whatever reason, the Social Security Administration listed that date as the date of his disabling condition on the Application Summary it provided pursuant to his request for a copy of his application. *See* (Ex. A). The associated application documents, however, demonstrate this was an error by the agency.

In the Disability Report – Adult, Mr. James indicated that he stopped working on May 15, 2008 "[b]ecause of [his] condition(s)." Yet, in response to the question "Did your condition(s) cause you to make changes in your work activity? (for example: job duties, hours or rate of pay)," he responded "No." *See* (Dft's Mem. Ex. L at 2, 4.C – 4.D). That was because he was capable of working if he had not been terminated "[b]ecause of [his] condition(s)."[22]

Further, in his Work History Report, Mr. James indicated that he worked for "MVP Interprise" [sic] during June and July of 2008 – after the May 15, 2008 date the agency listed as his disability onset date. Additionally, Mr. James continuously applied for work after Defendant terminated him. Aside from the MVP job, he actually worked for Dippin' Dots in March 2011,

---

[22] His statement in his Function Report – Adult that he "can't operate heavy machinary [sic], driving is questionable," *see* (Dft's Mem. Ex. O at 2), is not inconsistent. He cannot operate heavy machinery since Defendant terminated him and others were unwilling to give him a chance because of his medical history. Driving is questionable as demonstrated by Defendant raising the wisdom of his driving in this matter even though Dr. Moots released Mr. James to work without restrictions.

*see* (Pltf's 3d Supp Resp. to Dft's Ints. at 2-3 ¶ 9),[23] and he presently works for Home Depot. *See* (Pltf's 4th Supp. Resp. to Dft's Ints. at 2-3 ¶ 9).[24]

Mr. James never felt he was disabled and unable to work.[25] When he was unable to secure new work after describing the circumstances of his termination by Defendant, though, he applied for disability benefits out of desperation. *See* (James Dep. at 172:8 – 173:21). He never, however, intended to represent that he unable to work while he was trying to return to work for Defendant. Dr. Amble acknowledged that Mr. James only described his condition as it existed in late 2010 and never claimed to have been disabled in 2008. *See* (Amble Dep. at 39:19 – 40:14, 41:22-25, 42:6 – 43:10). Accordingly, once Mr. James received a copy of the Application Summary and discovered the May 15, 2008 date had been listed as the date of his disability contrary to his intention, he immediately filed documentation to change the disability onset date to August 31, 2010, the date of his application and the date he had always intended to be listed as his disability date. *See* (James 2d Decl. ¶¶ 4 - 10).

The Social Security documents are irrelevant because Defendant did not rely on them and they do not create any inconsistency with Mr. James's claim to have been able to return to work for Defendant in May 2008. Mr. James has always maintained that he was ready and able to return to work for Defendant as of May 20, 2008. As such, his disability benefits application is no bar to his claims in this matter. Therefore, the Court should deny Defendant's Motion for

---

[23] Attached as Ex. B. This document was mistakenly denominated as Plaintiff's "Second" Supplemental Response.

[24] Attached as Ex. C.

[25] It is also significant that Mr. James's disability application was based on anxiety attacks and migraines, not on seizures. *See* (James Dep. at 171:15-17). Thus, on his "Questionnaire for Epilepsy, Headaches And/Or Similar Disorders," Mr. James stated that his first seizure occurred on January 31, 2008 and that his "last spell" was the same date. At the same time, he noted he had suffered headaches since 2005 that had become "daily" and that he had begun having anxiety attacks in August 2010. *See* (Ex. D at 1 ¶ 1); *see also* (Dft's Mem. Ex. N, "Pain and Daily Activities Questionnaire," at 1 – 3) (discussing anxiety and headaches only).

Summary Judgment. The Court should, instead, grant summary judgment for Mr. James for the reasons set out herein and in Mr. James's Renewed Motion for Summary Judgment.

## CONCLUSION

For these reasons, the Court should deny Defendant's Motion for Summary Judgment and should, instead, grant summary judgment for Mr. James.

Respectfully submitted,

s/ D. Wes Sullenger____________________
D. Wes Sullenger, KY BAR # 91861
TN BPR # 021714

Sullenger Law Office, PLLC
1324 Jefferson Street
Paducah, KY 42001
Voice: (270) 443-9401
Fax: (270) 443-3624

wes@sullengerfirm.com

*Attorney for the Plaintiff,*
*Josh James*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of May, 2011, a copy of the foregoing was filed via the Court's CM/ECF system, which will send a notice of electronic filing to:

David L. Kelly
Denton & Keuler, LLP
P.O. Box 929
Paducah, KY 42002-0929

s/ D. Wes Sullenger