UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:09-CV-177

JOSH JAMES                                                                             PLAINTIFF

v.

JAMES MARINE, INC.                                               DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Plaintiff's Second Motion for Summary Judgment (Docket #29) and Defendant's Motion for Summary Judgment (Docket #32). Plaintiff has responded and replied (Docket #34, 35). Defendant has responded and replied (Docket #33, 36). This matter is now ripe for adjudication. For the following reasons, Plaintiff's motion is DENIED, and Defendant's motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Plaintiff Josh James began working for Defendant James Marine, Inc. ("James Marine"), on August 4, 2004, as a welder trainee. He was promoted to a welder position in which he welded on barges or docks located on the water. Eventually, Plaintiff also learned to operate Bobcats, forklifts, cherry pickers, and cranes. He was trained in fitting, which is different from welding and requires the use of a cutting torch. He occasionally worked as a deckhand.

In the summer of 2005, Plaintiff began suffering from migraine headaches. In November of 2006, Plaintiff learned that he had a malignant brain tumor. His doctor required him to take off work from November 20, 2006, to February 27, 2007. Most of the brain tumor was removed on December 20, 2006, and Plaintiff has not been required to undergo radiation therapy. After Plaintiff returned to work in February, he resumed his normal work responsibilities. He continues to suffer migraine headaches, although his doctors are unsure if his migraines are

linked to his tumor.

On January 31, 2008, Plaintiff suffered a seizure while at work. At the time, he was standing on the dock at the end of the day, getting ready to clock out. Plaintiff lost consciousness. Prior to that time, Plaintiff had never had a seizure before and there was no indication that he was going to suffer a seizure. An ambulance was called and Plaintiff was transported to the hospital. After being notified by James Marine that he needed a release from his doctor to return to work, Plaintiff visited Dr. Paul Moots, a neuro-oncologist, in Nashville, Tennessee. Plaintiff told Dr. Moots about his job and his responsibilities, although he did not give him a written job description. Dr. Moots informed Plaintiff that he needed to take time off work. Plaintiff was off work without pay for approximately six weeks. He obtained short-term disability payments through an insurance policy at work.

Dr. Moots permitted Plaintiff to return to work on March 12, 2008, without any restrictions, other than that he could not drive for six months from the date of the seizure. Dr. Moots also noted that Plaintiff could work around water. On March 12, 2008, Plaintiff took his work release to the yard superintendent, Roy Mannon, and resumed working. He was moved to the Fab Shop because Mr. Mannon felt it wasn't safe for Plaintiff to work on the dock close to water all the time.

> I was placed in the fab shop up on the hill. The same basic duties, welding. This was new metal instead of old rusty barges, so it was a little bit better work, actually. Welding, cutting with the cutting torch, using the big metal press that they have up there on the hill in the fab shop, bending metal for corners for barges or towboats.

James Depo., DN 29-1, p. 54-55. Plaintiff continued to operate equipment including a cherry picker, overhead crane, forklift, and Bobcat. He would ride along as a passenger to deliver

products and accompanied the foreman of the Fab Shop to the yard to learn more about making templates. He would have to go onto the dock for this, but never onto a barge. He was always accompanied by his foreman.

Plaintiff continued to work in the Fab Shop until May 15, 2008. During his shift that day, he began to feel intense pain in his back. The following day, a Friday, his back was still hurting so he went to see a doctor at Prime Care. On Saturday, he went to the emergency room for his back pain. There he was given a steroid injection and a pain shot and sent home. On Monday, he made an appointment with his regular doctor, Dr. Nelson, who gave him ten to twelve trigger point injections in his back. On Tuesday, Plaintiff returned to work with notes from his doctor at Prime Care and Dr. Nelson. He was told by Tom Freeman, the company's safety director, that he would have to complete a physical with Occunet before he could return to work.

At Occunet, a nurse practitioner examined Plaintiff's back by checking for a hernia and pushing on his back in different places. Plaintiff was also required to complete forms about his previous medical history. On these forms, he disclosed his prior brain surgery and seizure. A few days later, Plaintiff stopped in at Occunet to check when he would be able to return to work and the receptionist informed him that he needed to provide all of his medical history concerning the treatment of his cancer and seizure. Plaintiff provided his medical records to Occunet and was later informed by the receptionist that he would not be released to return to work until he could be certified as seizure-free for six months. This edict came from Dr. Ron Barlow, although Plaintiff never met with him.

Plaintiff called Dr. Moots in Nashville and asked him to provide a letter saying that he

3

had been seizure-free for six months. Dr. Moots's letter, dated August 4, 2008, indicated:

> Mr. Joshua James is followed at Vanderbilt University Medical Center for a low grade brain tumor. Serial MRI scans have shown that the tumor is not active. He has had generalized or major seizures on rare occasion, and none since January 2008. He is on keppra and is compliant with that.
>
> He has had two or three events over the last six months in which he had brief trouble speaking or numbness on the right side. It is uncertain whether these are partial seizures, although we did increase the keppra dose because of that possibility. Otherwise he is doing very well and feels able to work full time. I agree, but feel that close monitoring for additional seizures is important. We will be seeing him every 4 months in followup.

Dr. Moots Aug. 4, 2008, Letter, DN 29-2, p. 14. Keppra is an anti-convulsant drug that Plaintiff had been taking since early February. Plaintiff asserts that the two events he experienced involving numbness and trouble speaking were what he believed to be panic or anxiety attacks. Plaintiff had been previously treated for anxiety after he was diagnosed with a brain tumor. On August 30, 2008, Dr. Moots wrote an additional letter regarding Plaintiff's condition:

> Mr. James is followed for a glioma that is stable. He has had seizures for which he is on keppra and very compliant. However, in the last six months he has not had any generalized seizures and only had two brief events that are suspected to have been minor partial seizures without generalization. We follow him closely and as long as he is compliant with his medications and follow-up I think he is safe to work. Please contact me with any additional questions.

Dr. Moots Aug. 30, 2008, Letter, DN 29-2, p. 15. Plaintiff was advised by the receptionist at Occunet that Dr. Barlow did not believe these letters offered certification that Plaintiff had been seizure-free for six months.

Plaintiff testified that he tried to contact Chad Walker, human resources director at that time, or Tom Freeman but they were never in the office and would not return his phone calls. He did not take his doctor's notes to James Marine because it was Occunet who had requested them. He remained in contact with his supervisors, however, and kept them updated on his situation.

4

He obtained unemployment benefits during this time. He believed his employment status was "in limbo." "I didn't know what was going on, didn't have a clue, I thought that I was still employed, but I didn't understand why I hadn't gone back to work yet." James Depo., DN 29-2, p. 92.

On December 24, 2008, Plaintiff called James Marine to inquire about whether he would be receiving a Christmas bonus, since he had received one when he was on medical leave previously. He spoke with Chad Walker, who informed Plaintiff he had been terminated earlier that year. He received a termination letter dated January 14, 2009, which stated:

> This letter is a follow-up on the Company's previous communication with you at the outset of your request for medical leave. As you know, under the federal Family and Medical Leave Act (FMLA), the extent of medical leave is 12 work weeks, whether taken in one (1) continuous block of time or intermittently over a more extended period.
>
> Our records indicate that your first date of FMLA was taken on 5/16/08. Thus, your leave period concluded on 8/7/2008 and your employment has been terminated effective on that date due to you being unable to return to work and the exhaustion of your FMLA.

James Marine Jan. 14, 2009, Letter, DN 32-11, p. 1. The letter was sent by human resources director Jill C. Harper. Plaintiff did not have any further discussions with James Marine about his termination.

Plaintiff filed suit in this Court on October 13, 2009. His Complaint asserts three claims for relief: (I) Interference with Plaintiff's Rights Under the Family and Medical Leave Act; (II) Violation of the Americans with Disabilities Act; and (III) Disability Discrimination in Violation of the Kentucky Civil Rights Act. This matter is currently set for trial on August 29, 2011. The parties have filed cross-motions for summary judgment, which the Court now considers.

**STANDARD**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

Plaintiff essentially asserts four bases for liability under the ADA[1] and FMLA. Plaintiff's first argument is that Defendant violated the ADA by moving him from his former job to a job in the Fab Shop after he suffered a seizure in January of 2008. Next, Plaintiff argues that

---

[1]Plaintiff also asserts a claim under the Kentucky Civil Rights Act. This Act is modeled after federal law and is interpreted consistently with the ADA. *See Howard Baer, Inc. v. Schave*, 127 S.W.2d 589, 592 (Ky. 2003).

Defendant violated the ADA by forcing him to submit to a pre-employment medical evaluation rather than a fitness-for-duty examination after his back injury. Plaintiff's first FMLA claim argues that Defendant interfered with Plaintiff's right to reinstatement under the FMLA by refusing to let him return to work despite his doctors' releases. Finally, Plaintiff believes Defendant violated the FMLA by failing to comply with the Act's notice requirements. The Court addresses each of these claims separately.

I.   **Americans with Disabilities Act**

   *A.   Reassignment*

Plaintiff's first argument focuses on the time period after he had a seizure at work but before he began experiencing back pain and was sent for a medical evaluation. Plaintiff asserts that Defendant violated the ADA by reassigning Plaintiff to the Fab Shop after he had a seizure and returned to work, despite the fact that his doctor provided a work release. "To make out a prima facie case of discrimination under the ADA, a plaintiff must show '(1) that she or he is an individual with a disability, (2) who was otherwise qualified to perform a job's requirements, with or without reasonable accommodation; and (3) who was discriminated against solely because of the disability.'" *Spees v. James Marine, Inc.*, 617 F.3d 380, 395-96 (6th Cir. 2010). Plaintiff acknowledges that he was not disabled at the time Defendant reassigned him to work in the Fab Shop. A person may be considered disabled under the ADA, however, if they are "regarded as having such an impairment." 42 U.S.C. § 12102(2)(C).

The regarded-as-disabled provision applies when "'(1) an employer mistakenly believes that an employee has a physical impairment that substantially limits one or more major life activities, or (2) an employer mistakenly believes that an actual, nonlimiting impairment

7

substantially limits one or more of an employee's major life activities.'" *Spees*, 617 F.3d at 396 (quoting *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008) (brackets and citations omitted)). "In both cases, it is necessary that a covered entity entertain misperceptions about the individual . . . ." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). Plaintiff asserts that his seizure, coupled with his history of migraine headaches, qualifies as an "actual, nonlimiting impairment." *See Rosteutcher v. MidMichigan Physicians Group*, 332 F. Supp. 2d 1049, 1060 (E.D. Mich. 2004).

Defendant argues that Plaintiff cannot establish that he was regarded as substantially limited in the major life activity of working. As noted by the Supreme Court, the Equal Employment Opportunity Commission defines "substantially limited" in this context as being "'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'" *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 523 (1999) (quoting 29 C.F.R. § 1630.2(j)(3)(i) (1998)). "Thus, to be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job." *Id.* Plaintiff alleges that Defendant believed he was unable to perform a wide variety of jobs, including all jobs that involved being around water. "This meant Mr. James could not weld on any vessel on the water, could not operate a crane, and could not even assist with installing the metal he fabricated in the Fab Shop onto a vessel." Pl.'s Mem., DN 29-13, p. 16. Defendant counters that Plaintiff performed the same basic duties as a worker in the Fab Shop as he did prior to his reassignment and he was only prevented from welding on barges in the ship yard.

Plaintiff testified that after he was moved to the Fab Shop, he continued welding,

although on new metal rather than old barges. He asserts that welding older metal is more challenging. In addition, Plaintiff used the cutting torch and the metal press for bending metal in the Fab Shop. He continued to operate equipment, such as a cherry picker, overhead crane, forklift, and Bobcat. He could no longer install newly-fabricated metal onto barges, work as a fitter, or operate cranes near the water.

The Court finds that Plaintiff was not regarded as substantially disabled by Defendant, and no genuine issue of material fact remains. Plaintiff performed essentially the same duties in the Fab Shop as he performed prior to his reassignment. He continued to weld and operate machinery. The restriction that prevented him from working near water did not preclude him from working in a "class of jobs" or "broad range of jobs in various classes." *Contra Spees*, 617 F.3d at 398 (where the plaintiff was prevented from welding in any capacity and restricted to light-duty work, she was precluded from working in a "class of jobs").

> If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Sutton*, 527 U.S. at 492. Defendant's reassignment of Plaintiff still permitted Plaintiff to use many of the skills he developed during his time at James Marine. In addition, Plaintiff could work a wide range of jobs, so long as he was not located near water. Furthermore, the Fifth Circuit has noted that a restriction prohibiting an employee from working near water only excludes the employee "from a narrow category of jobs and [does] not render him unable to work." *Webster v. Texas Eng'g Extension Serv.*, 204 F.3d 1115, 1999 WL 1328093, at *3 (5th Cir. 1999). Accordingly, Plaintiff has not established that he was regarded as disabled, and he does not meet the definition of disabled. Because Plaintiff cannot establish that he meets this

9

definition, his ADA discrimination claim fails, and summary judgment is granted in favor of Defendant.

  B.  *Medical Evaluation*

Plaintiff's next claim alleges that Defendant violated the ADA by requiring him to submit to a medical examination. Under the ADA's provisions governing medical examinations and inquiries,

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A). This provision applies to disabled and nondisabled employees alike. *See Lee v. City of Columbus, Ohio*, 636 F.3d 245, 252 (6th Cir. 2011) ("A plaintiff need not prove that he or she has a disability in order to contest an allegedly improper medical inquiry under 42 U.S.C. § 12112(d).").

> An employer's request for a medical examination is job-related and consistent with business necessity when: (1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others.

*Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 379 (6th Cir. 2007).

There is no evidence that Plaintiff requested an accommodation after he injured his back. Thus, Defendant must demonstrate either that Plaintiff's ability to perform essential job functions was impaired or that Plaintiff posed a direct threat. "[F]or an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Sullivan v. River Valley School Dist.*, 197 F.3d 804, 811 (6th Cir. 1999). The employer is restricted to

determining whether an employee can perform "the essential functions of the job."  *Id.* at 811-12.  "'A job function is essential if its removal would fundamentally alter the position.'"  *Denman*, 266 F. App'x at 380.

The ADA defines "direct threat" as a "'significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.'"  *E.E.O.C. v. Prevo's Family Market, Inc.*, 135 F.3d 1089, 1095 (6th Cir. 1998) (quoting 42 U.S.C. § 12111(3)).  In considering whether an employee poses a direct threat, the Court should consider such factors as: "(1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm."  *Id.* (quoting 29 C.F.R. § 1630.2(r) (1996)).

In this case, Plaintiff had worked in the Fab Shop for approximately two months following his seizure.  He then experienced back pain and had to take two days off work to seek treatment.  He returned to work with notes from his doctors stating he could return to his normal job duties.  Defendant would not let Plaintiff return to work, however, until he submitted to a medical examination at Occunet.  Defendant's safety director, Tom Freeman, was concerned about letting Plaintiff return to work after having a large number of pain shots for the injury to his back.  As noted by the human resources director at the time, Chad Walker, "[w]e sent him to make sure that he could work so that his back – that he wouldn't injure himself because of his back."  Walker Depo., DN 29-5, p. 29.  Occunet was not informed that Plaintiff had a seizure in January of that year.

The Court finds that a genuine issue of material fact exists as to whether sending Plaintiff for a medical examination was job-related and consistent with business necessity.  Plaintiff

11

presented two notes from his doctors indicating that he could return to work. At the same time, Plaintiff acknowledged that he received several shots in his back for pain. Thus, there is a question as to whether it was reasonable for Defendant to believe that Plaintiff's ability to perform essential job functions was impaired or that he posed a direct threat because of his back injury.

Even if Defendant's purpose for requiring Plaintiff to submit to a medical examination was job-related and consistent with business necessity, Plaintiff asserts that the examination required by Defendant was too broad and is only permissible for post-offer pre-employment applicants. *See Farmiloe v. Ford Motor Co.*, 277 F. Supp. 2d 778, 782 (N.D. Ohio. 2002). Chad Walker testified that Occunet was directed to perform a return-to-work physical, which Walker considered to be the same as a "preemployment" test which includes a physical and medical history.[2] Occunet's forms indicate that Plaintiff was given a "preplacement" test. Plaintiff testified that he called Chad Walker and asked why he had to submit to a preemployment physical instead of a return-to-work physical, "and he told me, 'That's just the way it is.'" Pl.'s Depo., DN 29-1, p. 68. Plaintiff was required to fill out forms as to his previous medical history, including questions about previous surgeries and health issues like cancer or diabetes. Defendant acknowledges that Plaintiff's seizure history was revealed to Occunet in this health questionnaire. *See* Def.'s Resp. to Pl.'s First Set of Interrog., DN 29-3, p. 3. After filling out these forms, Occunet informed Plaintiff that "they needed to see all of my medical history from every doctor that had treated me during the course of the cancer or the tumor and the seizure."

---

[2]Walker testified, "This was the first one of its kind, so I told Pam that we would do the same thing that they did normally for a preemployment test, physical, medical history, and the work-specific stuff that – tests at Rehab Associates." Walker Depo., DN 29-5, p. 63-64.

Pl.'s Depo., DN 29-1, p. 75.

Dr. Barlow acknowledges in his deposition testimony that Defendant asked Occunet to perform a preplacement exam, which is broader in scope than a return to work exam.[3] "On a return to work, you would concentrate more on a body part that was injured or deficit." Dr. Barlow Depo., DN 37-4, p. 20. Dr. Barlow further admits that Occunet was never told to only examine Plaintiff's back to see if he could perform his job. Instead, Occunet asked for a past medical history which then revealed Plaintiff's history of a brain tumor and a seizure. Dr. Barlow did not let Plaintiff return to work because of his seizure history, although his back was fine.

A fitness-for-duty examination permitted under 42 U.S.C. § 12112(d)(4)(A) "is not an excuse for every wide-ranging assessment of mental or physical debilitation that could conceivably affect the quality of an employee's job performance." *Sullivan*, 197 F.3d at 812.

---

[3]Specifically, Dr. Barlow testified as follows:

A: We would do within the scope of what the company wanted. A lot of preemployments would include laboratory examination, pulmonary function test. If that's what they want, yes; but it looks like what James Marine wanted here was just a hands-on exam, assessment of capability.

Q: Okay. So look at all the body systems to see if he could do the job?

A: Right.

Q: All right. You or to your knowledge, the staff was never told that it was only necessary to look at his back and determine whether physically his back was up to the job?

A: No.

Dr. Barlow Depo., DN 29-4, p. 20-21.

"The EEOC's stated position on the scope of medical inquiry is that an employer may not request an employee's complete medical records under the disguise of job-relatedness and business necessity." *Farmiloe*, 277 F. Supp. 2d at 782-83 (discussing EEOC Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act, Question 13 (July 27, 2000)).

The Court finds that there is no genuine issue of material fact that Plaintiff was required to undergo a employment entrance examination instead of a return-to-work, or fitness-for-duty, exam. *See Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1273 (9th Cir. 1998) (noting the differences between preemployment exams, employment entrance exams, and employee exams). Employment entrance exams are not limited in scope by the ADA. *Id.* Such was the case here. Plaintiff was required to submit his past medical history, which clearly inquired into the nature and severity of any disabilities. This type of examination was a general inquiry into Plaintiff's health and was not limited to Plaintiff's back injury (or even his back injury and seizures). The ADA prohibits these types of general medical inquiries or examinations for *employees*, and there is no dispute that Plaintiff was employed by Defendant at the time. Thus, by failing to limit the scope of the medical examination, Defendant violated the ADA's medical inquiries and examinations provisions.

In order to prevail on this claim, however, Plaintiff must still establish that he suffered "'some cognizable injury in fact of which the violation is a legal and proximate cause . . . .'" *Indergard v. Georgia-Pacific Corp.*, 582 F.3d 1049, 1060 (9th Cir. 2009) (quoting *Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 562 (5th Cir. 1998)). The Court believes this matter is best left to the determination of the jury. For this reason, summary judgment is denied.

## II.     Family and Medical Leave Act

Plaintiff also seeks recovery under the Family and Medical Leave Act ("FMLA"). "The FMLA entitles a qualifying employee to take leave if the employee has a serious health condition rendering the employee unable to perform essential job duties." *Farhner v. United Transp. Union Discipline Income Prot. Prog.*, — F.3d —, No. 09-4431, 2011 WL 1641551, at *5 (6th Cir. May 3, 2011) (citing *Culpepper v. BlueCross BlueShield of TN, Inc.*, 321 F. App'x 491, 495 (6th Cir. 2009)); 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves – (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). An eligible employee may take up to twelve weeks of leave per year under the FMLA. *Branham v. Gannett Satellite Info. Network, Inc.*, 619 F.3d 563, 568 (6th Cir. 2010).

Under the FMLA, an employee has a private right of action under two theories: "the 'interference' or 'entitlement' theory, under which employers may not 'interfere with, restrain, or deny the exercise of or the attempt to exercise' FMLA rights" and "the 'retaliation' or 'discrimination' theory, under which employers may not 'discharge or in any other manner discriminate against any individual for opposing any practice made unlawful' by the FMLA . . . ." *Id.* (quoting 29 U.S.C. § 2615(a)(1), (2)); *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004). Plaintiff has sued under the interference or entitlement theory pursuant to 29 U.S.C. § 2615(a)(1).

### A.     Restoration

Plaintiff first argues that Defendant violated the FMLA by interfering with his right to

15

restoration. An employee who takes FMLA leave "shall be entitled, on return from such leave . . . to be restored by the employer to the position of employment held by the employee when the leave commenced . . . ." 29 U.S.C. § 2614(a)(1).

> To prevail on an entitlement claim, an employee must prove that: (1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled.

*Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006) (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)). "[T]he right to restoration does not arise unless the returning employee is able to perform the essential functions of the position or an equivalent." *Hoge*, 384 F.3d at 246. As a matter of law, the Court finds that Plaintiff was an eligible employee who was entitled to take leave and was working for an employer as defined by the FMLA. Thus, only the fourth and fifth elements are in dispute.

Plaintiff argues that Defendant violated his FMLA rights by refusing to reinstate him after he returned to work in May of 2008 with releases from his doctors. This occurred after Plaintiff missed two days of work, May 16 and 19, because of back pain.

> [T]he FMLA permits employers to apply a uniform policy or practice that conditions restoration under § 2614(a) on the receipt of medical certification from the employee's healthcare provider stating that the employee is able to resume work. 29 U.S.C. § 2614(a)(4). Further, an employer may delay restoration until an employee submits the required "fitness-for-duty" certification. 29 C.F.R. §§ 825.310(f), 825.311(c) & 825.312(c). However, the regulations permit an employer to seek such fitness-for-duty certification "only with regard to the particular health condition that caused the employee's need for FMLA leave." 29 C.F.R. § 825.310(c).

*Hoge*, 384 F.3d at 246. On May 20, 2008, Plaintiff produced releases from the doctors who treated him for back pain. These releases stated that Plaintiff could return to work. Instead of

16

reinstating Plaintiff, Defendant sent him to Occunet for a medical examination.

"Once an employee submits a statement from her health care provider which indicates that she may return to work, the employer's duty to reinstate her has been triggered under the FMLA." *Brumbalough v. Camelot Care Centers, Inc.*, 427 F.3d 996, 1004 (6th Cir. 2005). If an employer believes that the doctor's note is insufficient as a "fitness-for-duty certification," the employer should seek clarification from the employee's doctor. *Id.*[4] "No second or third opinions on a fitness-for-duty certification may be required." 29 C.F.R. § 825.312(b); *accord Jordan v. Beltway Rail Co. of Chicago*, No. 06 C 6024, 2009 WL 537053, at *6 (N.D. Ill. Mar. 4, 2009) ("An employer may not require an employee whose own physician has certified him fit to work to submit to a return-to-work physical prior to allowing the employee to return to work."). Moreover, "[a]n employer may seek a fitness-for-duty certification only with regard to the particular health condition that caused the employee's need for FMLA leave." 29 C.F.R. § 825.312(b).

The true point of contention as to this claim is whether Plaintiff was on FMLA leave at the time he returned to work on May 20, 2008. Plaintiff is only entitled to restoration if he was returning from FMLA leave. *See* 29 U.S.C. § 2614(a)(1). Plaintiff missed two days of work and it is unclear whether he notified Defendant he was taking FMLA leave.[5] At the same time,

---

[4]In this case, there is no evidence that Defendant conferred with Plaintiff's doctors.

[5]Plaintiff acknowledges that he called into work on the Friday and Monday that he was absent to tell them he would not be coming in because he was not feeling well. It is unclear, however, whether the information he provided to Defendant was enough to meet the FMLA's employee notice requirements. *See* 29 C.F.R. § 825.303(b) ("An employee shall provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request. . . . Calling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act.").

however, Defendant's own documentation asserts that Plaintiff began taking FMLA leave on May 16, 2008, the date on which Plaintiff was absent for back pain and Defendant had no apparent concerns regarding Plaintiff's seizure history. Thus, a genuine issue of material fact exists as to whether Plaintiff was returning from FMLA leave on May 20, 2008. Accordingly, summary judgment on this claim is denied.

B. *Notice of Rights*

Finally, Plaintiff argues that Defendant should be held liable for failing to notify him of his FMLA leave. An employer is required to provide four types of notice to its employees: general notice, eligibility notice, rights and responsibilities notice, and designation notice. 29 C.F.R. § 825.300(a)-(d). Under the eligibility notice requirement, "when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances." 29 C.F.R. § 825.300(b)(1). Similarly, designation notice requires an employer to designate leave as FMLA-qualifying and report this information to the employee. 29 C.F.R. § 825.300(d)(1). "When the employer has enough information to determine whether the leave is being taken for a FMLA-qualifying reason . . . the employer must notify the employee whether the leave will be designated and will be counted as FMLA leave within five business days absent extenuating circumstances." *Id.* This notice must be in writing. 29 C.F.R. § 825.300(d)(4).

Defendant notes that even if it failed to provide eligibility or designation notice,[6] Plaintiff

---

[6] Defendant acknowledges that it "did not specifically designate [Plaintiff's] time off work beginning in May 2008 as time off under FMLA until after-the-fact." Def.'s Mem. in Support of Mot. for Sum. Judg., DN 32-1, p. 28. "If an employer does not designate leave as

18

cannot prevail on his claim because there was no prejudice. "An employer's failure to comply with the notice requirements of the FMLA only supports a cause of action where 'the inadequate notice effectively interefere[s] with the plaintiff's statutory rights.'" *Fink v. Ohio Health Corp.*, 139 F. App'x 667, 671 (6th Cir. 2005) (quoting *Mion v. Aftermarket Tool & Equip. Group*, 990 F. Supp. 535, 539 (W.D. Mich. 1997)). Defendant argues that Plaintiff still received twelve weeks of leave under the FMLA and thus, Defendant's failure to notify Plaintiff did not interfere with Plaintiff's rights.

Putting aside whether it was proper for Defendant to place Plaintiff on FMLA leave, the Court finds that Defendant's failure to provide notice did not interfere with Plaintiff's FMLA rights. As noted by Defendant, Plaintiff still received the twelve weeks of leave he was entitled to under the FMLA. In addition, his awareness of this exact time period would not have affected his rights, as Defendant still considered him a "direct threat" and unable to return to work long after Plaintiff's twelve week period expired.

> [I]f an employer that was put on notice that an employee needed FMLA leave failed to designate the leave properly, but the employee's own serious health condition prevented him or her from returning to work during that time period regardless of the designation, an employee may not be able to show that the employee suffered harm as a result of the employer's actions.

29 C.F.R. § 825.301(e). Although Plaintiff asserts that he was healthy enough to return to his job and that his seizure history did not constitute a "direct threat," notice of his FMLA leave would not have changed his situation. Accordingly, summary judgment is granted in favor of

---

required by § 825.300, the employer may retroactively designate leave as FMLA leave with appropriate notice to the employee as required by § 825.300 provided that the employer's failure to timely designate leave does not cause harm or injury to the employee." 29 C.F.R. § 825.301(d).

19

Defendant.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiff's Second Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.